UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE RELATED COMPANIES, L.P. and MBM SUPPLY COMPANY LLC, | |
| Plaintiffs, | Civil Action No.  1:17-CV-4175 |
| -against- | |
| | Hon. Jed S. Rakoff |
| CARLETON RUTHLING, TESLA WALLS LLC, HUDSON WALLS LLC, RELATED SUPPLY LTD., JEANEAH PAIK, CHRISTOPHER DU, SKYE HOLDINGS LTD., and SKYE SUPPLY LLC, | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
CARLETON RUTHLING, TESLA WALLS LLC, HUDSON WALLS LLC,
RELATED SUPPLY LTD., AND SKYE HOLDINGS LTD.'S MOTION TO DISMISS**

Dated: July 17, 2107

**BOIES SCHILLER FLEXNER LLP**
Nicholas A. Gravante, Jr.
Luke Nikas
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

Karen C. Dyer
121 South Orange Avenue
Orlando, Florida 32801
(407) 425-7118

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................................... 4

PROCEDURAL HISTORY ................................................................................................................. 8

I.     OTHER ACTIONS ................................................................................................................ 8

II.    HISTORY OF THIS ACTION ................................................................................................. 9

ARGUMENT ................................................................................................................................. 10

III.   PLAINTIFFS' RICO CLAIMS ARE RIPE ............................................................................. 10

IV.   PLAINTIFFS HAVE PLED RICO CLAIMS ADEQUATELY UNDER RULE 9(B). ............................ 13

      A.    *Plaintiffs Have Alleged Predicate Acts With Particularity* ....................................... 13

      B.    *Plaintiffs Have Alleged a Pattern of Racketeering.* ..................................................... 17

      C.    *Plaintiffs Have Adequately Alleged Causation.* ........................................................... 18

      D.    *Plaintiffs Have Alleged a RICO Conspiracy.* .............................................................. 21

V.    PLAINTIFFS HAVE ADEQUATELY PLED THEIR STATE LAW CLAIMS ....................................... 23

      A.    *Plaintiffs Have Properly Pled Common Law Fraud* .................................................... 23

      B.    *Plaintiffs Have Properly Pled Unjust Enrichment* ...................................................... 24

CONCLUSION .............................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*AIU Ins. Co. v. Olmecs Med. Supply, Inc.*,
   No. 04-CV-2934, 2005 WL 3710370  (E.D.N.Y., Feb. 22, 2005) ................................................ 16

*Allied Irish Banks, P.L.C. v. Bank of America N.A.*,
   No 03-CV-3478, 2006 WL 278138 (S.D.N.Y., Feb. 2,   2006).................................................... 20

*Allstate Ins. Co. v. Valley Physical Med. & Rehab., P.C.*,
   No. 05-5934 DRH MLO, 2009 WL 3245388 (E.D.N.Y. Sept. 30, 2009).................................... 19

*Bank of China, New York Branch v. NBM LLC*,
   359 F.3d 171 (2d Cir. 2004)........................................................................................................ 18

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*,
   115 A.D.3d 128 (1st Dep't 2014) .............................................................................................. 19

*Bridge v. Phoenix Bond & Indemnity Co.*,
   553 U.S. 639 (2008)............................................................................................................ 18, 19

*Coraud LLC v. Kidville Franchise Co., LLC*,
   121 F. Supp. 3d 387 (S.D.N.Y. 2015)....................................................................................... 20

*DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*,
   15 N.Y.3d 147 (2010) ................................................................................................................ 20

*De Sole v. Knoedler Gallery, LLC*,
   974 F. Supp. 2d 274 (S.D.N.Y. 2013)....................................................................................... 13

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006)...................................................................................................... 12

*DLJ Mortg. Cap., Inc. v. Kontogiannis*,
   726 F. Supp. 2d 225 (E.D.N.Y. 2010) ...................................................................................... 12

*Eastman Kodak Co. v. Camarata*,
   No. 05 CV 6384L, 2006 WL 3538944 (W.D.N.Y. Dec. 6, 2006)............................................... 17

*GICC Capital Corp. v. Technology Finance Group, Inc.*,
   30 F.3d 289 (2d Cir. 1994)................................................................................................. 10, 11

*Glidepath Holding B.V. v. Spherion Corp.*,
   590 F. Supp. 2d 435 (S.D.N.Y. 2007)....................................................................................... 20

*Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*,
  748 F.2d 729 (2d Cir. 1984) ................................................................................. 19

*Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC*,
  No. 07 Civ. 8139, 2008 WL 3925175 (S.D.N.Y. Aug. 26, 2008) ................................ 12

*Hughes v. BCI Int'l Holdings, Inc.*,
  452 F. Supp. 2d 290 (S.D.N.Y. 2006) ...................................................................... 25

*In re Merrill Lynch P'ships Litig.*,
  143 F.3d 56 (2d Cir. 1998) ................................................................................... 11

*In re Refco, Inc. Securities Litigation*,
  Nos. 07 MDL 1902, 07-CV-8165, 2011 WL 1899758 (S.D.N.Y., May 16, 2011) .......... 10

*In re Sumitomo Copper Litig.*,
  995 F.Supp. 451 (S.D.N.Y.1998) ..................................................................... 14, 16

*Jones v. Ford Motor Credit Co.*,
  358 F.3d 205 (2d Cir. 2004) ................................................................................. 23

*Kirschner v. Bennett*,
  Nos. 07-CV-8165, 07 MDL No. 1902, 2011 WL 1875449 (S.D.N.Y. Feb. 14, 2011) ...... 10

*Madanes v. Madanes*,
  981 F. Supp. 241 (S.D.N.Y. 1997) ........................................................................ 17

*Maersk, Inc. v. Neewra, Inc.*,
  687 F.Supp.2d 300 (S.D.N.Y.2009) ....................................................................... 14

*McLaughlin v. Anderson*,
  962 F.2d 187 (2d Cir.1992) .................................................................................. 13

*Moore v. PaineWebber, Inc.*,
  189 F.3d 165 (2d Cir. 1999) ................................................................................. 16

*Motorola Credit Corp v. Uzan*,
  322 F.3d 130 (2d Cir. 2003) ....................................................................... 11, 12, 13

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................................. 17

*Picard v. Kohn*,
  907 F. Supp. 2d 392 (S.D.N.Y. 2012) .................................................................... 22

*Reich v. Lopez*,
  858 F.3d 55 (2d Cir. 2017) ................................................................................... 18

iii

*Schmuck v. United States*,
    489 U.S. 705 (1989) ....................................................................................................... 14

*Serin v. N. Leasing Sys., Inc.*,
    No. 7:06-CV-1625, 2009 WL 7823216 (S.D.N.Y. Dec. 18, 2009) ................................ 23

*Sky Med. Supply Inc. v. SCS Support Claims Servs.*,
    17 F. Supp. 3d 207 (E.D.N.Y. 2014) ............................................................................. 13

*State Farm Mut. Auto. Ins. Co. v. Grafman*,
    655 F. Supp. 2d 212 (E.D.N.Y. 2009) ........................................................................... 14

*Steinhardt Grp., Inc. v. Citicorp*,
    272 A.D.2d 255 (1st Dep't 2000) ................................................................................... 19

*SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.*,
    No. 12 CIV. 7280 ALC DCF, 2013 WL 5366373 (S.D.N.Y. Sept. 25, 2013) ............... 24

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966) ....................................................................................................... 23

*United States v. Lab. Corp. of Am. Holdings*,
    No. 107CV05696ALCRLE, 2015 WL 7292774 (S.D.N.Y. Nov. 17, 2015) ................... 16

*United States v. Zichettello*,
    208 F.3d 72 (2d Cir. 2000) ............................................................................................. 22

**Statutes**

18 U.S.C. § 1962 .................................................................................................................... 21

iv

Plaintiffs The Related Companies, L.P. and MBM Supply Company LLC respectfully submit this Memorandum of Law in Opposition to the Motion to Dismiss filed by Defendants Carleton Ruthling ("Ruthling"), Tesla Walls LLC ("Tesla II"), Hudson Walls LLC ("Hudson"), Related Supply, Ltd. ("Supply Co."), and Skye Holdings Ltd. ("Skye Holdings") (collectively, the "Ruthling Defendants").

PRELIMINARY STATEMENT

This case arises from Defendants' dishonesty, extortion, and greed in connection with joint ventures that Plaintiffs negotiated with Defendant Ruthling to provide goods and services in support of Plaintiffs' construction projects.  While Plaintiffs were misled to believe that these joint ventures would pursue mutually beneficial and legitimate business activities, they were, instead, part of a scheme used to defraud Plaintiffs out of millions of dollars.  Ruthling, working together with his co-conspirators, used multiple entities to perpetrate this fraud during at least a seven-year period, from 2007 to 2014.  Those entities included Tesla Wall Systems, LLC ("Tesla I") (which is not a party to this action) as well as Tesla II, Hudson, Supply Co., and Skye Holdings.

Plaintiffs' Amended Complaint ("Complaint" or "Compl.") lays out at length detailed allegations as to the circumstances of Defendants' fraudulent scheme, including the enterprises in which they participated and the nature and scope of numerous acts of mail and/or wire fraud by Defendants as part of that scheme.  Ignoring these allegations and relying on inaccurate or misleading legal positions, the Ruthling Defendants now ask this Court to dismiss this case as a matter of law.  But, as more fully set forth below, none of the arguments they present withstand even nominal scrutiny.

*First*, the Ruthling Defendants' arguments that Plaintiffs currently lack standing to pursue a RICO claim effectively ask this Court to find that Plaintiffs may never pursue such a claim, a

1

proposition for which they can find no legal support.  Plaintiffs' RICO claims are ripe.  Contrary to

the Ruthling Defendants' contentions, the remote possibility that Tesla I may someday obtain assets

to repay some of the funds it owes to Related does not bar Plaintiffs from obtaining RICO relief

from the Ruthling Defendants for their role in the scheme that looted Tesla I's assets.  The Second

Circuit has clearly held that when a corporation is fraudulently stripped of assets, issues of standing

do not bar its creditors from seeking RICO relief.  Further, Related has already pursued all

contractual remedies available to it, only to be left with a judgment against Tesla I that is currently

uncollectible and has no reasonable prospect to be fully collected.  In other words, Plaintiffs have

exhausted the types of contractual remedies referenced in the caselaw on which the Ruthling

Defendants rely.  Moreover, the present action seeks damages above and beyond those available

under Related's contract with Tesla I.  This is not only clearly alleged in the Complaint but inherent

in the factual allegations and nature of Plaintiffs' claims relating to a scheme that extended for years

before Tesla I's contract with Related even existed, and seeking the damages that are not inherently

limited to a contractual measure.

*Second*, Plaintiffs' 55-page Complaint amply satisfies the particularity required by Rule

9(b).  The Ruthling Defendants' arguments that Plaintiffs have failed to allege (i) predicate acts of

mail or wire fraud; (ii) continuity of those predicate acts; (iii) causation; and (iv) a conspiracy rest on

their cherry-picking of isolated allegations from their context and otherwise ignore detailed

allegations of the very sort which Defendants claim are lacking.  The Complaint as a whole

delineates the specific circumstances constituting the fraudulent scheme and offers multiple

examples of predicate acts of mail and/or wire fraud, which is all that Rule 9(b) requires.  It also

shows the continuity necessary to the "pattern" element of RICO by describing predicate acts over a

seven-year period, not less than two years as the Ruthling Defendants claim.

2

The Ruthling Defendants' argument that this Court should hold, as a matter of law, that there is no circumstance under which Plaintiffs can establish reasonable reliance again ignores the broader context of the allegations.  The Defendants' ongoing threats to withhold delivery of materials needed for Related's real estate projects if they refused to make advances, Ruthling and Du's representations regarding the amount and legitimacy of the sums needed, and Defendants' process of trickling out snippets of financial information in response to Plaintiffs' continuous requests for back-up support for the advances created ample foundation to find Plaintiffs' decision to make advances to Defendants in reliance on their representations quite reasonable.   Moreover, the reasonableness of reliance is a classic issue of fact; it is certainly not a matter that can or should be resolved on the face of this Complaint.  Finally with respect to Rule 9(b), the Ruthling Defendants are wrong to suggest that a RICO conspiracy can only be stated if Plaintiffs recite a date, time and place of an express agreement.  Plaintiffs' allegations establish the knowing participation of each of the Ruthling Defendants in the fraudulent scheme.  Furthermore, Ruthling's control over the other Ruthling Defendants and his use of them to further the fraudulent scheme that he concocted, by itself, provides an adequate foundation for conspiracy.  His knowledge is imputed to each of the other Ruthling Defendants, such that none can claim to have been ignorant of the conspiracy.

*Third*, for the same reasons that Plaintiffs' RICO claims are sufficiently stated, the Ruthling Defendants' arguments for dismissal of Plaintiffs' state law fraud claims also fail.  Plaintiff's unjust enrichment claims against the Ruthling Defendants—none of which is a party to the Term Sheet between Related and Tesla I—are also entirely proper.  The existence of a contract between non-party Tesla I and Related does not bar the present non-contractual claims, which arise out of the Ruthling Defendants' improper diversion of funds from Tesla I (which eviscerated Tesla I's ability to perform its agreement), not any contractual obligation of these Defendants.  Accordingly, the

3

Court should deny the Ruthling Defendants' motion in its entirety.

<u>**FACTUAL BACKGROUND**</u>

As alleged in the Complaint, in 2007 Defendant Ruthling and the Plaintiffs formed a joint venture to provide certain construction materials for Related's real estate projects.  (Compl. ¶¶ 1, 38.)  From 2007 through early 2012, Ruthling fraudulently induced Plaintiffs to advance millions of dollars to Supply Co., a company Ruthling created purportedly to serve the joint venture's purpose.  (*Id.* ¶¶ 1, 39-40.)  Then, in 2012, Defendants continued their scheme through Defendant Hudson as well as Tesla I.  (*Id.* ¶¶ 2, 41.)

