UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
RELATED COMPANIES, L.P. and MBM        :        17-cv-4175
SUPPLY COMPANY LLC,                    :
                                       :
          Plaintiffs,                  :        OPINION
                                       :
          -v-                          :
                                       :
CARLETON RUTHLING, TESLA WALLS LLC,    :
HUDSON WALLS LLC, RELATED SUPPLY       :
LTD., JEANEAH PAIK, CHRISTOPHER DU,    :
SKYE HOLDINGS LTD., and SKYE SUPPLY    :
LLC,                                   :
                                       :
          Defendants.                  :
------------------------------------x



JED S. RAKOFF, U.S.D.J.

    Globalization provides the advantages of a worldwide

marketplace, but it also can provide a convenient cover for fraud,

as the allegations of the instant complaint illustrate.

    By way of background, on February 17, 2017, plaintiffs Related

Companies, L.P. ("Related") and MBM Supply Company LLC ("MBM")

filed suit against defendants Carleton Ruthling, Tesla Wall

Systems, LLC ("Tesla I"), Tesla Walls LLC ("Tesla II"), Hudson

Walls LLC ("Hudson"), Related Supply Ltd. ("Supply"), Jeaneah

Paik, Christopher Du, Skye Holdings Ltd. ("Skye Holdings"), and

Skye Supply LLC ("Skye Supply") in Delaware state court. On April

3, Tesla I, Tesla II, and Hudson removed plaintiffs' suit to

Delaware federal court, see Notice of Removal, ECF No. 1, and on

1

June 5, 2017, the case was transferred, on consent, to the Southern District of New York, see ECF Nos. 42, 44, 45.

On June 26, plaintiffs amended their complaint. ECF No. 57.[1] On July 7, Ruthling, Tesla II, Hudson, and Skye Holdings (collectively, the "Ruthling defendants") filed a motion to dismiss plaintiffs' amended complaint, see ECF No. 66, as did Christopher Du, see ECF No. 60, and Skye Supply, see ECF No. 63.

After full consideration, the Court, by bottom-line Order dated August 4, 2017, denied the Ruthling defendants' motion, but granted Skye Supply's motion, and, as to Du's motion, allowed plaintiffs limited discovery to determine whether Du derived substantial revenue from interstate or international commerce as required to establish personal jurisdiction over Du in New York pursuant to C.P.L.R. § 302(a)(3)(ii). See ECF No. 81. Plaintiffs subsequently served supplemental requests for the production of documents on Du and conducted a telephonic deposition. On August 21 and 23, plaintiffs and Du each submitted supplemental memoranda of law. See ECF Nos. 83-86. Thereafter, the Court, by Order dated August 25, denied Du's motion to dismiss. See ECF No. 88.

This Opinion explains the reasons for these rulings.

The pertinent allegations, as set forth in plaintiffs' amended complaint, are as follows:

_____

[1] On July 5, plaintiffs dismissed Tesla I from the case without prejudice. See ECF No. 59.

In or around 2007, Related, a New York-based real estate conglomerate that oversees "development, acquisition, management, finance, marketing, and sales for mixed-use, residential, retail, and office properties," Am. Compl. ¶¶ 4, 21, ECF No. 57, and MBM, an affiliate of Related, id. ¶ 4, entered into a business relationship with Carleton Ruthling, an individual residing in Thailand, id. ¶ 23, and with Supply, a Samoan entity controlled by Ruthling, id. ¶ 27. Ruthling and Supply agreed to supply high-end glass façade material (known as "curtain wall") from China and, at times assisted by Ruthling's wife Jeaneah Paik, see id. ¶ 3, to install it on the exterior of plaintiffs' U.S. building projects, see id. ¶¶ 38, 99.

On or about May 12, 2011, Related awarded Supply a curtain wall contract for 500 North Lake Shore Drive in Chicago, Illinois ("NLSD"), one of Related's developments. Id. ¶ 38. During the pendency of the NLSD project, Ruthling formed Tesla I, which, like Supply, manufactured, transported, and installed curtain wall for Related's buildings. Id. ¶ 5. Tesla I subsequently served as a subcontractor on three Related real estate projects: the above-mentioned NLSD development; the 111 Wacker Drive development in Chicago, Illinois; and The Village at Santa Monica development in Santa Monica, California (collectively, "the projects"). Id. ¶ 6.

Ruthling also formed Hudson, a Delaware limited liability company, id. ¶ 26, which worked with Tesla I on the projects, id.

¶ 6, and Skye Holdings, a Hong Kong limited liability company, which held Ruthling's ownership interest in Tesla I, id. ¶ 28. Though Ruthling was the Chairman and Chief Executive Officer of Tesla I, id. ¶ 23, and through his control of Skye Holdings, its controlling owner, id. ¶ 5, Related also owned a stake in the company, held a seat on its Board of Directors, and possessed a right to approve certain corporate actions. See Declaration of Nicholas A. Gravante, Jr. in Support of Plaintiffs' Opposition to Defendants' Carleton Ruthling, Tesla Walls LLC, Hudson Walls LLC, Related Supply Ltd., and Skye Holdings Ltd.'s Motion to Dismiss ("Gravante Decl."), Ex. 6, ¶ 13.

According to the amended complaint, Ruthling, beginning in 2007 and continuing until mid-2014, was able through his control of the above-mentioned entities to perpetrate a fraudulent scheme to overbill and defraud Related. See Am. Compl. ¶ 7. Specifically, between 2007 and 2012, Ruthling induced plaintiffs to advance millions of dollars to Supply, conspired with Paik and others to issue false invoices to Supply, and caused Supply to pay those invoices, improperly siphoning away plaintiffs' money. See id. ¶ 1. Thereafter, after forming Hudson and Tesla I in 2012, Ruthling and his associates continued their fraud by inducing plaintiffs to advance Hudson and Tesla I millions of dollars, issuing false invoices to Hudson and Tesla I, and causing Hudson and Tesla I to

4

pay these invoices, depleting Tesla I's assets and siphoning away funds that were meant for the projects. Id. ¶ 2.

In furtherance of this fraud, Ruthling also allegedly conspired with non-party Steve Gramling, the controlling owner of defendant Skye Supply, a Nevada limited liability company based in California, id. ¶ 29, to slow work on the projects in order to extort additional cash advances, see id. ¶ 51.

Ruthling also allegedly conspired with Christopher Du, a CPA who provided accounting services to Tesla I. Id. ¶ 16. Du worked closely with plaintiffs and sent them numerous emails requesting additional cash for Tesla I. Id. ¶ 47. He also allegedly reclassified Related's cash advances to Tesla I as revenues, knowing that they were advances; misrepresented as expenses payments by Tesla I that were unsupported by legitimate invoices; and fabricated cash shortfalls to justify Tesla I's requests for additional funds. Id. ¶ 16.

For example, Ruthling initiated a transaction whereby VAT refunds Tesla I received for purchases made with plaintiffs' money were transferred to Skye Holdings for no consideration, id. ¶ 10, a transaction whereby Ruthling used funds plaintiffs advanced to Tesla I to form and capitalize a new shell company in Hong Kong that never provided services or materials to Related's projects, id. ¶ 64, and a transaction whereby Ruthling used $564,000 obtained from plaintiffs' transfers to Tesla I to pay himself for

intellectual property that Related had already paid for and had a significant ownership stake in, id. ¶ 65. Du and Ruthling were also involved in concealing transactions that enriched other parties such as Paik. See id. ¶ 19. Defendants allegedly used their ill-gotten gains to, inter alia, pay Ruthling's personal legal fees, set up a sham entity in Hong Kong, and pay the rent on Ruthling's personal residence. See id. ¶ 9.

## DISCUSSION

On the basis of the foregoing allegations, plaintiffs bring the instant action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., seeking to recover the millions of dollars defendants allegedly stole, plus treble damages, attorneys' fees, and costs. Plaintiffs also bring state law counts of fraud, unjust enrichment, aiding and abetting fraud, negligent misrepresentation, and breach of fiduciary duty.

As noted, six of the defendants, by three separate motions, moved to dismiss plaintiffs' complaint on various grounds including lack of personal jurisdiction, failure to state a claim, and failure to plead fraud with particularity.[2] The Court hereby reaffirms its bottom-line Orders denying two of these motions and granting one, for the following reasons:

_____

[2] Paik and Supply have not entered appearances.

6

## I. Personal Jurisdiction

Two defendants, Christopher Du, a resident of California, and Skye Supply, a California-based bicycle parts company incorporated in Nevada, move to dismiss plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(2).

Federal courts evaluate personal jurisdiction under the law of the forum in which they sit, here New York. See Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001) (citing Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997)). Plaintiffs bear the burden of establishing personal jurisdiction over Du and Skye Supply in New York. Id. At the pleading stage, plaintiffs must make a prima facie showing of personal jurisdiction and, on a motion to dismiss, the Court will construe the complaint in the light most favorable to plaintiffs, resolving all doubts in their favor. See id.

### A. Defendant Christopher Du

Plaintiffs advance three separate bases for jurisdiction over Du in New York, including New York's long-arm statute, C.P.L.R. § 302(a)(3). See Memorandum of Law in Opposition to Defendant Christopher Du's Motion to Dismiss the Complaint ("Pl. Du Mem.") at 1-2, ECF No. 70.

Under § 302(a)(3), plaintiffs can establish jurisdiction over an out-of-state defendant by showing, inter alia, that "(1) the defendant committed a tortious act outside New York; (2) the cause

of action arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4) the defendant expected or should reasonably have expected the act to have consequences in New York; and (5) the defendant derived substantial revenue from interstate or international commerce." Miller Inv. Trust v. Xiangchi Chen, 967 F. Supp. 2d 686, 694 (S.D.N.Y. 2013) (citing N.Y. C.P.L.R. § 302(a)(3)(ii)).