During this period, Tesla I entered into a joint venture with Related[1] to supply construction material to certain projects with a professed goal of becoming Related's sole supplier of "curtain wall," which Ruthling hoped would include some of the largest construction projects in Manhattan.  (*Id.* ¶¶ 2, 38, 40-43.)  Throughout this process, Plaintiffs were fraudulently induced to advance Supply Co., Hudson, and Tesla I millions of dollars.  (*Id.* ¶¶ 39-41.)  But as soon as the money hit the bank, Defendants drained it from those entities purportedly to pay Defendants' false and/or enormously inflated invoices, effectively stealing Plaintiffs' money.  (*Id.* ¶¶ 52-74.)

The Complaint is replete with examples of individual acts of wire fraud through which Defendants perpetrated their scheme during this seven-year period.  For example, the Complaint identifies:

- Seven specific examples of extortionate e-mails in which Ruthling and his co-conspirator, Defendant Christopher Du, threatened to withhold supplies necessary for Related's projects if Plaintiffs did not accede to their demands for funding advances. (*Id.* ¶¶ 47, 48.)

---

[1] Tesla I was jointly owned by Related and Skye Holdings pursuant to a November 2012 agreement executed by Ruthling on behalf of the latter.  Nikas Decl. Ex. 7.

4

- Eight specific examples of e-mails in which Ruthling and Du represented that funding advances were necessary to Tesla I's and Hudson's performance and/or existence. (*Id.* ¶ 55.)

- Sixty specific examples, including dates, dollar amounts, and wire reference numbers, of wires that Plaintiffs sent to Defendants in response to their requests for advances. (*Id.* ¶ 57.)

The Complaint also details additional fraudulent transactions that belie any effort by Defendants to put an innocent spin on their activities.  For example, Tesla I received value-added tax ("VAT") refunds in connection with its purchases of materials used to create curtain wall for Plaintiffs' projects. (*Id.* ¶ 10.)  Those purchases and the initial payment of VAT on them were made with Plaintiffs' money.  (*Id.*)  Yet Ruthling caused Tesla I to transfer VAT refunds to Skye Holdings for no consideration whatsoever.  (*Id.*)

As another example, Ruthling took funds Plaintiffs advanced to Tesla I, ostensibly to provide additional cash support for work on Related's 111 W. Wacker project, and instead used them to form and capitalize a shell company in Hong Kong that never provided services or materials to any of Plaintiffs' projects.  (*Id.* ¶ 64.)   When Related later questioned  where that money went, Du covered for Ruthing and the entire criminal enterprise in a January 24, 2013 email by responding: "[T]he move to Southern China has resulted in the relocation of the General Manager's ("GM") residence from Beijing to Hong Kong. To properly qualify for residency in Hong Kong, the GM formed a new entity and deposited $130,000 in a bank account (to demonstrate the new entities financial viability). In addition, the new entity was capitalized with cash of $50,000." (*Id.*)  Ruthling assured Plaintiffs that this situation was temporary and the funds would be returned, but they were not.  (*Id.*)  At a later date, when again questioned about the formation of that shell company, Ruthling hid behind the Defendants' corporate shell game by claiming that all of these funds had come from Skye Holdings, while purposefully omitting that Skye Holdings received the money from Tesla I for no

5

consideration from funds supplied by Related for the 111 W. Wacker project.  (*Id.*)

And as yet another example, in October 2013, from $2 million that Plaintiffs paid to Tesla I in response to Ruthling's claims that such funds were needed for the 111 W. Wacker project, Ruthling paid himself $564,000, allegedly for intellectual property transferred to Tesla I.  (*Id.* ¶ 65.) Ruthling knew Plaintiffs had never agreed to this payment, that Related already footed the bills for this intellectual property, and that Ruthling had no right to receive these funds.  (*Id.*)  But in an October 22, 2013 email to Du, Ruthling made sure that Du had fraudulently concealed  this payment when he asked "the $572K for curtain wall development costs has already been paid, so that is part of opex [operating expenses], yes?," in response to which Du confirmed,  "$564 is included in Opex."  (*Id.*)  In other words, Du and Ruthling made sure this payment for intellectual property was buried in "operating expenses" to hide the misappropriation of funds from Related.

Defendants used an array of delay tactics and extortion to prevent Plaintiffs from learning the truth about their misconduct, coming up with a variety of false excuses for the failure to give to Related the specific financial information it requested, refusing to turn over Tesla I's vendor contracts or to seek Related's approval before entering into such contracts, and waiting until it would have been practically and financially impossible to switch to a different curtain wall provider on Related's projects before disclosing limited financial information to Related to string Plaintiffs along.  (*Id.* ¶¶ 14, 47, 75-78.)  Throughout, Plaintiffs were given information and excuses that were plausible enough to keep the money flowing based on Plaintiffs' reasonable belief that they would soon receive more detailed documentation.  (*Id.*)

Nevertheless, Defendants eventually made mistakes that allowed Plaintiffs to start to put the pieces together.  For example, the Complaint cites a sequence of emails regarding a shipment that Skye Supply intentionally delayed in order to force Plaintiffs to provide funds to Tesla I.  (*Id.* ¶ 51.)

6

(Ruthling, a part owner of Skye Supply, used that entity to make customs arrangements and broker shipping for materials for Related, thereby maintaining control to allow the calculated withholding of those materials as leverage for demands for advances. (*Id.* ¶¶ 5, 15, 51.)) In those emails, a Tesla I employee asks why materials were not being timely delivered by AIT—the shipping company Skye Supply had engaged. (*Id.* ¶ 51.) Following receipt of that inquiry, Steven Gramling, one of Skye Supply's principals—the other principal was Ruthling—intended to email only AIT to give it directions as to how this inquiry should be deflected. (*Id.*) But he inadvertently copied the Tesla I employee. In that email, he acknowledged the manipulations he was spearheading at that time as part of Defendants' scheme by telling AIT: "I would say, don't answer. If he [the Tesla I employee] gets you on the phone, tell him he'll have to talk to Carleton [Ruthling]. Any further questions are ask Carleton. I think [the Tesla I employee] is one of the good ones, but this stuff still needs to be capped and he doesn't know the mine field he's walking in." (*Id.*)

Plaintiffs' dogged demands for documentation to support Ruthling and Du's constant demands for advances made it increasingly difficult for Defendants to sustain their fraud. As Du noted in an August 27, 2013 email to Ruthling, "I think we may have opened [P]andora's box by send[ing] the bank statements." (*Id.* ¶ 77.) Nevertheless, Defendants continued to work hard to hide the truth from Plaintiffs. For example, in a February 24, 2014, e-mail, Ruthling demanded that Du provide "assistance" because Related might "shut down the business . . . ." (*Id.* ¶ 75.) Ruthling told Du to scrub the books, stating, "money we borrowed to date, need a *clean* story, once you send me the numbers let's discuss." (*Id.* (emphasis added).)

Only with the benefit of discovery Related obtained in a separate state court litigation against Tesla I were Plaintiffs able to start to understand the scheme whereby Defendants stole millions of dollars from them. (*Id.* ¶ 80.) Given the Defendants' use of a multiplication of entities and complex

7

transactions between and among those entities to obfuscate their fraud, further discovery will only further expose the scope of Defendants' scheme and trace the funds they stole.  The information Plaintiffs have obtained and summarize in their Complaint is, however, extensive and offered with substantial detail.