**(1)  Tortious Act Outside New York**

With regard to the C.P.L.R.'s first requirement – that plaintiffs allege a tortious act outside New York – Related and MBM plead that Du made numerous misrepresentations regarding the financial condition of Tesla I, primarily via requests for additional funds sent by Du to New York from California. See, e.g., Am. Compl. ¶ 47 ("As you are aware, Tesla continues to experience dire cash flow shortfalls . . . Without additional funding, production in China will need to terminate as early as next week"); id. ("please send funds as soon as possible as both Tesla and Skye Holdings are effectively out of cash and can no longer fund manufacturing and installation"); see also id. ¶ 55 (quoting other emails of this kind). According to plaintiffs, Tesla I was not short on cash at these times, or, to the extent Tesla I may have been short on cash, it was only because defendants had fraudulently conveyed Tesla I's assets with Du's knowledge and assistance. See id. ¶¶ 35, 41.

8

Plaintiffs further cite numerous instances in which Du and Ruthling conspired to cover up allegedly improper disbursements by Tesla I. See id. ¶¶ 9, 16, 75-78. For example, in an October 22, 2013 email from Ruthling to Du, Ruthling asked Du about "572K for curtain wall development costs" listed in operational expenses. Du responded that the "$564 is included in Opex." The "564" was allegedly an improper $564,000 charge for intellectual property, not an operational expense. Id. ¶ 65.

Plaintiffs also point to communications between Ruthling and Du that suggest that Du created false accounting records for Tesla I. For example, plaintiffs cite an August 27, 2013 email from Du to Ruthling, in which Du wrote "I think we may have opened [P]andora's box by send[ing] the bank statements" to plaintiffs, id. ¶ 77, and a September 12, 2013 email from Du to Ruthling, in which Du asked, "Do you still want to go down this path with them???? More info means more questions," id. ¶ 78.

In another email thread, Ruthling asked Du to produce an accounting record to send to plaintiffs with the "money we borrowed to date[.]" Id. ¶ 75. "[N]eed a clean story," Ruthling told Du, "once you send me the numbers lets discuss." Id. And, in an email sent on June 16, 2014, Du wrote "[i]n regards to the A/R schedule, this is for you [Ruthling] to review and not intended to be shared to Related. All they will see are the actual financials which will no longer show the amount owed to MBM." Id. ¶ 16.

Taken together, these pleadings plainly satisfy the law's requirement that plaintiffs allege a tortious act committed by Du outside New York.

**(2) Cause of Action Arose From That Act**

Du does not contest that plaintiffs' claims against him for common law fraud, negligent misrepresentation, unjust enrichment, RICO fraud, and RICO conspiracy all arise out of the above-mentioned acts.

**(3) Injury In New York**

With respect to the third prong – injury in New York – Du argues that plaintiffs fail to allege that the situs of their injury is New York.

In a case such as this one, where plaintiffs allege fraud, "the critical question [under prong (iii)] is . . . where the first effect of the tort was located that ultimately produced the final economic injury." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 792 (2d Cir. 1999).

While it is clear that the mere experience of economic injury in New York is not a sufficient basis for jurisdiction under § 302(a)(3), see Whitaker, 261 F.3d at 209, the "New York Court of Appeals has not specifically analyzed the situs of injury in an action where the plaintiff alleges injury due to its reliance on an out-of-state defendant's misrepresentation," Miller Inv. Trust, 967 F. Supp. 2d at 696. A number of cases in this Circuit, however,

10

have held that the original event leading to the injury in a misrepresentation action is plaintiffs' reliance on defendant's misrepresentation. See Bank Brussels, 171 F.3d at 792 (holding that the original event causing injury was in New York where plaintiff relied on defendant's misrepresentation by disbursing funds in New York); Hargrave v. Oki Nursery, Inc., 636 F.2d 897, 900 (2d Cir. 1980) (holding that the original event causing injury was in New York where plaintiffs relied on defendant's misrepresentations by purchasing grape vines with funds in New York); Marine Midland Bank v. Keplinger & Assocs., Inc., 488 F. Supp. 699, 703 (S.D.N.Y. 1980) (holding that "since all disbursements . . . were made by [plaintiff] in New York, the situs of the injury was New York").

Here, Du contends that the "original events" were Du's accounting services, which were provided in California and relied on by Tesla I outside of New York. See Defendant Christopher Du's Memorandum of Law in Support of Motion to Dismiss the Complaint ("Du Mem.") at 7, ECF No. 62. The mere fact that plaintiffs are located in New York and accordingly experienced harm there, Du argues, is not sufficient to establish jurisdiction under § 302(a)(3). Id.

But it is not plaintiffs' presence in New York alone which gives rise to their injury in New York. The first effect of Du's out-of-state misrepresentation — i.e., the original event that

11

caused the injury — was plaintiffs' detrimental reliance on it, which reliance manifested in the issuance of cash advances and cash payments from New York. See Am Compl. ¶¶ 56-57. Du may have been supplying accounting services to Tesla I, but he directed his alleged misrepresentations on Tesla I's behalf to plaintiffs in New York, with language expressly requesting that plaintiffs rely on these representations by disbursing funds from New York. Assuming for purposes of this motion that plaintiffs' allegations are true, the situs of their injury is therefore New York. See, e.g., Bank Brussels, 171 F.3d at 792.

### (4) Reasonable Foreseeability

Next, the law requires plaintiffs to show that Du "'expects or should reasonably expect' his actions to have consequences in New York." Ferri v. Berkowitz, 678 F. Supp. 2d 66, 78 (E.D.N.Y. 2009) (quoting Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 241 (2d Cir. 1999)). This test, which is objective, rather than subjective, id., requires plaintiffs to show "a purposeful availment of the benefits of the laws of New York such that the defendant may reasonably anticipate being haled into New York court." Forties B LLC v. Am. W. Satellite, Inc., 725 F. Supp. 2d 428, 434 (S.D.N.Y. 2010) (quoting Kernan, 175 F.3d at 241)). And, under New York law, a party sending fraudulent misrepresentations into New York should reasonably expect the act to have consequences

in New York. See Gabriel Capital, L.P. v. Caib Investmentbank Aktiengesellschaft, 814 N.Y.S.2d 66, 68 (App. Div. 2006).

Here, Du repeatedly directed false statements via email to plaintiffs in New York and the content of those messages plausibly suggests that Du knew and intended his actions to have consequences in New York. See, e.g., Am. Compl. ¶ 16 ("Du reclassified Related's advances to Tesla I as revenues, knowing they were advances"); id. (Du emailed Ruthling, "[i]n regards to the A/R schedule, this is for you [Ruthling] to review and not intended to be shared to Related"); id. ¶ 47 (Du emailed Related, "please send funds as soon as possible as both Tesla and Skye Holdings are effectively out of cash and can no longer fund manufacturing and installation"); id. ¶ 77 (Du emailed Ruthling "I think we may have opened [P]andora's box by send[ing] the bank statements" to plaintiffs); id. ¶ 65 (Du miscategorized $564,000 in intellectual property costs as operational expenses).

These pleadings are sufficient to show Du reasonably expected his conduct to have consequences in New York, most particularly in the form of plaintiffs issuing cash advances to Tesla I. See, e.g., Hargrave, 636 F.2d at 900.

**(5) Substantial Revenue**

New York law further requires plaintiffs to show that Du derived substantial revenue from interstate or international commerce. This requirement "narrows the long-arm reach to preclude

the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within [New York] but whose business operations are of a local character." AmTrust Fin. Servs., Inc. v. Lacchini, 260 F. Supp. 3d 316 (S.D.N.Y. 2017) (quoting Ingraham v. Carroll, 687 N.E.2d 1293, 1296 (N.Y. 1997)).

Though plaintiffs' complaint includes no specific allegations regarding Du's revenues, "dismissal for lack of personal jurisdiction is inappropriate under 302(a)(3)(ii), even where there is no proof that a defendant derives substantial revenue from interstate or international commerce, where that knowledge is peculiarly under the control of [the defendant], and may come to light in the course of [s]ubsequent discovery." See Energy Brands Inc. v. Spiritual Brands, Inc., 571 F. Supp. 2d 458, 468 (S.D.N.Y. 2008) (internal quotation omitted). Therefore, prior to ruling on Du's motion, the Court granted plaintiffs discovery limited to this issue. See ECF No. 81.

Du, it turns out, derives no revenue from interstate and international commerce in his individual capacity. Thus, Du argues, in the absence of alter ego or corporate veil piercing allegations, the out-of-state revenues derived by his wholly-owned business Summit CPA, Inc. ("Summit") cannot be attributed to him for jurisdictional purposes. See Supplemental Memorandum of Law, ECF No. 84; Supplemental Reply Memorandum of Law, ECF No. 85. Additionally, even if the Court attributes Summit's business

14

revenues to him, Du argues that Summit's revenues are not sufficiently "substantial" within the meaning of the statute to permit jurisdiction by New York courts. Id.

In support of his position, Du cites a 1975 Southern District case declining to attribute the revenue of a corporate defendant to its sole shareholder, an individual defendant, reasoning that this would constitute piercing the corporate veil, which could only be done if the plaintiff could show, for example, a failure to observe corporate formalities. Lehigh Valley Indus., Inc. v. Birenbaum, 389 F. Supp. 798, 805 (S.D.N.Y. 1975), aff'd sub nom. Lehigh Val. Indus., Inc. v. Birenbaum, 527 F.2d 87 (2d Cir. 1975). Du also cites a 1983 case, which relies on Lehigh Valley, finding that "it is the individual, and not his corporate employer, who must derive 'substantial revenue' for jurisdiction to attach under section 302(a)(3)(ii)." Bulk Oil (USA) Inc. v. Sun Oil Trading Co., 584 F. Supp. 36, 41 (S.D.N.Y. 1983).

But the reasoning in these cases was repudiated by the New York Court of Appeals in a 1988 case called Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 470 (1988). Kreutter explicitly overturned prior trial court decisions that had applied the so-called "fiduciary shield doctrine" to the N.Y. C.P.L.R. jurisdictional provisions. According to the Court of Appeals, in conducting an analysis under § 302, it is "neither necessary nor desirable to adopt the fiduciary shield doctrine," which would

15

prevent an individual from being subject to jurisdiction in cases where his dealings with New York were solely in a corporate capacity. Id. Specifically, the Court reasoned, nothing "in the statute's language or the legislative history relating to it suggests that the Legislature intended to accord any special treatment to fiduciaries acting on behalf of a corporation or to insulate them from long-arm jurisdiction for acts performed in a corporate capacity." Id. Though Kreutter did not address the question of substantial revenue under 302(a)(3)(ii), Kreutter effectively rejected the basis for the court's finding in Lehigh.