## PROCEDURAL HISTORY

### I.    OTHER ACTIONS

The Ruthling Defendants spend much of their Motion to Dismiss ("Motion") discussing two lawsuits that have been largely or entirely resolved.    Neither of these cases precludes any of the present claims as a matter of law; even the Ruthling Defendants do not offer any authority to attempt to support such a suggestion.  But the characterization of those cases in the Motion is entirely misleading and warrants correction.

While the Ruthling Defendants imply that Related engaged in conduct that caused harm to Tesla I and/or Ruthling, no case has ever been filed by any of the Ruthling Defendants or Tesla I against Related.  The only lawsuit brought by any of them that has even a tangential association with Related is a case filed by Tesla I against its former employee Michael Budd in this Court in 2014. Nikas Decl. in Supp. Of Pl. Opp. To Defs. Mot. to Dismiss ("Nikas Decl.") Ex. 1.  In that case, Tesla I claimed that Budd breached his employment contract and/or violated fiduciary duties when Budd left Tesla I after a brief period of employment.  *Id.*  Budd, who had decades of experience in the construction industry, subsequently commenced employment at Related.  A general verdict found Budd liable on Tesla I's claims but did not specify whether that finding rested entirely on Budd's employment contract or other grounds.  No finding of misconduct by Related was ever made. Furthermore, the jury's damages verdict for $14.5 million was set aside on post-trial motions due to Tesla I's complete failure to offer admissible evidence of any damages.  Nikas Decl. Ex. 2.  Not only

is there no date set for retrial on damages, Tesla I currently has no expert witness who has articulated a cognizable theory of damages.  This is not surprising given that Tesla I never turned a profit during its brief existence.

The other lawsuit to which the Ruthling Defendants point is a case brought by Related against Tesla I in New York Supreme Court for breach of contract.  Nikas Decl. Ex. 3. That case led to a final judgment for Related in the amount of almost $15.4 million—*i.e.*, more than the award briefly won by Tesla I in its case against Mr. Budd.  Nikas Decl. 4.  When ruling on the parties' cross motions for summary judgment, the trial court expressly recognized that Tesla I lacks any funds to pay a judgment.  Nikas Decl. 5.  The only potential future sources from which Related may conceivably collect part of the judgment awarded to it are:  (a) any damages awarded to Tesla I following its damages retrial against Mr. Budd and that Tesla I is able to collect; and (b) refunds of certain taxes paid by Tesla I which are unlikely to amount to much.  Importantly, even if Tesla I recovers such funds, under the New York Supreme Court's order, it has the right to pay more than $2.5 million in attorney's fees before Related may collect even a penny of the judgment it holds.

## II.    HISTORY OF THIS ACTION

Plaintiffs first filed this action in Delaware state court after learning through discovery in the New York state court litigation of the fraudulent scheme by which the Defendants had stripped Tesla I of any assets.  Defendants removed this case to Delaware federal court on the ground that Plaintiffs' federal RICO claims establish subject matter jurisdiction.  Defendants then filed motions to dismiss and for a change of venue arguing, *inter alia*, that New York was a more appropriate forum.  To expedite resolution of this case on the merits, Plaintiffs stipulated to transfer to this Court.  Plaintiffs filed the current Complaint, and the Ruthling Defendants filed the present Motion.

<u>ARGUMENT</u>

## I.   PLAINTIFFS' RICO CLAIMS ARE RIPE.

The Ruthling Defendants' argument that Plaintiffs' RICO claims are not ripe is unavailing

for multiple independent reasons.

*First*, the Second Circuit has held that a plaintiff's RICO claim is ripe when the plaintiff

alleges that the defendant diverted assets from the plaintiff's contractual counterparty so as to

frustrate the plaintiff's ability to recover for its loss through contractual remedies.  *GICC Capital*

*Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289 (2d Cir. 1994), which the Ruthling

Defendants ignore, is directly on point.  In that case, the plaintiff alleged that one of the defendants,

a corporation, had issued a note to plaintiff in order to comply with a settlement obligation.  *Id.* at

290.  It was further alleged that all of the defendants had participated in a scheme to defraud the

plaintiff by looting the corporation that issued the note, in an effort to escape both the note and the

settlement obligation.  *Id.*  There, as here, the defendants sought dismissal of the RICO claim for

lack of standing, arguing that the plaintiff could still pursue contractual remedies against the note

issuer to recover for its loss.  The Second Circuit rejected this argument, explaining:  "When a

corporation fraudulently is caused to issue debt and stripped of its assets in a manner that obviously

will leave the creditors unpaid, those creditors have standing" to assert claims against the

perpetrators who stripped the assets.  *Id.* at 293; *see also, e.g.*, *Kirschner v. Bennett*, Nos. 07-CV-

8165, 07 MDL No. 1902, 2011 WL 1875449, *5 (S.D.N.Y. Feb. 14, 2011), *report and*

*recommendation adopted in In re Refco, Inc. Securities Litigation*, Nos. 07 MDL 1902, 07-CV-

8165, 2011 WL 1899758, at *5 (S.D.N.Y., May 16, 2011) (applying *GICC*'s holding regarding

standing and explaining:  "This is a case in which the FX Customers gave value at a time when an

undisclosed fraud 'undermine[d] the possibility of repayment.'")  Plaintiffs' allegations in this case

10

are comparable to the allegations found sufficient in *GICC Corp.* because they allege a pattern of looting Tesla I in derogation of Plaintiffs' contractual rights, and that Plaintiffs would not have provided funds to Tesla I had they known those funds were being looted.  *Compare GICC Corp.*, 30 F.3d at 293, *with* Compl. ¶¶ 2, 8, 41, 46, 73, 74, 79; *see also* Compl. ¶¶ 10, 12, 61-78.

      *Second*, even if the Plaintiffs *were* required to pursue contractual remedies before bringing RICO claims, they already did just that:  Related brought a breach of contract action against Tesla I in New York Supreme Court and pursued that action to a final judgment in its favor.  Nikas Decl. Exs. 3, 4.  The trial court in that case has expressly recognized that Tesla I lacks the funds to pay that judgment.  Nikas Decl. Ex. 5.  In fact, Ruthling himself has repeatedly asserted that Tesla is no longer a going concern:  It does no business other than pursuing its litigation against Budd.  Nikas Decl. Ex. 6. Thus the only scenarios in which Tesla I may get assets in the future are remote and leave no reasonable prospect for Related to be fully compensated for even its contractual losses (and accruing post-judgment interest), let alone the damages sought here.

      The mere possibility that Tesla I may in the future obtain funds to pay the final judgment that has already been awarded to Related but which the Supreme Court has found that Tesla I is unequipped to repay at all is not the type of "real possibility" that the Plaintiffs' injury "may be eliminated or significantly reduced" that the Second Circuit has held to defeat RICO standing.  *Motorola Credit Corp.*, 322 F.3d at 136 (quoting *In re Merrill Lynch P'ships Litig.*, 143 F.3d 56, 59 (2d Cir. 1998)).  Indeed, a holding that RICO standing is defeated by the mere possibility Tesla I could in the future obtain funds sufficient to pay Related's judgment could not be reconciled with the Second Circuit's holding in *GICC Capital Corp.*, because so long as a creditor entity that has

11

been stripped of assets continues to exist, there is a *possibility* that the entity could do business or otherwise obtain new assets.[2]  This is instead a case in which there is "no collateral on which to foreclose, or any other contractual remedy."  *Motorola Credit Corp.*, 322 F.3d at 136.  As a result, Plaintiffs should not be required to wait further before their RICO claims may be pursued.