Following Kreutter, a Southern District court vacated its earlier decision in a case called Facit, Inc. v. Krueger, Inc., 657 F. Supp. 1069 (S.D.N.Y. 1987) (hereinafter Facit I), vacated, 732 F. Supp. 1267 (S.D.N.Y. 1990) (hereinafter Facit II). Whereas Facit I invoked the fiduciary shield doctrine to protect the sole owner of a corporation from personal jurisdiction in New York ("[t]he fiduciary shield doctrine prevents reliance on corporate earnings as a means of asserting long-arm jurisdiction over individual defendants," 657 F. Supp. at 1073), Facit II attributed the company's sales to the individual defendants. 732 F. Supp. at 1272-73.

Although subsequent cases have declined to extend Facit II, they have not disturbed its central holding. For example, Siegel v. Holson Co., did not impute the revenue of a corporate entity to

its president for jurisdictional purposes on the grounds that "he is a non shareholding officer of the corporation." 768 F. Supp. 444, 446 (S.D.N.Y. 1991), but it distinguished Facit II on the grounds that, in Facit II, "the officers of a corporation were subject to personal jurisdiction because they were major shareholders of the company for whom they were employed," id.

More recently, in Pincione v. D'Alfonso, the court noted that "if a corporation derives substantial revenue from interstate or international commerce, that revenue cannot be imputed to the company's non-shareholding officers." No. 10 Civ. 3618 (PAC), 2011 WL 4089885, at *10 (S.D.N.Y. Sept. 13, 2011), aff'd, 506 F. App'x 22 (2d Cir. 2012) (citing Siegel, 768 F. Supp. at 446; Bulk Oil, 584 F. Supp. at 41). Siegel and Pincione, however, both reiterate Facit II's holding that corporate out-of-state revenues can be imputed to shareholding officers.[3]

Here, Du personally received 100% of Summit's profits as the 100% owner of its stock. He is also its president, secretary, and sole manager. See ECF No. 84, Ex. B. Moreover, Du is the accountant who performed the work at issue in this case and who engaged in

---

[3] McKinney's treatise on the C.P.L.R. also summarizes this doctrine, noting that "when a corporation and one of its officers are both sued for a tortious act under C.P.L.R. §302(a)(3)(ii), the company's interstate revenue cannot be imputed to the individual for jurisdictional purposes if he or she is not a major shareholder."

17

much of the wrongdoing alleged by plaintiffs. Summit's revenues were paid by plaintiffs to Tesla I, a Delaware corporation, and then to Summit and to Du. Hence, as in Facit II, Du's interstate revenues are connected to the cause of action. Thus, this is not a case where defendants' only interstate revenues are attributable to an unrelated corporation earning monies by conducting unrelated activities.

In New York the law is clear: "[i]nasmuch as the constitutional and statutory safeguards sufficiently alleviate the equitable concerns posed by long-arm jurisdiction, there is no convincing reason why the mere fact of corporate employment should alter the jurisdictional calculus." Kreutter, 71 N.Y.2d at 471 (internal quotation omitted). Thus, the Court attributes Summit's revenues to Du for purposes of determining whether Du derives substantial revenue from interstate or international commerce.

With regard to whether these revenues are substantial within the meaning of the statute, "[t]here is no bright-line rule regarding when a specific level of revenue becomes substantial for purposes of 302(a)(3)(ii)." Energy Brands Inc. v. Spiritual Brands, Inc., 571 F. Supp. 2d 458, 468 (S.D.N.Y. 2008) (citing Light v. Taylor, No. 05 Civ. 5003 (WHP), 2007 WL 274798, at *4 (S.D.N.Y. Jan. 29, 2007), aff'd, 317 F. App'x 82 (2d Cir. 2009)). To determine whether revenue is substantial, courts look either to the percentage of a party's overall revenue derived from interstate

commerce, or to the absolute amount of revenue generated by a party's activities in interstate commerce, with each case to be decided on its own facts. City of New York v. A-1 Jewelry & Pawn, Inc., 501 F. Supp. 2d 369, 417 (E.D.N.Y. 2007) (citations omitted). "[T]he main concern" in a substantial revenue analysis, "is the overall nature of the defendant's business and the extent to which he can fairly be expected to defend lawsuits in foreign forums." Light, 2007 WL 274798, at *4 (internal quotations omitted).

The substantiality prong, in effect, represents a "bigness requirement." See Ingraham, 687 N.E.2d at 1296 (describing "substantial revenue" as essentially a "'bigness requirement' designed to assure that the defendant is 'economically big enough' to defend suit in New York") (quoting David D. Siegel, Siegel's N.Y. Prac. § 88, at 136)). Large amounts of revenues (revenues in excess of $1,000,000) are presumptively substantial. See Hamilton v. Accu-Tek, 32 F. Supp. 2d 47, 68-69 (E.D.N.Y. 1998) (collecting cases). For example, in Allen v. Canadian Gen. Elec. Co., the Court sustained jurisdiction where the 1% of defendant's business transacted in New York amounted to $8.79 million. 65 A.D.2d 39, 41-43 (N.Y. App. Div. 1978), aff'd, 409 N.E.2d 998 (N.Y. 1980). In reaching this determination, the court reasoned that "[i]t would be difficult to convince an economist that sales of approximately $9 million were not substantial regardless of their ratio to total sales." Id. at 43.

19

Where a defendant earns less than seven figures of out-of-state revenues, courts look to the overall percentage of revenue derived from out-of-state sources, and consider whether the defendant seeks to engage in interstate or international commerce. See, e.g., United Bank of Kuwait, PLC v. James M. Bridges, Ltd., 766 F. Supp. 113, 117-18 (S.D.N.Y. 1991). For example, in Cable News Network, L.P. v. GoSMS.com, Inc. the court found that $60,000 in revenue from Europe and Israel was sufficient to confer jurisdiction where "GoSMS.com's operations are international and in no way limited to California." No. 00 Civ. 4812 (LMM), 2000 WL 1678039, at *5 (S.D.N.Y. Nov. 6, 2000). Other cases have found that interstate revenue was substantial where, as a percentage of total revenue, that revenue was greater than five percent. See, e.g., United Res. 1988-I Drilling & Completion Program, L.P. v. Avalon Expl., Inc., No. 91 Civ. 8703 (RPP), 1994 WL 9676, at *4 (S.D.N.Y. Jan. 10, 1994).

Du argues that Summit, a small, California-based accounting practice that never had more than four accountants working for it at any given time, is the type of non-domiciliary that the doctrine is meant to exclude. Du cites for this proposition a series of cases where parties have failed the "bigness" test. See, e.g., Light, 2007 WL 274798, at *5 (no "substantial revenue" where, in the five prior years, the defendant had "earned only $336 in commissions on total sales of $1,523" received through his

website); Ronar, Inc. v. Wallace, 649 F. Supp. 310, 317 (S.D.N.Y. 1986) (finding that "an individual near retirement with $6,500 of annual income from international commerce . . . is not among the entities that can, consistently with the requirements of fundamental fairness, be called upon to bear the expense and inconvenience of litigating in distant forums").

But unlike the situations in Ronar and Light, Du markets to clients throughout the United States and has derived tens of thousands of dollars of revenue from at least eleven states and four countries. See Summit CPA, Inc. Revenue Summary, ECF No. 84, Ex. D. For example, Du's gross revenues between 2012 and 2016 ranged from approximately $250,000 to $310,000. Even excluding the work Du performed for Tesla I, Summit's revenues from non-California clients ranged from around $4,000 to $7,000 per year for 9 to 14 clients. And between 2012 and 2014, when Du worked for Tesla I, out-of-state revenues totaled $41,585, $58,460, and $48,437 yielding overall percentages of 16.8%, 19.8%, and 15.5%.[4]

Thus, Du's work for Tesla I generated material interstate revenues and those revenues are highly relevant to the Court's determination of whether Du could be expected to defend this suit

---

[4] Du also derives revenue from an export company that he owns with his wife, called Pangaea. According to Du, Pangaea generates a couple hundred thousand dollars per year. For purposes of deciding Du's motion, the Court does not reach the question of whether these revenues should also be attributed to Du.

in New York. Indeed, Du generally sought to do business out of
state, and during the years in which he did do such business for
Tesla I, that business was a significant portion of his overall
activity. Moreover, it is not without consequence that, as the
accountant for Tesla I, Du was well aware that his primary role
was to provide financial statements to Related, based in New York,
which he did directly, and to review the flow of funds into Tesla
I from Related. As a result, Du was clearly aware that Tesla I's
revenues were derived from Related in New York and that the
payments from Tesla I to his accounting practice were from Related
in New York.

Taking into account all of these factors, therefore, the
substantial revenue prong is met in the instant case.

**(6)  Due Process Considerations**

Next, plaintiffs must show that jurisdiction in New York
passes constitutional muster.

A district court's exercise of personal jurisdiction over a
nonresident defendant comports with due process only if (i) the
nonresident defendant has purposefully established minimum
contacts with the forum state and (ii) the quality and nature of
the party's contacts are such that the maintenance of the suit
does not offend traditional notions of fair play and substantial
justice. Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d
560, 567-68 (2d Cir. 1998) (citing Int'l Shoe Co. v. State of

Wash., Office of Unemployment Comp. & Placement, 66 S. Ct. 154, 158 (1945)).

In cases where the "conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff," "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 173 (2d Cir. 2013) (citing Calder v. Jones, 465 U.S. 783, 789 (1984)).

Here, Du intentionally directed dozens of emails and telephone calls to New York, allegedly in order to convey false and misleading information to plaintiffs so as to induce plaintiffs to disburse funds from New York. See Am. Compl. ¶ 35. Du therefore "expressly aimed" his conduct at New York and purposely availed himself of its laws.

Moreover, Du does not present "a compelling case," - or indeed any case - "that the presence of some other considerations would render jurisdiction unreasonable." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1984). While Du is an individual residing several thousand miles away from this Court, New York has a strong interest in adjudicating this action and the judicial system has as a strong interest in trying plaintiffs' claims against these defendants in as few forums as possible.