None of the cases cited by the Ruthling Defendants on this issue involve facts comparable to this case.  They instead address circumstances in which the plaintiffs were still in the midst of litigation or arbitration seeking the type of relief that Related has already pursued, or those plaintiffs had the ability to pursue such remedies but had not even started to do so.[3]  *See DLJ Mortg. Cap., Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 238-39 (E.D.N.Y. 2010) (Plaintiffs had not pursued claims to enforce the mortgages Defendants sold to them and which Plaintiffs now claimed were fraudulent); *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC*, No. 07 Civ. 8139, 2008 WL 3925175, at *5 (S.D.N.Y. Aug. 26, 2008) (Plaintiffs' RICO claims

_____

[2] Under the facts, it is particularly unlikely that Tesla I will obtain assets sufficient to pay any significant portion of Related's judgment.  The Ruthling Defendants cite only the possibility that Tesla I will recover in a lawsuit it has brought against its former employee Michael Budd in the S.D.N.Y.  Nikas Decl. Ex. 1.  But the court there already set aside a jury award of damages in that action due to a complete lack of admissible evidence of damages.  Nikas Decl. Ex. 2.  In order to pay a significant portion of Related's judgment (not including post-judgment interest), Tesla I would have to adduce evidence of damages, convince a jury on a damages retrial to accept that evidence over extensive evidence to the contrary, obtain a judgment of more than $18.7 million (the sum of the $15.4 million judgment awarded to Related and the $2.3 million-plus offset for unpaid legal fees and costs), and collect on that judgment from an individual defendant.  It is not a tenable reading of the RICO statute that Plaintiffs' standing must wait for such an unlikely series of contingencies, wholly outside of Plaintiffs' control.

[3] The Ruthing Defendants also cite *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006).  In that case the Plaintiffs were a class of individuals to whom Defendants had recommended tax strategies that the IRS declared illegal, resulting in penalties against some Plaintiffs.  *Id.* at 259.  The plaintiffs that the Court held lacked RICO standing were those who had not  yet been assessed a penalty by the IRS, and therefore had suffered no financial harm at all.  *Id.* at 266.

sought only the funds that could be awarded them in ongoing bankruptcy proceedings); *Motorola Credit Corp v. Uzan*, 322 F.3d 130, 132, 136 (2d Cir. 2003) (Plaintiffs had not yet sought to foreclose on allegedly the fraudulent loans or obtained a final judgment in arbitrations relating to the underlying transactions); *Sky Med. Supply Inc. v. SCS Support Claims Servs.*, 17 F. Supp. 3d 207, 217, 231 (E.D.N.Y. 2014) (Plaintiff was concurrently litigating and pursuing arbitration with regard to the allegedly fraudulent denials of its insurance claims). Here, in contrast, there is nothing more Plaintiffs can do to pursue alternative remedies. If Plaintiffs claims are not ripe now, they will never be.

*Third*, as specifically alleged in the Complaint, the present action seeks damages for Defendants' tortious conduct, not just the sums lost due to Tesla I's breach of its contract with Related. For example, the Complaint seeks to recover for a fraudulent scheme that fleeced the Plaintiffs for seven years while the Tesla I contract with Related was only in existence for well under half of this time period. Furthermore, Defendants' fraud caused harm to Plaintiffs well beyond the loss of specific advances and Plaintiffs are entitled to make their case for full recovery. Thus, even if there was a credible basis to say that Related could fully collect its breach of contract judgment—which there is not—there would still be a foundation for this lawsuit and a right for Plaintiffs to pursue the present claims.

## II.   PLAINTIFFS HAVE PLED RICO CLAIMS ADEQUATELY UNDER RULE 9(B).

### A.   *Plaintiffs Have Alleged Predicate Acts With Particularity.*

"To establish RICO claims based on mail and wire fraud, a complaint must, as a threshold matter, allege 'the existence of a fraudulent scheme.'" *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 299 (S.D.N.Y. 2013) (quoting *McLaughlin v. Anderson*, 962 F.2d 187, 190-91 (2d Cir.1992)). "The complaint must also allege that 'the defendant 'caused' the mailing or use of the

wires' and that 'the mailing or use of the wires 'was for the purpose of executing the scheme or, in other words, incident to an essential part of the scheme.'"  *Id.* (quoting *Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp.2d 300, 332 (S.D.N.Y.2009)).  "In short, a RICO complaint must provide 'a detailed description of the underlying [fraudulent] scheme and the connection of the mail and/or wire communications to the scheme.'"  *Id.* (quoting *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y.1998)).  "[W]here the mails or wires are used in furtherance of fraud, the communications need not contain false or misleading information themselves."  *Id.* at 307 (citing *Schmuck v. United States*, 489 U.S. 705, 715 (1989)).  "It is sufficient for the mailing [or transmission] to be incident to an essential part of the scheme or a step in the plot."  *Id.* (quoting *Schmuck*, 489 U.S. at 710-11).

To adequately allege such a fraudulent scheme, it is not necessary for a plaintiff to identify each and every act of mail or wire fraud.  Contrary to Defendants' implication, there is no requirement that a pleading detail *all* predicate acts in furtherance of a fraudulent scheme; examples are sufficient.  *State Farm Mut. Auto. Ins. Co. v. Grafman*, 655 F. Supp. 2d 212, 228 (E.D.N.Y. 2009) (complaint complied with Rule 9(b) where it offered "examples of fraudulent statements").

The present Complaint more than meets all of these standards.  Plaintiffs have alleged the nature, scope, contours and details of a fraudulent scheme by Defendants to obtain advances from Plaintiffs on the false pretext that such advances were needed to supply materials to Plaintiffs' projects through the Tesla I joint venture and other Ruthling-controlled entities.  In fact, the huge advances demanded were not necessary or used for such purposes but, instead, were stolen by Defendants for their own benefit.