In short, plaintiffs' amended complaint establishes this Court's jurisdiction over Du in New York under New York's long-arm statute and is consistent with the due process requirements of the federal Constitution.[5]

## B. Defendant Skye Supply

Skye Supply also moves to dismiss plaintiffs' complaint for lack of personal jurisdiction in New York. Skye Supply is a designer and distributor of bicycle parts and accessories operating out of Gardena, California and is majority owned and controlled by non-party Steve Gramling, who lives and works in California. See Declaration of Steven Gramling ("Gramling Decl.") ¶¶ 2, 9, 11, ECF No. 65. Skye Supply never entered into a contract with plaintiffs or submitted an invoice for payment to them, never conducted business in New York, and is not controlled by any of the other defendants in this case. Id. ¶¶ 9, 13, 18.

In addition to its bicycle parts business, Skye Supply "acted as a third party vendor that arranged customs brokers to clear products through customers and brokered the services of truck drivers and/or other shipping services for Ruthling-related entities." Id. ¶ 18. Among those entities was Tesla I, the joint-venture between plaintiffs and Carleton Ruthling.

---

[5] Therefore, the Court need not reach the alternative questions of whether plaintiffs properly allege jurisdiction over Du under 18 U.S.C. § 1965(b) or § 302(a)(2) of the C.P.L.R.

24

Plaintiffs assert three bases for jurisdiction over Skye Supply in connection with these services – none of which are sufficient:

**(1) N.Y. Long Arm Jurisdiction**

As discussed above, in order to establish jurisdiction over a defendant under § 302(a)(3)(ii) of the New York C.P.L.R., a plaintiff must show that the defendant (1) committed a tortious act outside New York, (2) which gave rise to the instant action, (3) which caused injury inside New York, and (4) which the defendant reasonably should have expected to have consequences here. Additionally, a plaintiff must show that the defendant (5) derived substantial revenue from interstate or international commerce. See Miller Inv. Trust, 967 F. Supp. 2d at 694.

**(a) Tortious Act Outside New York**

As an initial matter, Skye Supply argues that plaintiffs fail to allege any tortious act committed by Skye Supply. In their answering papers, plaintiffs point to eight paragraphs in their complaint, which they claim allege tortious acts. See Memorandum of Law in Opposition to Defendant Skye Supply LLC's Motion to Dismiss ("Pl. Skye Mem.") at 7, ECF No. 72 (citing ¶¶ 9, 15, 17, 36, 40, 46, 51, and 56). Seven of the eight paragraphs, however, amount to nothing more than conclusory allegations and impermissible group pleading. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied

where the complaint vaguely attributes the alleged fraudulent statements to 'defendants'") (citations omitted); 380544 Canada, Inc. v. Aspen Tech., Inc., 544 F. Supp. 2d 199, 218 (S.D.N.Y. 2008) ("indiscriminate defendant 'clumping' does not adhere to the particularity standards of Fed. R. Civ. P. 9(b)") (quoting Dresner v. Utility.com, Inc., 371 F. Supp. 2d 476, 493-94 (S.D.N.Y. 2005)). See also Grika v. McGraw, 57 N.Y.S.3d 675 (Sup. Ct. 2016) (citing C.P.L.R. § 3016(b)).

For example, plaintiffs allege that "Skye Holdings and Skye Supply intentionally submitted false invoices to Supply Co., Hudson, and Tesla I to extract Plaintiffs' advances." Am. Compl. ¶ 17. But nowhere in their complaint do plaintiffs identify a single invoice submitted by Skye Supply (or by any other defendant) to Supply, Hudson, or Tesla I, false or otherwise.

Plaintiffs also argue that Skye Supply communicated "misrepresentations" to plaintiffs in New York, Pl. Skye Mem. at 7, but plaintiffs do not identify a single misrepresentation communicated by Skye Supply to plaintiffs in New York. Indeed, although plaintiffs allege that "Skye Supply directed numerous communications to Related in New York," they cite only one email dated August 8, 2008 "from Gramling to Related regarding Gramling filing his name as the importer of record on Tesla I's FedEx account for the shipment of Related's materials." Am. Compl. ¶

26

37.[6] Furthermore, nowhere in their complaint do plaintiffs state or even imply that there was anything improper or fraudulent about this communication.

Plaintiffs cite four paragraphs to support their allegation that Skye Supply "accept[ed] assets fraudulently conveyed by its co-conspirators." Pl. Skye Mem. at 7. But these paragraphs merely include Skye Supply in group pleading. See Am. Compl. ¶ 9 ("Skye Holdings transferred these funds to Ruthling and Paik, as well as to Skye Supply, a company owned in part by Ruthling, pursuant to yet another round of fraudulent invoices"); id. ¶ 40 ("[A]dditional capital was required only because Defendants fraudulently conveyed assets from Supply Co. to Skye Holdings, Skye Supply, Ruthling, Du, and Paik"); id. ¶ 46 ("Defendants fraudulently conveyed assets from Tesla I to Skye Holdings, Skye Supply, Ruthling, Du, and Paik"); id. ¶ 56 ("Ruthling then wired the money from these accounts to himself, Du, Paik, Skye Supply, and Skye Holdings").

As plaintiffs never identify or suggest specific evidence of a fraudulent transfer of assets to Skye Supply, plaintiffs cannot rely on these "conclusory statements without any supporting facts, as such allegations would 'lack the factual specificity necessary to confer jurisdiction.'" Lewis v. Madej, No. 15 Civ. 2676 (DLC),

---

[6] Plaintiffs' complaint includes a list of eight communications, but seven of the eight are emails from either Ruthling or Related, not from Gramling or Skye Supply. See Am. Compl. ¶ 37.

2015 WL 6442255, at *3 (S.D.N.Y. Oct. 23, 2015) (quoting Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 185 (2d Cir. 1998)).

Paragraph 15 of plaintiffs' complaint is similarly unavailing. It states that "[o]n multiple occasions, Ruthling caused Skye Supply and Skye Holdings to delay shipments of critical supplies to the Projects until Related approved his additional funding requests." Am. Compl. ¶ 15. But this sentence does not allege a tortious act by Skye Supply; it alleges a tortious act by Ruthling who "caused Skye Supply . . . to delay shipments." Id.

This leave paragraph 51, the one paragraph of the complaint that alleges a potential tortious act by Skye Supply, to wit, that Skye Supply "deliberately delay[ed the] delivery of goods [to Tesla I] to extort payments from plaintiff." Pl. Skye Mem. at 7.

Paragraph 51 regards a shipment of materials from non-party AIT Worldwide Logistics to Tesla I, which Tesla I allegedly intended to use to supply one of Related's building projects (in either California or Illinois) and which, plaintiffs' complaint alleges, Ruthling "conspired" with Skye Supply to "delay." See Am. Compl. ¶ 51. Among other things, paragraph 51 quotes an email sent on April 28, 2014 (after Related had informed Ruthling and Tesla I of its intention to end their business relationship) from an employee of Tesla I to Related stating that "Steve G[rambling] still has not released AIT, maybe one of you can reach out to Steve and see why he hasn't released AIT. At this time I'm still

28

restricted from getting the materials tomorrow." Id. Paragraph 51 also cites an email from a Related employee to Du and Ruthling stating "I have been notified that AIT is holding release of these materials pending word from Steve Gramling that this payment was received." Id.

According to plaintiffs, Gramling - intending to email the employee at AIT to give instructions on how to respond to Tesla I's inquiry - inadvertently emailed Tesla I saying "don't answer. If he [the Tesla I employee] gets you on the phone, tell him he'll have to talk to Carleton. Any further questions are ask Carleton. I think [the Tesla I employee] is one of the good ones, but this stuff still needs to be capped and he doesn't know the mine field he's walking in." Id.

Gramling was clearly writing this email in his capacity as principal of Skye Supply and in furtherance of Skye Supply's business coordinating shipments for Tesla I. Further, in the email, Gramling instructed an AIT employee to ignore potential inquiries from a Tesla I employee and to redirect such requests to Carleton Ruthling. Nonetheless, it is not apparent from the pleadings that this message actually concealed any information from plaintiffs that they did not already have. Indeed, other emails quoted by plaintiffs in the very same paragraph suggest that Tesla I and Related were already aware that "AIT is holding release of these materials pending word from Steve Gramling that this payment was

received." Id. Plaintiffs nowhere allege what "this payment" was and whether it was or was not improper for AIT to hold release until it was received. Ruthling and Gramling may simply have sought to halt these shipments because plaintiffs had not paid their bills. Moreover, there is nothing obviously tortious about instructing someone to ask their boss about a business matter.

But taking the pleadings in the light most favorable to plaintiffs, Gramling's suggestion that employees at Tesla I don't know the "mine field" they are walking in supports plaintiffs' contention that Gramling was delaying shipments to Tesla I for an improper purpose in order to assist Ruthling. Thus, if only barely, plaintiffs meet their burden of alleging a tortious act – delaying a shipment by AIT to Tesla I – committed by Skye Supply outside New York.

**(b) Injury in New York**

Plaintiffs cannot, however, meet their burden to show that this allegedly tortious act outside New York caused injury in New York. As discussed previously, "the critical question [in a prong 3 analysis] is . . . where the first effect of the tort was located that ultimately produced the final economic injury." Bank Brussels, 171 F.3d at 792. The mere experience of economic injury in New York is not a sufficient basis for jurisdiction under § 302(a)(3). See Whitaker, 261 F.3d at 209.

Plaintiffs argue that the injury from Gramling's act was the economic harm felt in New York when Related advanced funds to Tesla I. See Pl. Skye Mem. at 9. But the first effect of Gramling's tort would have been in California where presumably Tesla I did not receive certain shipments on time, or in Nevada or Delaware, where Tesla I is based. Gramling, indeed, never emailed Related, and did not even intend to email Tesla I. According to plaintiffs, Gramling only intended to email an employee at AIT Logistics in furtherance of an alleged scheme to delay the receipt by Tesla I of a shipment from AIT Logistics. The first effect of these acts was not in New York.

Assuming plaintiffs' allegations in paragraph 51 are true, Skye Supply conspired with an out-of-state entity, AIT, in order to aid a scheme intended to induce an in-state entity, Related, to advance additional funds to Tesla I. But plaintiffs cite no authority for the proposition that jurisdiction can extend to an out-of-state defendant in a situation where the immediate effect of the out-of-state defendant's allegedly tortious act was to harm another out-of-state third party. As the first effect of Skye Supply's act was outside of New York, personal jurisdiction over Skye Supply cannot be established under section 302(a)(3).