Plaintiffs also allege numerous examples of specific communications by mail or wire in furtherance of the Defendants' scheme to defraud Plaintiffs such as:

| Paragraph | Sample Allegations of Predicate Acts |
|---|---|
| 47 | "A June 4, 2013 email from Due to Related stating 'As you are aware, Tesla continues to experience dire cash shortfalls . . . .  Without additional funding, production in China will need to terminate as early as next week." |
| 47 | "A June 5, 2013 email from Ruthling to Related and Du stating "The business (Tesla) is sound and operating well except for the lack of cash.  However, I don't see the business going past 24 hours from now.  Since there has been no supportive response from Related to fund the cash flow requests from Chris (Du) the only option now seems shutdown." |
| 47 | "A February 14, 2013 email from Ruthling to Related and Du stating 'REMINDER: BLUE SKYE INSTALLER HAS NOT BEEN PAID FOR NLSD.  HE MAY WALK OFF THE JOB IN NLSD TODAY IF FUNDS ARE NOT RECEIVED" |
| 47 | "A September 23, 2013 email from Du to Related stating 'Again, please send funds as soon as possible as both Tesla and Skye Holdings are effectively out of cash and can no longer fund manufacturing and installation." |
| 48 | "An email dated April 22, 2014 from Ruthling to Related, wherein Ruthling states 'I am putting a temporary hold on delivery of materials and engineering so the balance can get corrected.'" |
| 48 | "An April 23, 2014 email from Ruthling to Related, where Ruthling states 'all product/any product is suspended pending accounts being brought current.'" |
| 48 | "An April 24, 2014 email from Ruthling to Related where Ruthling states 'The above outlines the financial reasons why Tesla has temporarily suspended services and deliveries until accounts are brought current." |
| 75 | "On February 24, 2014 Ruthling emailed Du in a panic, demanding 'financial assistance' because Related might 'shut down the business . . .'  Ruthling asked Du to scrub the books so they could present Related with a seemingly legitimate explanation for Defendants' conduct, stating, 'money we borrowed to date, need a *clean* story, once you send me the numbers lets discuss" (emphasis added). |
| 76 | "On August 23, 2013, . . . Ruthling and Du emailed Related attaching certain bank statements for Skye Holdings that they had attempted to 'clean' up, as Ruthling had previously instructed Du." |

The above is just a sampling of the Amended Complaint's extensive detailed allegations regarding specific wire communications in furtherance of Defendants' fraudulent scheme.  *See also, e.g.*, Compl. ¶¶ 12, 13, 49, 50, 51, 55, 65, 67, 68, 75, 78.  Plaintiffs have further alleged details of individual transactions that belie any innocent explanation and certainly not at the motion to dismiss stage, including, for example:

15

- A transaction whereby VAT refunds that Tesla I received for purchases made with Plaintiffs' money were transferred to Skye Holdings for no consideration.  (*Id.* ¶ 10.)

- A transaction whereby Ruthling used funds Plaintiffs advanced to Tesla I to form and capitalize a new shell company in Hong Kong that never provided services or materials to Related's projects.  (*Id.* ¶ 64.)

- A transaction whereby Ruthling used funds obtained from Plaintiffs' transfers to Tesla I to pay himself for intellectual property that Related had already paid for and had significant ownership stake in due to Related's ownership interest in Tesla I.  (*Id.* ¶ 65.)

The Ruthling Defendants' sole criticism of the specificity of Plaintiffs' pleading is that Plaintiffs alleged that a key component of the fraudulent scheme was Defendants' issuance of false invoices over a period of years, but have not itemized the individual invoices.  Mot. at 12-13. However, "in a complex civil RICO action involving multiple defendants, Rule 9(b) does not require that the 'temporal or geographic particulars of each mailing be stated with particularity,' but only that the 'plaintiff delineate, with adequate particularity in the body of the complaint, *the specific circumstances constituting the overall fraudulent scheme*.'"  *State Farm,* 655 F. Supp. 2d at 227 (quoting *AIU Ins. Co. v. Olmecs Med. Supply, Inc*., No. 04-CV-2934, 2005 WL 3710370 at * 11 (E.D.N.Y., Feb. 22, 2005), and *In re Sumitomo Copper,* 995 F. Supp. 451, 456 (S.D.N.Y. 1988), and citing *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172-73 (2d Cir. 1999)) (emphasis added). Furthermore, "[r]ule 9(b) may be applied less stringently when the specific factual information is peculiarly within the defendant's knowledge or control."  *United States v. Lab. Corp. of Am. Holdings*, No. 1:07-CV-05696 (ALC)(RLE), 2015 WL 7292774, at *4 (S.D.N.Y. Nov. 17, 2015). The invoices at issue were distributed between and among the Defendants and all of them were designed to create the impression that millions of dollars of costs had been incurred by Defendants in the performance of work pertaining to Plaintiffs' construction projects.  Plaintiffs have described the time period to which these invoices relate, it is difficult to imagine that the Ruthling Defendants

16

have such extensive businesses that they are unable to look at their own records and identify what invoices are potentially at issue. Indeed, that is exactly what they would be expected to do in the face of discovery that is often far less detailed than the Complaint here.  Especially given the fact that Defendants have custody and control over the invoices at issue, the Plaintiffs have satisfied Rule 9(b)'s requirements here by specifying the time period during which the fraudulent invoices were sent, their senders and recipients, and their role as part of Defendants' fraudulent scheme.

Moreover, a RICO complaint can be sufficient as a whole even if particular allegations lack precise detail.  *Madanes v. Madanes*, 981 F. Supp. 241, 253 (S.D.N.Y. 1997) ("[P]laintiff does not have the burden of perfection, and thus a complaint may survive despite its blemishes."); *accord Eastman Kodak Co. v. Camarata*, No. 05 CV 6384L, 2006 WL 3538944, at *8 (W.D.N.Y. Dec. 6, 2006).  Here, the Complaint alleges a fraudulent scheme which, at its heart, was designed to extract as much money from Plaintiffs as possible using grossly inflated and false requests for funds.  Those misrepresentations were maintained and concealed through the concerted efforts of all Defendants. The invoices were only one of the means used to achieve that end.  As a result, Defendants' focus on the invoices asks the Court to require Plaintiffs to specifically identify even more of the trees when, in fact, the Complaint more than adequately describes the forest.  That is all that Rule 9(b) requires. *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." (citation omitted)).

### B.      Plaintiffs Have Alleged a Pattern of Racketeering.

The Ruthling Defendants' argument that Plaintiffs have failed to allege closed-ended continuity under RICO fundamentally misrepresents Plaintiffs' allegations.  The Ruthling Defendants cherry-pick a single paragraph from the Complaint, a paragraph which refers to

17

fraudulent invoices between 2012 and 2014.  Mot. at 14.  But they ignore the immediately preceding paragraph, paragraph 59, which alleges that "[b]etween 2007 and early 2012, Supply Co. paid Defendants' fraudulent invoices which were sent through interstate wires and mail."  The two separate paragraphs, when looked at collectively, allege a pattern of activity extending over seven years.  They describe the events in two steps by distinguishing an earlier time period when some invoices were sent by mail (2007 to early 2012) and a later time period when all invoices were sent by wire (2012-2014) but there can be no doubt that, together, they allege a seven year course of wrongful conduct.  *See also* Compl. ¶ 79 ("Defendants carried out their scheme for approximately seven years . . . .").   In other words, the allegations as a whole describe a fraudulent scheme that more than satisfies the the continuity requirements of RICO even accepting Defendants' claims regarding those requirements.  *See Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017) ("[T]his Circuit generally requires that the crimes extend over at least two years.").