"Under either prong of CPLR § 302(a)(3), 'each element is essential and if plaintiffs fail to proffer sufficient evidence of any element it is dispositive of the issue of personal jurisdiction

under this provision.'" Adamou v. Cty. of Spotsylvania, Virginia, No. 12 Civ. 7789 (ALC), 2016 WL 1064608, at *6 (S.D.N.Y. Mar. 14, 2016) (quoting Overseas Media, Inc. v. Skvortsov, 407 F. Supp. 2d 563, 575 (S.D.N.Y. 2006), aff'd, 277 F. App'x 92 (2d Cir. 2008)).

The Court, therefore, need not reach the question of whether plaintiffs' injury was reasonably foreseeable or if Skye Supply derived substantial revenue from interstate or international commerce.

**(2) N.Y. Conspiracy Jurisdiction**

As a separate basis for jurisdiction over Skye Supply, plaintiffs point to C.P.L.R. § 302(a)(2), which provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . commits a tortious act within the state[.]" Under § 302(a)(2), acts committed in New York by a co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to the jurisdiction of New York courts. See Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991).

Skye Supply argues, first, that § 302(a)(2) does not apply here as plaintiffs do not explicitly mention § 302(a)(2) in their amended complaint. See Reply Brief in Support of Defendant Skye Supply LLC's Motion to Dismiss ("Skye Reply") at 5, ECF No. 74. But plaintiffs' amended complaint does plead that the "Court has personal jurisdiction over . . . Skye Supply . . . also because

[Skye Supply] . . . engaged in a conspiracy with Tesla I, Tesla II, and Ruthling to steal millions of dollars from Related." Am. Compl. ¶ 37. And, in any event, under New York law, a "'[c]omplaint need not expressly allege participation in a conspiracy' for jurisdictional purposes." Biz2Credit, Inc. v. Kular, No. 14 Civ. 8223 (ER), 2015 WL 2445076, at *7 (S.D.N.Y. May 21, 2015) (quoting LaChapelle v. Torres, 1 F. Supp. 3d 163, 170 (S.D.N.Y. 2014)).

What New York law does require, however, is that plaintiffs plead (1) "a prima facie showing of conspiracy," and (2) "specific facts warranting the inference that the defendant was a member of the conspiracy." Sea Trade Maritime Corp. v. Coutsodontis, No. 09 Civ. 488, 2012 WL 3594288, at *7 (S.D.N.Y. Aug. 16, 2012) (quoting Chrysler Capital Corp., 778 F. Supp. at 1266)).

Here plaintiffs fall short:

### (a) Prima Facie Conspiracy

A prima facie showing of conspiracy consists of four elements: "(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the conspiracy, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury." Chrysler Capital Corp., 778 F. Supp. at 1267. To establish conspiracy jurisdiction in New York, plaintiffs must allege at least one overt act in furtherance of the conspiracy in New York. See Chrysler Capital Corp., 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991).

33

Skye Supply argues that plaintiffs fail to establish that Skye Supply entered into an agreement to defraud plaintiffs. See Skye Reply at 6. The law, however, does not require plaintiffs, at this stage, to prove participation, just to allege it. Moreover, even "disconnected acts, when taken together, may satisfactorily establish a conspiracy." First Fed. Savings and Loan Assn. of Pittsburgh v. Oppenheim, Appel, Dixon & Co., 629 F. Supp. 427, 443-44 (S.D.N.Y. 1986) (internal citations omitted). Plaintiffs plead that Skye Supply deliberately caused materials to be withheld from plaintiffs' projects to aid a conspiracy masterminded by Ruthling. See Am. Compl. ¶ 51. These allegations are sufficient at the pleading stage. See Sea Trade Mar. Corp. v. Coutsodontis, No. 09 Civ. 488 (BSJ) (HBP), 2012 WL 3594288, at *7 (S.D.N.Y. Aug. 16, 2012) (finding that, at the pleading stage, it is enough for plaintiff to allege "acts to suggest" a corrupt agreement between defendants).

**(b) Defendant's Role in the Conspiracy**

Next, plaintiffs must demonstrate that Skye Supply's membership in the conspiracy confers jurisdiction by showing: (a) "the out-of-state co-conspirator had an awareness of the effects of the activity in New York"; (b) "the New York co-conspirator's activity in New York was for the benefit of the out-of-state conspirators"; and (c) "that the co-conspirators in New York acted

34

at the behest of or on behalf of, or under the control of the out-of-state co-conspirators." Biz2Credit, 2015 WL 2445076, at *8.

Before an "agency relationship will be held to exist under section 302(a)(2), a showing must be made that the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981) (collecting cases). See also First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 218 F. Supp. 2d 369, 395 (S.D.N.Y. 2002) (rejecting conspiracy jurisdiction where plaintiff offered only "conclusory allegations" that an in-state co-conspirator was controlled by an out-of-state co-conspirator).

Here, taking all of the allegations in the light most favorable to plaintiffs, Skye Supply acted at the behest of Ruthling, the purported in-state co-conspirator, not the other way around. See Am. Compl. ¶ 15 (noting that Ruthling "caused Skye Supply . . . to delay shipments of critical supplies to the Projects"); id. ¶ 37 (alleging that Ruthling "used [Skye Supply] to assist him in the scheme alleged herein"). Even plaintiffs conceive of Skye Supply's out-of-state tortious act – Gramling's email involving AIT Logistics and Tesla I – as being for the benefit of Ruthling. See id. ¶ 51.

As plaintiffs fail to allege that Ruthling or any other co-conspirators' in-state activities were undertaken for the benefit

of Skye Supply or that Ruthling or any other co-conspirators acted at the behest of Skye Supply, § 302(a)(2) jurisdiction over Skye Supply under cannot be maintained. Grove Press, 649 F.2d at 122.

**(3) Due Process Considerations**

Even were plaintiffs to properly allege personal jurisdiction over Skye Supply in New York pursuant to § 302(a)(2) or § 302(a)(3), the exercise of such jurisdiction would not comport with due process under the federal Constitution.

According to plaintiffs, Skye Supply has sent, at most, a handful of emails to New York over many years, only one of which they cite in their complaint. See Am. Compl. ¶ 37 ("An August 8, 2008 email from Gramling to Related regarding Gramling filing his name as the importer of record on Tesla I's FedEx account for the shipment of Related's materials."). Plaintiffs do not allege that any of Skye Supply's emails to New York were fraudulent. Instead, the only email they cite was transparently a byproduct of work that Skye Supply provided to other entities, based outside of New York, and for projects located outside of New York. None of the allegations against Skye Supply — that it inflated its invoices to Tesla I (a conclusory statement for which plaintiffs provide no evidence) or that it conspired with co-defendants to halt shipping to Tesla I — involve conduct expressly aimed at New York.

Nor has Skye Supply physically entered New York or had substantial contacts with New York. Furthermore, none of the

36

alleged harms took place in New York, as the shipment Skye Supply was allegedly involved in delaying was destined for a project in another state. Skye Supply was not in privity with plaintiffs, it did not expressly direct its activity into New York, and its alleged tortious acts were not made in New York or have their first effects in New York.

Thus, the "conduct that forms the basis for the controversy" - Skye Supply's shipping services to Tesla I and its communications with Tesla I - occurred entirely out-of-forum. In such a circumstance, the exercise of personal jurisdiction may be constitutionally permissible only if the defendant expressly aimed its conduct at New York. See Calder, 465 U.S. at 789. A handful of unrelated emails sent to recipients in New York, in the absence of any other direct connection between defendant's allegedly tortious conduct and New York, are insufficient to show that the defendant expressly aimed its conduct here. See Barron Partners, LP v. Lab 123, Inc., No. 07 Civ. 11135 (JSR), 2008 WL 290218, at *11 (S.D.N.Y. July 25, 2008).

**(4) RICO Jurisdiction**

Federal law provides that, when the "ends of justice" require it, plaintiffs can assert "nationwide service and jurisdiction" over RICO defendants. 18 U.S.C. § 1965(b).

Congress, however, "has expressed a preference in § 1965 to avoid, where possible, haling defendants into far flung fora." PT

37

United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 72 (2d Cir. 1998). Thus, it is generally accepted that "ends of justice" jurisdiction is authorized only "where the RICO claim could not otherwise be tried in a single action because no district court could exercise personal jurisdiction over all of the defendants." Elsevier Inc. v. W.H.P.R., Inc., 692 F. Supp. 2d 297, 315 (S.D.N.Y. 2010) (collecting cases). See also Zito v. Leasecomm Corp., No. 02 Civ. 8074 (GEL), 2004 WL 2211650, at *20 (S.D.N.Y. Sept. 30, 2004) (finding that "this requirement is met where it would be impracticable to bring all co-defendants together in a single action because no district court could exercise personal jurisdiction over all of them") (internal quotation omitted); Anderson v. Indiana Black Expo, Inc., 81 F. Supp. 2d 494, 505 (S.D.N.Y. 2000) (finding that "to the extent that Section 1965(b) authorizes national service of process on other defendants 'if the ends of justice [so] require,' this phrase has been 'interpreted to mean that § 1965(b) authorizes an assertion of personal jurisdiction if, otherwise, the entire RICO claim could not be tried in one civil action'") (citing Daly v. Castro Llanes, 30 F. Supp. 2d 407, 413 (S.D.N.Y. 1998)); Nuevo Mundo Holdings v. PriceWaterhouse Coopers LLP, No. 03 Civ. 0613 (GBD), 2004 WL 2848524, at *7 (S.D.N.Y. Dec. 9, 2004) (finding that the "ends of justice" requirement means that "the statute authorizes personal

jurisdiction if, otherwise, the entire RICO claim could not be tried in one civil action") (citations omitted).

Plaintiffs in this case assert that "there may be no other forum where all Defendants are subject to jurisdiction," Pl. Du Mem. at 16, and that "it is highly unlikely that most of the Defendants subject to jurisdiction here would concede jurisdiction in California, which is the only location where Skye Supply apparently believes it could be sued," Pl. Skye Mem. at 19.