### C.      *Plaintiffs Have Adequately Alleged Causation.*

The Ruthling Defendants do not dispute that Plaintiffs have alleged that they relied on Plaintiffs' misrepresentations.  They argue only that Plaintiffs have not alleged *reasonable reliance*.  For this argument, Plaintiffs cite the Second Circuit's holding in *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004), that to prevail on a RICO claim predicated on fraud, "the plaintiff must establish 'reasonable reliance,' on the defendants' purported misrepresentations or omissions," *id.* at 178.  *Bank of China* and Defendants' other authorities for this proposition, however, preceded the Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), which held that first-party reliance by the plaintiff is not an element of a RICO claim premised on mail or wire fraud.  *Id.* at 658.  Although the Supreme Court acknowledged that "it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must

establish at least third-party reliance in order to prove causation," reliance-in-fact establishes a causal link between the defendant's misrepresentations and the plaintiff's injury, irrespective of whether or not the reliance is reasonable. *Id.* at 659.[4]  In *Bridge*, the Supreme Court consistently refers to "reliance" rather to "reasonable reliance," which makes good sense:  Where the plaintiff's reliance is an element of a claim, the common law recognizes the equity of requiring that the plaintiff have acted reasonably before holding the defendant liable.  But where the only required element is causation, the same equitable consideration is inapplicable and reasonableness of the underlying reliance is not essential.

Even if reasonable reliance was an element of Plaintiffs' claims, the allegations here establish reasonable reliance under the case law on which Defendants rely.  For example, on this issue, Defendants cite *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729 (2d Cir. 1984), which addressed common law fraud under New York law.   But New York law is clear that a plaintiff need not undertake an independent investigation of facts that are within the defendant's peculiar knowledge, such that even an express disclaimer of reliance by the plaintiff does not preclude a finding of reasonable reliance if the relevant facts were within the defendant's peculiar knowledge.  *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 115 A.D.3d 128, 139 (1st Dep't 2014) ("[A] purchaser may not be precluded from claiming reliance on misrepresentations of facts peculiarly within the seller's knowledge."); *Steinhardt Grp., Inc. v. Citicorp*, 272 A.D.2d 255, 257 (1st Dep't 2000) ("[A] purchaser may not be precluded from

---

[4] Certain decisions subsequent to *Bridge* appear to assume that reasonable reliance is required under RICO, but they do not specifically address whether the required reliance must be "reasonable" or only reliance-in-fact under the Supreme Court's reasoning.  *See, e.g., Allstate Ins. Co. v. Valley Physical Med. & Rehab., P.C.*, No. 05-5934 DRH MLO, 2009 WL 3245388, at *4-5 (E.D.N.Y. Sept. 30, 2009).

claiming reliance on misrepresentations of facts peculiarly within the seller's knowledge, notwithstanding the execution of a specific disclaimer.").  In other words, when the facts are uniquely known to the defendant, the reasonableness of reliance on defendants' representations regarding those facts is effectively presumed.  Here, the legitimacy of Ruthling's requests for advances turned on information about the financial circumstances and transactions of entities controlled by Ruthling, which was beyond Plaintiffs' ken.  As a result, the fact that the information that Plaintiffs alleged was misrepresented to them was peculiarly within Defendants' control is enough to establish reasonable reliance.

Moreover, the reasonableness of reliance is a fact-intensive inquiry that is not appropriately addressed on a motion challenging the adequacy of the pleadings.  *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 459 (S.D.N.Y. 2007) (while the Court may examine whether the plaintiff has adequately pled justifiable reliance on a motion to dismiss in certain cases, reasonable reliance is "'a fact-specific inquiry generally considered inappropriate for determination on a motion to dismiss . . . .'") (quoting *Allied Irish Banks, P.L.C. v. Bank of America N.A.*, No 03-CV-3478, 2006 WL 278138 (S.D.N.Y. Feb. 2, 2006).  Indeed, such issues are typically not resolved even on summary judgment.  *Coraud LLC v. Kidville Franchise Co., LLC*, 121 F. Supp. 3d 387, 394 (S.D.N.Y. 2015) ("'[t]he question of what constitutes reasonable reliance is . . . nettlesome because it is so fact-intensive,' . . . and reasonable reliance is therefore a question normally reserved for the finder of fact and not usually amenable to summary judgment.") (quoting *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 155 (2010)).   There is no reason to depart from these principles and resolve the issue of reasonable reliance as a matter of law based solely on the pleadings here.

Finally, despite Defendants' assertions to the contrary, the allegations do not suggest that Plaintiffs' actions or reliance on Defendants' misrepresentations were inherently unreasonable, even

for businesses with the Plaintiffs' experience and knowledge.  As part of Defendants' scheme,

documentation for the expenses that were supposedly the basis for Tesla I's claims for advances was

withheld from Plaintiffs until after Tesla I had been awarded projects that were on strict timelines

requiring work to be completed without delay.  As a result, Plaintiffs were forced to rely upon

Defendants' representations regarding the need for and amount of advances as well as the financial

circumstances of Supply Co., Hudson, Skye Holdings, and Skye Supply because those facts were

within the Defendants' peculiar knowledge and Plaintiffs had every reason to believe that those

entities were all contributing to the process by which Tesla I would be delivering and installing

curtain wall on the buildings Plaintiffs were developing.  (Compl. ¶¶ 61-74.)  The substantial risk of

delay in the Related projects at issue if any of the Defendants' delayed their performance and the

significant financial consequences of such delay left Plaintiffs with no choice but to accede to the

demands for advances.  Under such circumstances, Plaintiffs' actions in reliance on Defendants'

representations was reasonable—particularly when all reasonable inferences from the pleadings are

drawn in Plaintiffs' favor, as the Court must do in addressing a motion to dismiss.  (*Id.* ¶ 47.)

### D.     *Plaintiffs Have Alleged a RICO Conspiracy.*

The Ruthling Defendants' argument that the Plaintiffs' RICO conspiracy claims under 18

U.S.C. § 1962 (d) must be dismissed because Plaintiffs have failed to allege underlying violations of

18 U.S.C. § 1962 (c) is unavailing because Plaintiffs have, in fact, alleged such violations as set

forth above.

Defendants' alternative argument that Plaintiffs fail to adequately allege a conspiratorial

agreement because they "do not explain when the agreement was made, how the agreement came

about, or what was agreed upon" misapprehends the concept of an agreement for purposes of §

1962(d).  That provision does not require a plaintiff to identify an express agreement with the date,

21

time, and location when it was entered into.  As the Second Circuit made clear a decade after the one

appellate case cited by Defendants on this point, "[a] RICO conspiracy charge is proven if the

defendant embraced the objective of the alleged conspiracy, and agreed to commit predicate acts in

furtherance thereof."  *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000) (citation omitted).

"Assuming that a RICO enterprise exists, the government must prove only that the defendants know

the general nature of the conspiracy and that the conspiracy extends beyond their individual roles."

*Id.* (citation omitted).  "In applying this analysis, [the court] need inquire only whether an alleged

conspirator knew what the other conspirators were up to **or** whether the situation would logically

lead an alleged conspirator to suspect he was part of a larger enterprise."  *Id.* (citation omitted)

(emphasis added).[5]  The Complaint does just that by identifying the roles and activities of each of

the Defendants, thereby supporting the conclusion that the Ruthling Defendants could not have

played their roles without some awareness that they were not alone in this venture and that their

actions advanced the cause of extracting vast sums from Plaintiffs.