But plaintiffs make no effort to show that the other defendants would not be subject to suit in California, and their contention that Skye Supply could only be sued in California is belied by the fact that Skye Supply is uncontestably subject to suit in Nevada, where it is incorporated. Moreover, and fatally for plaintiffs' position here, plaintiffs themselves brought this same suit in Delaware (where Tesla I and MBM are domiciled), and alleged jurisdiction over all defendants there. Plaintiffs, therefore, fail to allege extraordinary circumstances which would require the Court to invoke "ends of justice" jurisdiction.

## II. PLAINTIFFS' RICO CLAIMS

Turning to the seven counts of plaintiffs' complaint, the Court next considers the sufficiency of plaintiffs' federal law RICO claims (counts IV and V), which Du and the Ruthling defendants both move - pursuant to Rule 12(b)(6) - to dismiss.

### A. Count IV: Section 1962(c)

39

To state a RICO claim, plaintiffs must plead (1) that defendants (2) through the commission of two or more acts (3) constituting a pattern (4) of racketeering activity (5) directly or indirectly invested in, or maintained an interest in, or participated in the conduct of (6) an enterprise (7) the activities of which affect interstate or foreign commerce. Moss v. Morgan Stanley Inc., 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(a)-(c)). In a case such as this one, based on predicate acts of mail and wire fraud, plaintiffs must plead these elements with particularity. F.R.C.P. 9(b). And, in a civil cause of action arising under 18 U.S.C. § 1962, plaintiffs must further establish standing to seek relief in Court by adequately alleging an injury proximately caused by the RICO violation.

The Ruthling defendants argue that plaintiffs fail to adequately plead two of the elements of a RICO claim – predicate acts and a pattern of racketeering. See Defendants Carleton Ruthling, Tesla Walls LLC, Hudson Walls LLC, and Skye Holdings Ltd.'s Memorandum of Law in Support of their Motion to Dismiss ("Ruthling Def. Mem.") at 11-14, ECF No. 67. Additionally, defendants argue that plaintiffs fail to allege reasonable reliance, which, they contend, is an element of a RICO claim based on fraud. Id. at 15.

Du, moving separately, argues that plaintiffs have failed to plead predicate acts of fraud with particularity, the existence of

an enterprise, his scienter, or his participation in the alleged enterprise. See Du Mem. at 14-19.

The Court considers each of these arguments in turn:

## (1) Plaintiffs' Standing

To establish standing in a RICO action, plaintiffs must allege "an injury to business or property" and "causation of the injury by the violation." Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir. 1990). See also First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 767 (2d Cir. 1994). These two prongs, sometimes referred to as "RICO standing," are "a more rigorous matter than standing under Article III." Denney v. Deutsche Bank AG, 443 F.3d 253, 266 (2d Cir. 2006).

The Ruthling defendants argue that plaintiffs fail to allege an injury to business or property because their purported losses are not "clear and definite." See Ruthling Def. Mem. at 9-11; Denney, 443 F.3d at 266. Indeed, RICO damages are "speculative" or "unprovable" where "contractual or other legal remedies remain which hold out a real possibility that the debt, and therefore the injury, may be eliminated or significantly reduced." In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 59 (2d Cir. 1998); DLJ Mortg. Capital, Inc. v. Kontogiannis, 726 F. Supp. 2d 225, 237 (E.D.N.Y. 2010). According to the Ruthling defendants such a real possibility exists here as plaintiffs are, essentially, creditors attempting to recover certain cash advances made to Tesla I, claims

41

they are already pursuing against Tesla I in New York State Supreme

Court. Thus, they argue, plaintiffs' alleged injury in this case

depends upon the outcome of the New York state action, which has

already resulted in a $15 million judgment that is stayed pending

appeal. As "conceivable contingencies" exist that might abate

plaintiffs' losses, defendants argue, their RICO claims are

unripe. Ruthling Def. Mem. at 10.

But "[w]hen a corporation fraudulently is caused to issue

debt and stripped of its assets in a manner that obviously will

leave the creditors unpaid, those creditors have standing" to sue

under RICO. GICC Capital Corp. v. Tech. Fin. Grp., Inc., 30 F.3d

289, 293 (2d Cir. 1994). Though GICC Capital is an "anomalous case

where the primary injured party lacks the ability to sue," Jackson

Nat. Life Ins. Co. v. Ligator, this is also such a case. 949 F.

Supp. 200, 206 (S.D.N.Y. 1996).

As in GICC Capital, "[s]uit by the derivatively injured

party," here Related, "may be the only means to an equitable

resolution." Id. Also, as in GICC Capital, "there exists no risk

of double recovery." Id. That is because Tesla I, the primary

injured party, lacks the ability to sue defendants as defendants

are its majority owners and controlling members. Tesla I is not

going to sue its controlling owners to recover the funds those

owners allegedly stole. The fact that plaintiffs might be able to

recover from Tesla I if Tesla I is able to recover assets in other

42

lawsuits is not a bar to plaintiffs pursuing the instant action. Courts routinely take into account recoveries from other sources when a plaintiff has claims against multiple parties. A double recovery would occur only if both Related and Tesla I were awarded judgments against the Ruthling defendants.

Moreover, even were plaintiffs required to pursue their contractual and other legal remedies before bringing their RICO claims against defendants, they have done so here. Plaintiffs tried their case against Tesla I to a final judgment in New York state court. Tesla I, which has appealed from that judgment, currently has no assets and owes $2.3 million to its attorneys. See Memorandum of Law in Opposition to Defendants' Carleton Ruthling, Tesla Walls LLC, Hudson Walls LLC, Related Supply Ltd., and Skye Holdings Ltd.'s Motion to Dismiss ("Pl. Ruthling Mem.") at 12, ECF No. 68. Though Tesla I won a judgment against Michael Budd, its former employee, that action is pending a retrial on damages.

The law does not require plaintiffs to wait to see if Tesla I is one day able to make good on its debts; it only requires plaintiffs to exhaust their legal remedies.

Thus, this case is not like Motorola Credit Corp. v. Uzan, where the plaintiff had not yet obtained a final judgment in arbitrations relating to the underlying transactions. 322 F.3d 130, 135-37 (2d Cir. 2003). Nor is it like Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC, where

43

plaintiff sought funds that could be awarded in an ongoing bankruptcy proceeding. 347 F. App'x 711, 713 (2d Cir. 2009).

It is also distinguishable from DLJ Mortg. Cap, 726 F. Supp. 2d at 238-39 (where plaintiff had not pursued claims to enforce the mortgages defendants sold to them and which plaintiff now claimed were fraudulent) and Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc., 17 F. Supp. 3d 207, 231 (E.D.N.Y. 2014) (where plaintiff was concurrently litigating and arbitrating the allegedly fraudulent denials of its insurance claims).

Here, plaintiffs are not secured creditors; there is "no collateral on which to foreclose, or any other contractual remedy." Motorola Credit Corp., 322 F.3d at 136. Plaintiffs gave value to Tesla I at a time when defendants' were allegedly engaged in an undisclosed fraud to loot Tesla I. See Kirschner v. Bennett, No. 07 Civ. 8165 (JSR), 2011 WL 1875449, at *5 (S.D.N.Y. Feb. 14, 2011), report and recommendation adopted sub nom., In re Refco, Inc. Sec. Litig., No. 07 MDL 1902 (JSR), 2011 WL 1899758, at *5 (S.D.N.Y. May 16, 2011) (applying GICC Capital, explaining: "This is a case in which the FX Customers gave value at a time when an undisclosed fraud 'undermine[d] the possibility of repayment.'"). Thus, plaintiffs' injury is sufficiently clear, definite, and proximate for purposes of demonstrating RICO standing.

**(2) Predicate Acts**

44

Turning next to plaintiffs' substantive RICO claim, defendants argue that plaintiffs fail to allege "the existence of a fraudulent scheme," McLaughlin v. Anderson, 962 F.2d 187, 190-91 (2d Cir. 1992), or to provide a "detailed description" of that scheme and how it was connected to mail or wire communications, In re Sumitomo Copper Litig., 995 F. Supp. 451, 456 (S.D.N.Y. 1998). According to defendants, plaintiffs' complaint rests on allegations that defendants billed Tesla I countless "fraudulent invoices," which were improperly paid with cash advances from Related, and yet plaintiffs do not identify a single fraudulent invoice paid by Tesla I. As a result, defendants argue, plaintiffs' complaint alleges no specific predicate acts of fraud. See Ruthling Def. Mem. at 12.

But defendants' "invoices" were only one means allegedly used to affect the fraud at issue.[7] Plaintiffs also allege numerous specific examples of fraudulent transfers such as:

(i) a transaction whereby VAT refunds Tesla I received for purchases made with plaintiffs' money were transferred to Skye Holdings for no consideration, see Am. Compl. ¶ 10;

(ii) a transaction whereby Ruthling used funds plaintiffs advanced to Tesla I to form and capitalize a new shell company in

---

[7] Furthermore, the invoices are "peculiarly within the defendant's knowledge and control." United States v. Lab. Corp. of Am. Holdings, No. 07 Civ. 5696 (ALC) (RLE), 2015 WL 7292774, at *4 (S.D.N.Y. Nov. 17, 2015).

45

Hong Kong that never provided services or materials to Related's projects, see id. ¶ 64; and,

(iii) a transaction whereby Ruthling used funds obtained from plaintiffs' to pay himself for intellectual property that Related had already paid for and had significant ownership stake in due to Related's ownership interest in Tesla I, see id. ¶ 65.

Moreover, plaintiffs properly plead the nature, scope, and contours of the fraudulent scheme as required by law. They allege that, between 2007 and 2012, they advanced Supply $5 million in response to defendants' requests for additional funding, and that between 2012 and 2014, they advanced Tesla I $15 million in response to similar requests. See id. ¶¶ 52, 55. These monies were wired from plaintiffs' accounts to Tesla I's accounts and, according to plaintiffs, Ruthling subsequently caused these funds to be improperly wired to himself, Du, Paik, Skye Supply, and Skye Holdings. Id. ¶ 56. Indeed, though plaintiffs do not produce the fraudulent invoices that supported the payment of these funds from Tesla I to defendants, they "delineate, with adequate particularity . . . the specific circumstances constituting the overall fraudulent scheme." State Farm Mut. Auto. Ins. Co. v. Grafman, 655 F. Supp. 2d 212, 227 (E.D.N.Y. 2009) (internal quotation omitted). For example, plaintiffs allege that Ruthling and Du mispresented Tesla I's activities and expenses, including by "cleaning up" its financial statements. Am. Compl. ¶¶ 75, 76.