     In addition, in this case,, the Complaint alleges Ruthling's knowledge of and responsibility

for the creation of the unlawful scheme, Ruthling's interests in each of the other Defendants that

have brought the present motion, and that Ruthling had sufficient control to—and did—utilize each

of those entities in support of that scheme.  *See, e.g.*, Compl. ¶¶ 5, 16-18, 25-29.  In addition,

Ruthling and his co-conspirator Du served as Plaintiffs' main points of contact at Supply Co., Skye

---

[5] *Picard v. Kohn*, 907 F. Supp. 2d 392 (S.D.N.Y. 2012), Mot. at 18, does not advance Defendants' argument.  The Court there addressed pleadings that identified only conduct that could have had an innocent explanation or purpose and, thus, would not have given the defendant knowledge of the existence of a larger unlawful scheme.  *Id.* at 400 ("Under *Twombly*, where several different theories might explain the same conduct, a complaint must provide a factual basis for the specific theory on which its legal claims rely.").

Holdings, and Hudson.  (*Id.* ¶¶ 37, 55.)  Ruthling's knowledge is thus imputed to each of the other

Ruthling Defendants, which, alone, suffices for conspiracy claims against them.  *See Serin v. N.*

*Leasing Sys., Inc.*, No. 7:06-CV-1625, 2009 WL 7823216, at *14 (S.D.N.Y. Dec. 18, 2009) ("[T]he

knowledge of Defendants Cohen, Hahn, and Krieger can be imputed to the corporate entity they

allegedly controlled and utilized to further the conspiracy, Defendant NLS.").

## III.   PLAINTIFFS HAVE ADEQUATELY PLED THEIR STATE LAW CLAIMS.

### A.   *Plaintiffs Have Properly Pled Common Law Fraud.*

As set forth above in Sections II.A and II.C, Plaintiffs have adequately pled their RICO

claims with particularity under Rule 9(b), including the nature of Defendants' fraudulent conduct

and the fact of Plaintiffs' reliance.  Defendants' arguments for dismissal of Plaintiff's state law fraud

claims mirror their arguments challenging Plaintiffs RICO claims.  As a result, the same reasons that

the RICO claims should survive the present Motion fully rebut Defendants' efforts to dismiss

Plaintiffs' state law fraud claim.[6]

––––––––––––––––––––

[6] Even if the Court were to dismiss Plaintiffs' RICO claims—which, for the reasons explained
above, it should not do—it has discretion to exercise supplemental jurisdiction over Plaintiffs' state
law claims.  The Court should exercise that discretion where, as here, Defendants voluntarily chose a
federal forum over a state tribunal by removing the original Delaware state court case to federal
court and then sought out the Southern District of New York as the forum for resolution of this case
by moving to transfer venue to this Court from the Delaware federal court.  Having obtained a venue
of their own choosing, Defendants should not be permitted to further delay adjudication of
Plaintiffs' claims through yet more forum shopping.  Such a result would be inefficient and unfair to
Plaintiffs and to the judicial process.  *See Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d
Cir. 2004) ("[A] district court should not decline to exercise supplemental jurisdiction unless it also
determines that doing so would not promote the values articulated in [*United Mine Workers of Am.
v. Gibbs*, 383 U.S. 715, 726 (1966)]: economy, convenience, fairness, and comity.").  At a
minimum, the Court should permit limited jurisdictional discovery regarding the citizenship of
Defendants (which include LLCs, which have the citizenships of each of their members) so that it
can be determined whether diversity of citizenship provides an alternative ground for federal
subject-matter jurisdiction.

### B.      Plaintiffs Have Properly Pled Unjust Enrichment.

Defendants argue that Plaintiffs' unjust enrichment claim is fully covered by the November 2012 Term Sheet regarding Tesla I.  However, while that agreement established a very general framework for Related's advances to Tesla I and Related's rights to reimbursement of those advances, it did not address transfers of funds from Tesla I to other entities such as the Ruthling Defendants or any of the other wrongful conduct discussed in the Complaint, including at least five years during which the fraudulent scheme was in place before that Term Sheet came into existence.  Nikas Decl. Ex. 7.  Moreover, the only parties to that agreement were Related, non-party Tesla I, and Skye Holdings.  *Id.*  Thus, it is readily apparent that large swaths of the conduct for which relief is sought in this case fall outside the Term Sheet and Plaintiffs are entitled to seek to recover for such conduct through a claim for Defendants' unjust enrichment.

In addition, where, as here, an unjust enrichment claim is directed to persons and entities who facilitated the transfer of funds away from a party in contractual privity with the plaintiff so as to frustrate the plaintiff's ability to collect those funds by enforcing its rights with its contractual counterparty (in this case non-defendant Tesla I) an unjust enrichment claim is viable.  *SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.*, No. 12 CIV. 7280 ALC DCF, 2013 WL 5366373, at *19 (S.D.N.Y. Sept. 25, 2013), is directly on point.  *Id.* at *20.  In that case, Plaintiff SungChang had alleged breach of contract by defendant, SMA.  *Id.*  SungChang also alleged that SMA had transferred assets to other defendants, which were not parties to the SungChang/SMA contract, and that such asset transfers were for the purpose of frustrating SungChang's ability to recover from SMA.  Because SungChang's allegations regarding the unjust enrichment claims were "different from the allegations of breach of contract," in particular, because they "allege[d] the improper change of ownership of SMA's assets first through the surrender of its assets to R&R and

24

then the sale to New SMA," this Court held that "recovery in quasi contract [was] still permitted to prevent the third-party's unjust enrichment."  *Id.*; *accord Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 311 (S.D.N.Y. 2006) (holding that the plaintiffs could maintain an unjust enrichment claim against entities that were not parties to a contract under which plaintiffs had invested in a non-defendant company and had allegedly wrongfully obtained assets intended for the company in which plaintiff had invested, thereby depriving the plaintiffs of the value of their investment).  Here, likewise, while Related had contractual rights against Tesla I which it pursued to judgment, that contract does not bar Related from pursuing claims for  unjust enrichment against the Ruthling Defendants, who are responsible for Related's inability to collect a judgment from Tesla I based on its contractual rights.[7]

## CONCLUSION

For the foregoing reasons, the Ruthling Defendants' Motion to Dismiss should be DENIED in its entirety.  Further, even if Plaintiffs' Federal RICO claims are dismissed, this Court should exercise supplemental jurisdiction over Plaintiffs' common law claims.

_____

[7] Although Skye Holdings was a party to the Term Sheet with regard to the relative ownership of Skye Holdings and Related in Tesla I, an unjust enrichment claim should is available against it too. The Term Sheet addressed advances to Tesla I, not to Skye Holdings, and Skye Holdings received funds diverted from Tesla I, thwarting Related's ability to collect a contract judgment against Tesla I.  Nikas Decl. Ex. 7.

Dated: New York, New York
July 17, 2017

BOIES SCHILLER FLEXNER LLP

/s/ *Nicholas A. Gravante, Jr.*
Nicholas A. Gravante, Jr.
Luke Nikas
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

Karen C. Dyer
121 South Orange Avenue
Orlando, Florida 32801
(407) 425-7118
*Attorneys for Plaintiffs*

26