These allegations are sufficient at the pleading stage to sustain plaintiffs' claims.

### (3) Pattern of Racketeering

Next, defendants argue that plaintiffs fail to plead with particularity a pattern of racketeering, which requires that they allege "(1) at least two predicate acts of racketeering occurring within a ten-year period; (2) that these predicate acts are related to each other; and (3) that these predicate acts amount to or pose a threat of continuing criminal activity." D.R.S. Trading Co., Inc. v. Fisher, No. 01 Civ. 8028 (WHP), 2002 WL 1482764, at *3 (S.D.N.Y. July 10, 2002) (citing GICC Capital, 67 F.3d at 465).

Prong three — known as the "continuity requirement" — can be satisfied either by showing a "closed-ended" pattern of racketeering activity (i.e., a series of related predicate acts extending over a substantial period of time) — or by demonstrating an "open-ended" pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed. H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 241-42 (1989); Kilkenny v. Law Office of Cushner & Garvey, L.L.P., No. 08 Civ. 588 (KMK), 2012 WL 1638326, at *6 (S.D.N.Y. May 8, 2012).

"Closed-ended continuity is primarily a temporal concept." Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 184 (2d Cir. 2008) (internal quotation omitted). And, "[s]ince the Supreme

Court decided H.J. Inc., [the Second Circuit has] never held a period of less than two years to constitute a substantial period of time." Id. (internal quotation marks omitted); see also Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999) (noting that the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time'"); Grimes v. Fremont Gen. Corp., 785 F. Supp. 2d 269, 301 (S.D.N.Y. 2011) (holding that plaintiffs "have not sufficiently alleged close-ended continuity, because they have not adequately pled predicate acts over a period of at least two years").

Though the two-year requirement is not a "bright-line" rule, "it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity." Spool, 520 F.3d at 184. This is particularly the case where "'the activities alleged involved only a handful of participants' and do not involve a 'complex, multi-faceted conspiracy.'" Id. (quoting GICC Capital, 67 F.3d at 468).

Defendants argue that, here, the complaint alleges a scheme that falls at most sometime between 2012 and 2014, less than two years. Generally, "[w]hen the fraudulent conduct alleged involves such a limited number of perpetrators, small number of victims, and limited goal, it cannot support a claim of open-ended or closed-ended continuity." D.R.S. Trading Co., 2002 WL 1482764, at *4 (citing GICC Capital, 67 F.3d at 468 (finding that single-

victim acts by a handful of participants was not a "multi-faceted scheme" sufficient to meet continuity requirement); Price v. Gast, No. 98 Civ. 7769 (WHP), 2000 WL 369381, at *9 (S.D.N.Y. Apr. 11, 2000) (finding that "short-lived, inherently terminable schemes with a few criminal acts and few victims do not show a threat of continuity sufficient to plead a RICO pattern"); China Trust Bank of New York v. Standard Chartered Bank, PLC, 981 F. Supp. 282, 287-88 (S.D.N.Y. 1997) (finding that although a number of acts of misconduct were alleged, they were all carried out by a single defendant against one victim, pursuant to a single scheme and thereby failed both open and close-ended continuity requirements); Airlines Reporting Corp. v. Aero Voyagers, Inc., 721 F. Supp. 579, 583 (S.D.N.Y. 1989) (holding that a complaint which alleged "a closed-ended, single scheme involving three perpetrators, (a company and two of its directors), one victim, and an uncomplicated transaction (essentially relating to a simple breach of contract," over a thirteen month period failed to plead continuity)). Indeed, all but two of the wire transfers plaintiffs made by plaintiffs to Tesla I fell within a 20-month period between 2013 and 2014. See Am. Compl. ¶ 57.

But defendants fail to note that one of the early wire transfers to Tesla I, made in February 2012, was for $2.9 million. Id. In addition, plaintiffs allege a scheme prior to the creation of Tesla running from 2007 through 2012 during which time

49

defendants induced Related to advance money to Supply, which defendants conveyed to themselves by issuing fraudulent invoices to Supply. See id. ¶ 59. Although plaintiffs do not plead with particularly much of the pre-2012 fraudulent activity, the complaint does allege at least two specific pre-2013 fraudulent wires, to wit, improper payments of $10,750 and $5,093.25 to Ms. Paik in early 2012. See id. ¶ 63.

It may turn out that, ultimately, plaintiffs cannot prove continuity, but plaintiffs' amended complaint includes sufficient allegations of continuity to survive defendants' motion to dismiss. As the Court put it in Gerstenfeld v. Nitsberg, "[t]he purpose of Rule 9(b)'s heightened pleading requirements is threefold: (1) to enable the defendant to defend himself through adequate notice of the claims; (2) to protect the defendant's reputation from pending charges that are without any particularized basis; and (3) to derail 'strike suits' in which the threat of RICO liability is used to increase leverage in settlement negotiations in business disputes unrelated to racketeering." 190 F.R.D. 127, 131 (S.D.N.Y. 1999) (collecting cases). Here, all three purposes are satisfied as plaintiffs have provided adequate notice of their claim, plead the overall claim with particularity, and plausibly alleged facts and circumstances - by stringing together various emails and other records -

suggesting the possibility of a racketeering enterprise designed to defraud plaintiffs out of millions of dollars.

### (4) Reasonable Reliance

Defendants next argue that plaintiffs fail to allege reasonable reliance. While the mail and wire fraud statutes do not contain a reasonable reliance component, defendants argue that the Second Circuit has imported one into the causation element for RICO claims that plead predicate acts of mail or wire fraud. See Ruthling Def. Mem. at 15. Thus, according to defendants, "in order to prevail in a civil RICO action predicated on any type of fraud . . . the plaintiff[s] must establish 'reasonable reliance' on the defendants' purported misrepresentations or omissions." Bank of China, N.Y. Branch v. NBM LLC, 359 F.3d 171, 178 (2d Cir. 2004).

But, subsequently, in 2008, the Supreme Court held in Bridge v. Phoenix Bond & Indemnity Co., that first-party reliance by the plaintiff is not an element of a RICO claim premised on mail or wire fraud. 553 U.S. 639, 658 (2008). Thus, today, "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." Id. at 661. Instead, the central question is whether the alleged violation led directly to the plaintiff's injuries. Id. at 654.

51

Moreover, even if Bank of China applied, plaintiffs would not be required at this stage to prove the reasonableness of their reliance to survive defendants' motion to dismiss. See Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 459 (S.D.N.Y. 2007) (noting that reasonable reliance is "a fact-specific inquiry generally considered inappropriate for determination on a motion to dismiss" (internal quotation omitted)). It is enough that plaintiffs allege reasonable reliance, and here they do so adequately by detailing the steps which defendants took to deceive them. See, e.g., Am. Compl. ¶¶ 65, 75, 76.

### (5) Du's Participation in a RICO Enterprise

Moving separately, Du argues that plaintiffs do not allege the existence of a RICO enterprise, see Du Mem. at 19, Du's scienter, see id. at 17, or Du's participation in "the operation or management of [the] enterprise through a pattern of racketeering activity," see id. at 14; Reves v. Ernst & Young, 507 U.S. 170, 184 (1993).

A RICO enterprise may be, inter alia, "'a group of persons associated together for a common purpose of engaging in a course of conduct,' the existence of which is proven 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)).

"The enterprise must be separate from the pattern of racketeering activity . . . and distinct from the person conducting the affairs of the enterprise." Id. (internal citations omitted). Moreover, plaintiffs may not "circumvent the distinctiveness requirement 'by alleging an enterprise that consists merely of a corporate defendant associated with its own employees or agents[.]'" Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 89 (2d Cir. 1999) (quoting Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir. 1994).

According to Du, other than alleging that he "provided accounting services in connection with the Projects," plaintiffs fail "to allege, in a non-conclusory fashion, that Du . . . worked together with the other members of the purported enterprise." Du Mem. at 19. But Du's arguments do not address many of the allegations in plaintiffs' complaint that tie him to the conspiracy. See, e.g., Am. Compl. ¶ 65 (alleging Du's role in stealing $564,000 from plaintiffs through falsifying accounting statements); id. ¶ 78 (alleging Du's concern about providing plaintiffs with more information regarding Tesla I's financial statements as it would raise more questions Du would be unable to answer); id. ¶ 16 (quoting a June 16, 2014 email from Du in which he implies that he maintained two different versions of Tesla I's books and records, only one of which he shared with plaintiffs). These allegations

clearly suggest that Du worked to advance the goals of the enterprise and to defraud plaintiffs.

Moreover, "[a]n enterprise is 'operated' not just by upper management but also by the lower rung participants in the enterprise who are under the direction of upper management." Reves, 507 U.S. at 184. "[O]utsiders" may be liable under § 1962(c) if they are "associated with" an enterprise and participate in the conduct of its affairs. Id. at 185.

Taking the pleadings in the complaint as true, the common purpose of the association of Du and Ruthling was to defraud plaintiffs. While Du may be able to show, following discovery, that his conduct was limited to his role as an accountant for Tesla I, and plaintiffs may be unable to substantiate the allegations in their complaint, at the pleading stage plaintiffs' complaint is sufficient to state a § 1962(c) claim for relief against Du.

## B. Count V: Section 1962(d)

Du and the Ruthling defendants each move to dismiss count V of the complaint – plaintiffs' RICO conspiracy claim – on the grounds that plaintiffs do not allege the existence of a corrupt agreement. See Ruthling Def. Mem. at 18 (arguing that plaintiffs do not allege "when the agreement was made, how the agreement came about, or what was agreed upon"); Du Mem. at 20 (arguing that plaintiffs' complaint "fails to allege specific facts to show that

Du entered into a corrupt agreement to commit" the alleged predicate acts of fraud).

"Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990). However, plaintiffs need not allege when the agreement was made or how it came about. "Assuming that a RICO enterprise exists, the government must prove only that the defendants know the general nature of the conspiracy and that the conspiracy extends beyond their individual roles." United States v. Zichettello, 208 F.3d 72, 99 (2d Cir. 2000) (internal quotation omitted). Nonetheless, plaintiffs must show that the defendants "embraced the objective of the alleged conspiracy, and agreed to commit predicate acts in furtherance thereof." Id. (internal quotation omitted); see also Bristol-Myers Squibb Co., 948 F. Supp. 2d at 345 (plaintiffs must allege that defendants "agreed to commit at least two predicate acts in furtherance of a pattern of racketeering activity, and that these agreed-upon acts, if carried out, would have formed a pattern of racketeering activity") (internal quotation omitted).

Here, plaintiffs allege that Ruthling conspired with Du and Paik to overbill Related and to induce Related to advance cash to Supply and Tesla I. The complaint includes examples of Du and Ruthling communicating in order to further this scheme. See Am.

Compl. ¶¶ 16, 65. It also includes examples of Ruthling using the defendant entities to further this scheme, and his knowledge can be imputed to them for purposes of showing their involvement in the conspiracy. See Serin v. N. Leasing Sys., Inc., No. 06 Civ. 1625, 2009 WL 7823216, at *14 (S.D.N.Y. Dec. 18, 2009). As plaintiffs have shown that defendants knew of the general nature of the conspiracy to defraud Related and that the alleged conspiracy extended beyond each of their individual roles, involving multiple parties and multiple entities, plaintiffs sufficiently plead conspiracy under 1962(d).

## III. STATE LAW CLAIMS

Turning now to plaintiffs' state law claims, the Ruthling defendants move pursuant to Rule 12(b)(6) to dismiss counts I, VI, and VII of the complaint, plaintiffs' fraud, breach of fiduciary duty, and unjust enrichment claims, and Du moves pursuant to Rule 12(b)(6) to dismiss counts I and VII as well as counts II and III, plaintiffs' aiding and abetting fraud and negligent misrepresentation claims.

### A. Count I: Fraud

Under New York Law, plaintiffs must allege five elements to state a common law fraud claim: (1) a material misrepresentation or omission of fact (2) made by defendants with knowledge of its falsity (3) and intent to defraud, which (4) plaintiffs reasonably

relied on, (5) resulting in damage to plaintiffs. Herzfeld v. JP
Morgan Chase Bank, N.A., 354 F. App'x 488, 489 (2d Cir. 2009).

Du and the Ruthling defendants argue that plaintiffs have not
alleged a material misrepresentation of fact because they have not
specified any fraudulent invoices submitted to and (improperly)
paid by Tesla I. See Ruthling Def. Mem. at 19; Du Mem. at 22. But
plaintiffs need not, at this stage, produce the actual invoices
defendants sent to Tesla I, as long as plaintiffs can point to
other specific facts supporting their contention that defendants'
various representations were false or misleading. As discussed
previously, plaintiffs have done so by quoting from emails and
describing specific transactions that support their allegations
that defendants' statements regarding the financial condition of
Tesla I were misleading. See, e.g., Am. Compl. ¶¶ 10, 16, 64, 65,
75-78.

Additionally, the Ruthling defendants dispute whether
plaintiffs reasonably relied on defendants' misrepresentations.
See Ruthling Def. Mem. at 19. To properly allege reliance, New
York law does not require plaintiffs to undertake an independent
investigation of facts that are uniquely within the defendants'
knowledge. See Basis Yield Alpha Fund (Master) v. Goldman Sachs
Grp., Inc., 115 A.D.3d 128, 139 (N.Y. App. Div. 2014). Moreover,
the reasonableness of plaintiffs' reliance on defendants' alleged
misrepresentations is a fact-intensive inquiry and defendants'

motion merely challenges the adequacy of the pleadings. As plaintiffs plausibly plead that the fraudulent nature of Tesla I's requests for cash advances, generally made through Ruthling or Du, turned on information about the financial circumstances of Tesla I – which defendants controlled and manipulated in order to deceive Related - their complaint is sufficient to state a claim for relief. See, e.g., Am. Compl. ¶ 78.

## B. Count VII: Unjust Enrichment

Both Du and the Ruthling defendants move to dismiss count VII of plaintiffs' amended complaint.

To prevail on a claim for unjust enrichment in New York, a "plaintiff must show that the other party was enriched, at plaintiff's expense, and that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Georgia Malone & Co., Inc. v. Rieder, 86 A.D.3d 406, 408 (N.Y. App. Div. 2011) (internal quotation omitted).

The Ruthling defendants argue that plaintiffs' claim here is governed by a contract between Related and Ruthling that sets out Related's rights to recover its cash advances to Tesla I. This document, defendants argue, bars plaintiffs' attempt to recover these advances in quasi-contract. See Ruthling Def. Mem. at 20.

But plaintiffs' unjust enrichment claim against defendants is different from plaintiffs' contractual claims against Tesla I. The former alleges that defendants fraudulently transferred or

58

received the assets of Tesla I, and the latter alleges that Tesla I failed to pay back cash advances from Related. Defendants here were enriched at plaintiffs' expense because they drained funds out of Tesla I that would have otherwise been used to pay back plaintiffs. These allegations are sufficient to state an unjust enrichment claim against the Ruthling defendants.

Moving separately, Du argues that plaintiffs fail to state a claim of unjust enrichment against him because there is no specific allegation in the complaint supporting plaintiffs' contention that he was the recipient of fraudulent transfers from Tesla I. While Du may prevail on this point following discovery, at the motion to dismiss phase plaintiffs need merely plausibly allege that there were transfers from Tesla I to Du that were fraudulent. Here, plaintiffs plead generally that Du received fraudulent transfers from Tesla I and other Ruthling-controlled entities, see Am. Compl. ¶¶ 40, 46, 56, and with particularity that Du was involved in transferring funds improperly to Hong Kong, see id. ¶ 64. Plaintiffs further argue that even if Du's only financial gain was through hourly fees from Tesla I for his "accounting services," some of the "services" he provided to Tesla I were meant to assist Ruthling in defrauding plaintiffs, as pleaded with particularity in several paragraphs of the complaint, and thus Du's associated compensation was ill-gotten. These allegations, taken together,

and in the context of the overall complaint, are sufficient to state a claim for unjust enrichment.

## C. Count II: Aiding and Abetting Fraud

Du argues that plaintiffs fail to state an aiding and abetting fraud claim, as they do not plead with particularity predicate acts of fraud. See Du Mem. at 22.

To establish liability for aiding and abetting fraud in New York, plaintiffs must show "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 592 F. Supp. 2d 608, 625 (S.D.N.Y. 2009).

Du argues that plaintiffs fail to allege fraudulent acts with particularity, because they do not cite any specific invoices. See Du Mem. at 22. But, as discussed previously, plaintiffs do cite specific emails suggesting that Du conspired with Ruthling to "clean" Tesla I's financial records. See Am. Compl. ¶ 75, 77, 98. These allegations are sufficient, at this stage, to state a claim for aiding and abetting fraud.

## D. Count III: Negligent Misrepresentation

Du also argues that plaintiffs fail to state a negligent misrepresentation claim. See Du Mem. at 23.

To state a negligent misrepresentation claim plaintiffs must allege that (1) Du had a duty, as a result of a special

relationship, to give correct information; (2) Du made a false misrepresentation that he should have known was correct; (3) the information supplied in the representation was known by Du to be desired by plaintiffs for a serious purpose; (4) plaintiffs intended to rely and act upon it; and (5) plaintiffs reasonably relied on it to their detriment. Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000).

Du contests prong (1), arguing that, because he provided accounting services to Tesla I, the joint venture, he did not have a duty to Related. See Du Mem. at 23.

But Du undeniably had a duty to Tesla I, for which he was the accountant. And, while Du was not directly in privity with Related, there are numerous allegations tending to support the notion that he was "'so close as to approach'" it. Eaves v. Designs for Fin., Inc., 785 F. Supp. 2d 229, 255 (S.D.N.Y. 2011) (citing Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson, 73 N.Y.2d 417, 424 (1989)). Tesla I had two owners, one of which was Related, and Related depended on Du to receive correct financial information about Tesla I.

As part of his job, Du allegedly sent hundreds of messages directly to Related and MBM regarding Tesla I's financial position. By sending plaintiffs, part-owners of Tesla I, allegedly inaccurate information, Du plausibly breached his duty to them. These allegations are sufficient to state a claim for negligent

misrepresentation. See Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 103 (2d Cir. 2001) ("[g]iven that a determination of whether a special relationship exists is essentially a factual inquiry, these allegations [that the defendant vouched for the veracity of allegedly deceptive information] are sufficient to overcome a motion to dismiss").

### E. Count VI: Breach of Fiduciary Duty

For common law breach of fiduciary duty claims, New York courts apply the law of the state of incorporation. Marino v. Grupo Mundial Tenedora, S.A., 810 F. Supp. 2d 601, 607 (S.D.N.Y. 2011). Tesla I - the fiduciary here - is incorporated in Delaware. Under Delaware law, the elements of a claim for breach of fiduciary duty include (i) the existence of a fiduciary duty and (ii) a breach of that duty. Id. (citations omitted). Though minority members of an LLC do not owe fiduciary duties, "controlling members of an LLC owe fiduciary duties to other members." Id. at 608 (citation omitted).

Plaintiffs plead that Ruthling and Skye Holdings had a fiduciary duty to Related, because they were the controlling members in a joint venture to supply curtain wall for Related's development projects. See Am. Compl. ¶ 28. Skye Holdings and Ruthling allegedly breached their duty by lying to Related about Tesla I's funding needs, using their control over Tesla I to fraudulently transfer assets to themselves at Related's expense,

and siphoning assets from Tesla I for their personal benefit. Defendants provide no grounds for the Court to dismiss plaintiffs' breach claim. See Ruthling Def. Mem. Therefore, the Court declines to dismiss it.

**IV.  CONCLUSION**

For the reasons stated above, the Court granted Skye Supply's motion dismissing plaintiffs' case against Skye Supply, and denied the remaining motions, permitting plaintiffs' case against the Ruthling defendants and Du to proceed.

Dated:     New York, NY
           December 15, 2017                JED S. RAKOFF, U.S.D.J.