**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE RELATED COMPANIES, L.P. and
MBM SUPPLY COMPANY LLC,

Plaintiffs,

- against -

CARLETON RUTHLING, TESLA WALLS LLC,
HUDSON WALLS LLC, RELATED SUPPLY LTD.,
JEANEAH PAIK, CHRISTOPHER DU, SKYE
HOLDINGS LTD., and SKYE SUPPLY LLC,

Defendants.

Civil Action No. 17-cv-4175

--------------------------------------------------------------

TESLA WALL SYSTEMS, LLC,

Plaintiff,

- against –

RELATED COMPANIES, L.P. and NEW HUDSON
FACADES LLC,

Defendants.

Civil Action No. 17-cv-5996

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION TO COMPEL RELATED SUPPLY DOCUMENTS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………………………1

FACTUAL BACKGROUND………………………………………………………………..3

      A.     Ruthling Transfers Guangzhou ASIS's Assets to Guangzhou Guxia……………..3

      B.     Ruthling Manages the Operations of Guangzhou Guxia…………………………5

      C.     Guangzhou Guxia Employees Aid Ruthling in Obtaining Documents…………...5

      D.     Related Supply Operations and the RelatedSupply.net Domain…………………6

ARGUMENT…………………………………………………………………………10

      I.     RUTHLING HAS THE "PRACTICAL ABILITY" TO OBTAIN RELATED
           SUPPLY DOCUMENTS FROM GUANGZHOU GUXIA……………………10

      II.    CHINESE LAW DOES NOT PROHIBIT RUTHLING FROM PRODUCING
           DOCUMENTS……………………………………………………………..13

      III.   SANCTIONS ARE WARRANTED BECAUSE RUTHLING FAILED TO
           PRESERVE DOCUMENTS WHEN HE ANTICIPATED LITIGATION……..15

CONCLUSION……………………………………………………………………18

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*In re NTL, Inc. Sec. Litig.*,
    244 F.R.D. 179 (S.D.N.Y. 2007) ........................................................................................10, 18

*Kronisch v. United States*,
    150 F.3d 112, 126 (2d Cir. 1998)………………………………………………………………15

*Munoz v. China Expert Tech., Inc.*,
    No. 07-cv-10531, 2011 WL 5346323 (S.D.N.Y. Nov. 7, 2011)……………………………..14

*Richmark Corp. v. Timber Falling Consultants*,
    959 F.2d 1468 (9th Cir. 1992)………………………………………………………………...13, 14

*Ronnie Van Zant, Inc. v. Pyle*,
    No. 17-cv-3360, 2017 WL 3721777 (S.D.N.Y. Aug. 28, 2017)……...………………………10

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*,
    482 U.S. 522 (1987)………………………………………………………………………………14


<u>Rules and Statutes</u>

Fed. R. Civ. P. 33………………………………………………………………………...13

Fed. R. Civ. P. 34………………………………………………………………………...13

Restatement (Third) of Foreign Relations Law § 442…………………………………………...14

Plaintiffs The Related Companies, L.P. and MBM Supply Company LLC (collectively, "Related") respectfully submit this supplemental memorandum in support of their Motion to Compel Defendants Carleton Ruthling, Tesla Walls LLC, Hudson Walls LLC, and Skye Holdings Ltd. (collectively, the "RICO Defendants") and Plaintiff Tesla Wall Systems LLC ("Tesla I") (together with the RICO Defendants, the "Ruthling Parties") to produce documents pertaining to Related Supply Ltd. ("Related Supply"), including all relevant emails sent to and from relatedsupply.net email accounts.[1]

## PRELIMINARY STATEMENT

Pursuant to the Court's request, Plaintiffs submit this brief to address three issues: (1) whether the Ruthling Defendants can obtain Related Supply documents that are now purportedly in the possession of Guangzhou Guxia; (2) whether Chinese law would place an impediment on the production of these documents; and (3) whether, if these documents are not produced, sanctions are warranted.

The answer to the first question is indisputably "yes." On the last business day before the hearing on Related's motion to compel, and one day after the close of discovery on January 11, the Ruthling Defendants produced nearly 3,000 new documents that conclusively show Ruthling has at all times controlled the formation and operation of Guangzhou Guxia. Indeed, Ruthling admitted as much at the hearing when he stated that his status as a director of Asis QC Manufacturing Ltd. ("Asis QC") gave him "commercial control" over Guangzhou Guxia. Ex. 1, at 21:2-4.[2] Thus, it is not surprising that Ruthling has been able to obtain documents from

---

[1] We understand that the Court interpreted Related's motion to compel as encompassing only documents created prior to 2011. Order of Dec. 22, 2017, at 6 n.1 (Dkt. 130). For the reasons set forth more fully below, Related requests that its motion to compel be expanded to address all of relevant documents at the domain relatedsupply.net from 2007-2015.

[2] All cites to "Ex." refer to the Declaration of Nicholas A. Gravante, Jr. ("NAG Decl.").

Guangzhou Guxia to support *his* case — including most recently documents to aid his expert witness, Timothy Cummins, in preparing his report.  Ex. 29, at 84:22-88:18; Ex. 1 at 46:3-48:18.  In the face of this overwhelming evidence of his ability to obtain documents from Guangzhou Guxia, Ruthling's testimony that the company's principals denied his telephonic, unrecorded request for documents made pursuant to the Court's order on some unspecified date is wholly implausible.

Second, Chinese law in no way prevents disclosure of these documents.  Even if Ruthling did not waive this argument by failing to timely raise it in his objections to Related's document requests, he has failed to satisfy his burden of showing that Chinese law is as broad as he claims.  In fact, Ruthling's sweeping claim (for which he cites no authority) that China's privacy laws prohibit disclosure of emails would render the document productions he has already made improper under those same rules, and would also render Guangzhou Guxia's provision of selective emails requested by Ruthling equally  improper.  *See* Ex. 24, at 23.  And even if Chinese law operated in the way Ruthling claims, the balancing test that this Court would perform weighs heavily in favor of disclosure.

Finally, sanctions are warranted for several reasons.  First, Ruthling has admitted that he transferred relevant documents out of his custody and control in May 2014 (and possibly later as well).  By that time, the documentary evidence indisputably shows that Ruthling was contemplating litigation against Related and Michael Budd.  Ruthling's self-serving testimony that he did not consider filing litigation until August 2014 is contradicted by his own statements in Spring 2014, including his consultations with several attorneys regarding how to address conduct that he believed to give rise to civil liability.  Moreover, Ruthling's constantly shifting testimony regarding the location and preservation of relevant documents, and his connection to

those documents, has made litigating this case unnecessarily complicated, frustrating, and costly. Accordingly, if Ruthling is unable to produce the documents promptly, the Ruthling Parties should be precluded from using themselves any documents obtained from Guangzhou Guxia. In addition, Related asks that the Court award it the cost of the many hours of attorneys' fees it has incurred trying to obtain documents that are within Ruthling's control and which he was legally obligated to produce.

## FACTUAL BACKGROUND

Although Related's opening Memorandum in support of its Motion to Compel sets forth certain facts relevant to this motion (*see* Dkt. 121), additional background is required in light of new discovery produced by the Ruthling Parties. One week ago – the day after discovery closed and the last business day before the hearing directed at this issue – the Ruthling Defendants produced 2,915 documents that conclusively show Ruthling was in charge of Guangzhou ASIS and its liquidation, as well as the formation and operation of Guangzhou Guxia. Below is a brief description of the narrative that emerges from these documents.

### A.    Ruthling Transfers Guangzhou ASIS's Assets to Guangzhou Guxia.

As explained in Related's prior briefing, Ruthling formed Guangzhou ASIS in November 2012 to engage in curtain wall operations in China. Ruthling held an ownership stake in Guangzhou ASIS through his interest in Asis QC Manufacture, Ltd. ("Asis QC"). Ruthling currently serves as a director of Asis QC.

Ruthling began making plans to liquidate Guangzhou ASIS in mid-April 2014 with the assistance of Feng Yuanlin, his longtime accountant and bookkeeper. Ex. 5. Ruthling was the sole member of the Guangzhou ASIS liquidation committee. *Id.* at 5. On October 27, 2014 – the same day Ruthing caused Tesla I to file suit against Budd in the SDNY, and a month after Tesla I

filed its first lawsuit against Budd in Minnesota – Carrie "Yun Yun" Pang, another Ruthling employee, emailed Ruthling to advise him that Guangzhou ASIS's office lease would be terminated on November 30, 2014.  Ex. 16.  Carrie told Ruthling she was providing early notice to "leave **us** some time for looking for new office."  Ex. 7 (emphasis added).  She further noted that Guangzhou ASIS was in the process of "closing."  *Id.*  Ruthling has submitted no evidence to show that the Guangzhou ASIS office was closed by May 2014, or that the documents of Guangzhou ASIS that ultimately went to Guangzhou Guxia were deposited with an interim third party around that time that was outside of Ruthling's reach.

Ruthling began discussing the formation of the new company, Guangzhou Guxia, with Feng and Carrie in December 2014.  Ex. 10, at 2.  On January 5, 2015, Feng emailed Ruthling, stating, "Carrie told me that you decide to register a new company in GuangZhou."  *Id.* at 2.  Meanwhile, on January 8, 2015, Carrie reported to Ruthling that she found an office that "is the best choice for **us**," noting the landlord would "give **us** the first three month rent free."  Ex. 9 (emphasis added).

On January 12, 2015, Feng wrote to Ruthling, "Carrie notify me that you will let me be the shareholder of the new company."  Ex. 10.  He later sent an email to Ruthling describing that the ownership stake of Guangzhou Guxia would be 80% him and 20% Carrie.  *Id.*  The email also described the "business scope" as "Whole sale and commission agent of Construction Materials, Import & Export; R&D and design of Construction Material Product; Technical Services; Commercial Information Consultation."  *Id.*  Feng suggested Carrie "act as the legal representative and manager of the new company," but she declined.  *Id.*  On April 2, 2015, Carrie, writing from a relatedsupply.net address with a Tesla I signature block, told Ruthling: "As what I mentioned before, I am not willing to be the legal person for the new company.  It

4

takes too much risks and responsibilities for me."  Ex. 11.  Ruthling responded, "Hello Carrie there is no need to remind me.  It is already agreed that you are not the legal person for the company.  You also do not need to list the reason why you do not want such a position."  *Id*. Earlier in the email chain, Ruthling told Feng that "Carrie has not found a place for **us** to move to yet."  *Id*. (emphasis added).

      **B.**      **Ruthling Manages the Operations of Guangzhou Guxia.**

      Ruthling continued to plan the development and operation of Guangzhou Guxia throughout 2015.  In early April 2015, he told Carrie:  "Carrie maybe we consider hiring that former staff of yours for the cw business" – meaning Permasteelisa's former Chinese workers who had been hired to design curtainwall for Tesla I.  Ex. 12.  Carrie asked Ruthling for permission to reach out to "Rocky," who also performed work for Tesla I projects.  *Id*.  On April 15, 2015, Ruthling responded to an email from Feng about the deregistration of Guangzhou ASIS and the formation of Guangzhou Guxia.  Ex. 13.  Feng asked Ruthling, "what is your plan for this company?"  *Id*.  Ruthling replied, "**new company will be the same as the previous one**, since we are starting fresh, let's have rocky and carrie have better practices so any accounting issue can be minimized."[3]  *Id*. (emphasis added).  Despite seeking a "fresh" start, on June 10, 2015, Ruthling sent Carrie an accounts payable spreadsheet for Related projects from July 29, 2014.  Ex. 16.

      Guangzhou Guxia was officially registered on June 30, 2015.  Ex. 17, at 2.  Notably, Feng sent Ruthling the registration bill and asked for Ruthling's approval.  *Id.* at 1.  Feng's

---

[3] At the hearing, Ruthling testified that he was "talking about same in different capacity" in this email, and that there was a "massive difference" between Guangzhou ASIS and Guangzhou Guxia because the latter company has two Chinese owners. Ex. 1, at 34:3-15; 49:1-20. Because Ruthling's contemporaneous email speaks for itself regarding the strong similarities between the companies, his self-serving testimony should not be credited.

solicitation of Ruthling's approval for expenses appears to be a common occurrence, as there are several documents showing that payments to and from Guangzhou Guxia are subject to Ruthling's approval.  *See* Exs. 20, 21.

      **C.**    **Guangzhou Guxia Employees Aid Ruthling in Obtaining Documents.**

Carrie and Feng's more recent correspondence with Ruthling includes information relevant to this matter.  For example, Feng's January 20, 2016 email stated, "I plan to **ratify part of loan from Related** (RMB199019) as business receiving of Guxia Company to match with its expenses, so we can have a little profit in 2015."  Ex. 20 (emphasis added).  Carrie, meanwhile, continued to exchange emails with Ruthling about Related projects.  *See* Ex. 19.  She also routinely communicated with Ruthling regarding pending litigation.  *See* Exs. 18, 19, 22, 23.  As part of that correspondence, Carrie forwarded to Ruthling employee emails from relatedsupply.net accounts.  *See* Ex. 24, at 23.  Carrie also assisted the Ruthling Parties' expert witness, Timothy Cummins, in getting relevant documents because in the words of Ruthling, "she was quite good on getting information, backup information."  Ex. 1, at 48:12-18.  Thus, far from being an independent third party, her actions demonstrate that she continues to take direction from Ruthling with respect to this litigation.

      **D.**    **Related Supply Operations and the RelatedSupply.net Domain.**

Given the strong evidence of Ruthling's control of Guangzhou Guxia's operations, it is not surprising that his counsel spent a great deal of time at the hearing eliciting testimony to suggest Guangzhou Guxia no longer possesses any relevant documents.  That testimony, however, is belied by Ruthling's prior statements.

*First*, with respect to Related Supply's operations, Ruthling's testimony misleadingly suggested that Related Supply did not perform curtain wall work.  *See* Ex. 1, at 27:14-24; 30:20-

31:11.  In another passage, Ruthling first admits that there was "a little bit of overlap" between employees performing Related Supply's curtain wall work and Guangzhou Guxia – but then takes this back and says, "The best answer is no, all Related Supply employees were let go." Ex.1, at 26:1-12.  He added that Related Supply, which like Tesla I provided construction materials to Related projects, was a "radically different" business model than Tesla I and thus it "would be pointless" to have saved documents from Related Supply.  Ex. 1, at 26:13-16, 29:25-30:13.

Two years ago, however, Ruthling testified that Related Supply was a "predecessor company of Tesla" that "did facade work as well as a number of things, but **Related Supply did window wall work and also developed curtainwall capability**."  Ex. 30, at 46:17-20 (emphasis added).  Thus, Related Supply had documents pertaining to curtainwall, and any statement to the contrary is false.  It is also irrelevant, given that Related alleges that Ruthling defrauded Related directly through the Related Supply joint venture.  *See* Dkt. 57 at ¶¶ 1, 7, 8, 9, 17.

***Second*,** Ruthling testified that information was lost when Tesla I began winding down its operations because Chinese employees had taken their computers.  Ex. 1, at 32:20-33:17.  This, too, is directly contradicted by Ruthling's prior deposition testimony, in which he claims all relevant data was consolidated and preserved in Guangzhou:

> Q. So at the end of 2014 when you closed the physical offices where the files -- at least for procurement, resided --
> A. Uh-huh.
> Q. -- where did that material go?
> A.  Well, it was preserved.
> Q. That's lovely.  Where?
> A.  In Guangzhou.
> …
> Q.  [Would the business people] have retained their business documents on the computers they were using?
> A.  Yes, however, the information would be consolidated probably onto two computers.
> Q.  Okay.  And whose computers would it be consolidated onto?

A.  One of them would be Yunyun's and then I would have to get the name of where the
other files are.
Q.  When the Guangzhou office closed down in 2014, what happened to those two
computers?
A.  **We still have them.**
Q.  Okay.  You still have them.  Okay.
A.  Yeah.
Q.  So they are in the current Guangzhou office?
A.  Correct.

Ex. 30, at 61:4-11; 68:12-22 (emphasis added).  This deposition testimony indicates that

Ruthling had custody and control of Carrie's computer as of February 24, 2016 – yet now, in the

midst of this litigation, he claims no such information is available.

**Third**, Ruthling admits that the @relatedsupply.net domain was created in August 2011,

while Related Supply was operational.  He nonetheless claims that, "The relatedsupply.net has

nothing to do with Related Supply.  It just has the words in it.  It was not for that business."  Ex.

1, at 28:12-14.  He does not even attempt to explain why he would create a domain name that

bears the same name as another company he owns, if the domain was always intended to be used

for some other business, nor does he deny that Related Supply employees in fact used the

domain to conduct business for the company.  *See* Ex. 3. Further, the documents make clear that

relatedsupply.net was also indeed used in connection with the business of Tesla I.

**Fourth**, Ruthling claimed that he already turned over all of the relevant emails that he is

able to access.  Ex. 1 at 29 ("Q. And is it your understanding that all emails from the

relatedsupply.net domain that was associated with the Related Supply era has been produced in

accordance with the parties' agreements in this matter?  A. Yes.").  Ruthling neglects to mention,

however, that he has produced documents from only **three** email addresses, all of which were his

own email accounts.  Thus, Ruthling's statement that "all" emails had been produced was based

on a purported "company policy" that he had to be copied on all emails.  Regardless of whether

he has a "policy" of being copied on documents, such a policy may not always be carried out. There are undoubtedly instances where an employee purposefully or inadvertently did not copy Ruthling.  Moreover, disclosure of employee emails will ensure that Ruthling's production is complete – just as third party discovery previously revealed deficiencies in his email production.

*Fifth*, in the interest of efficiency, rather than filing an entirely new motion, Related requests that its motion to compel be construed to include all of relevant documents at the domain "relatedsupply.net" from 2007-2015.  The facts adduced at the January 16, 2018 hearing and set forth in the briefs are equally relevant to those documents, and the Ruthling Parties (at whom Related's motion is directed) have been on notice for months that Related is seeking relatedsupply.net emails.  Indeed, Ruthling's declaration asserts, correctly, that accessing these emails is the primary purpose of Related's motion.  *See* Dkt. 125, ¶ 20 (stating that he had requested "the 'relatedsupply.net' emails that are the subject of Plaintiffs' Motion to Compel").

Moreover, any confusion regarding the ownership of this email domain stems from the Ruthling Parties' decision to create two entities called "Related Supply Ltd.," one of which continues to operate today as "Asis Manufacture QC Ltd." ("Asis QC").  See Dkt. No. 122-10, at 28 (Certificate of Name Change stating that Related Supply, Ltd. BVI changed its name to Asis QC as of June 21, 2011).  The confusion over which company owns emails found at the "@relatedsupply.net" domain is exacerbated by the Ruthling Parties' decision to permit employees to send emails from relatedsupply.net accounts with the signature blocks of at least **five** of Ruthling's interrelated companies (Related Supply, Tesla I, Tesla II, Guangzhou Asis, and Asis QC).  *See* signature blocks of Exs. 3, 7, 9, 11, 19. 35.

Notably, Asis QC was the sole owner of Guangzhou Asis, an entity created in December

2012 to which all Related Supply documents were transferred.[4]  Ex. 36.  Asis QC is also a current business partner of Guangzhou Guxia.  Ex. 28 at 73:8-12.  Ruthling continues to serve as a director of Asis QC, and it is in this capacity that he purportedly sought documents from Guangzhou Guxia.  *Id.* at 157:7-16.  Thus, one Related Supply entity remains in existence and, through its affiliation with Defendant Ruthling and Tesla II, has the ability to obtain documents from Guangzhou Guxia.  Ex. 28 at 73:8-12.  In fact, Ruthling has been obtaining those documents for his own use, but then claiming he has no access to them with respect to Related's document requests.  For these reasons, we ask that the Court treat the pending motion to compel "Related Supply documents" as encompassing documents at the "relatedsupply.net" domain and grant the relief to Related requested herein.

## **ARGUMENT**

### I.  **RUTHLING HAS THE "PRACTICAL ABILITY" TO OBTAIN RELATED SUPPLY DOCUMENTS FROM GUANGZHOU GUXIA.**

A party can be compelled to produce documents even where it does not have legal ownership or actual physical possession of those documents, so long as it has the "practical ability to obtain the documents from a non-party to the action."  *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. Jan. 30, 2007).  The evidence before the Court overwhelmingly demonstrates that Ruthling has the ability to obtain the relevant documents that he claims are possessed by Guangzhou Guxia and his two longtime employees, Feng Yuanlin and Carrie (Yun Yun) Pang.

The foregoing facts make clear that in operation – if not as a matter of corporate

---

[4] Because Guangzhou Asis did not exist until November 19, 2012 (Ex. 8), even if the Court does not treat Related's motion as encompassing the entire relevant date range here, the motion should at least cover the pre-December 2012 time period. Ruthling admitted during the hearing that Related Supply continued operating in 2012. Ex. 1 at 25.

formalities – Guangzhou Guxia is Ruthling's company.  He set it up, authorized its expenses, and directed its employees to perform tasks on his behalf.   Ruthling also conceded at this week's hearing that he exercises "commercial control" over Guangzhou Guxia.  Ex. 1, at 21:2-4.  And, when questioned in 2016 about the existence of documents that were housed in Guangzhou Guxia's offices, Ruthling responded, "**We** still have them."  Ex. 30, at 69:12.  The "practical ability" inquiry is designed precisely for this type of scenario, where "common sense" shows that a non-party's documents are "practically speaking, under [the party's] control."  *Ronnie Van Zant, Inc. v. Pyle*, No. 17-cv-3360, 2017 WL 3721777, at *8-9 (S.D.N.Y. Aug. 28, 2017) (holding that a party could be sanctioned for failing to produce a non-party's text messages that were effectively under its control due to the people's close relationship and the non-party's financial interest in the outcome of litigation). For avoidance of any doubt, Guangzhou Guxia and Tesla II share office space and have the same address in China.  Ex. 34.

Even if the overwhelming evidence of Ruthling's ability to produce documents were insufficient, Ruthling has requested, and received, all of the documents he has requested from Guangzhou Guxia to aid in his defense.  Ruthling testified at a deposition that Carrie is gathering "supporting information" for him at "the direction of ASIS BVI," and that he personally made this request to her "to assist in this process."  Ex. 28, 156:2-157:6.  As a result of Carrie's assistance, the Ruthling Defendants have produced thousands of pages of documents that were provided by Guangzhou Guxia.  Ex. 25.

Moreover, Related learned during its deposition of Ruthling's expert witness, Timothy Cummins of Aronson LLC, that Cummins had received substantial assistance from Carrie and Feng in preparing his report.  Ex. 29, 84:22-88:18; Ex. 1 at 46:3-48:18.  Cummins testified that he spoke to Carrie two to three times during the course of preparing his expert report, and that

she "was managing the requests that Aronson LLC was making for documents." Ex. 29, 84:22-86:21. This entailed Carrie "working with a team of people to find [documents] in old records and files." *Id.* at 86:22-25. Cummins also spoke to Feng once or twice regarding accounting issues for Skye Holdings. *Id.* at 87:23-88:18. These interactions serve as further proof that Carrie and Feng are not isolated business owners who act in an arm's length capacity to the Ruthling Parties, but are instead trusted employees who assist Ruthling and act at his direction.

In the face of this evidence, Ruthling's statement that he asked for documents but was denied them is not credible. In fact, his recitation of the circumstances under which he asked does not even make sense. On December 13, 2017, Ruthling filed a declaration in support of his opposition to Related's motion to compel in which he stated: "I have requested additional documents from Guangzhou Gusha, including the 'relatedsupply.net' emails that are the subject of Plaintiffs' Motion to Compel. Guangzhou Gusha has unequivocally denied all such request[s]." Dkt. 125, ¶ 20. This Court then permitted Ruthling to "renew his request to Guangzhou Gusha for these documents and to explain to the Chinese owners the importance to the Court and to the fair administration of justice that the full record be turned over." Order of Dec. 22, 2017, at 7 (Dkt. 130). Yet when testifying about making a request for these documents – at a hearing that was convened specifically to address this issue – Ruthling claims that he made the request a "few months ago," at the request of counsel, and "transmitted the Court's request." Ex. 1, 43:23-44:8. This is obviously impossible, given that the Court order was issued less than a month before the hearing, and in any event Ruthling discusses unsuccessful requests being made to Carrie and Feng only after the date of the Court's Order – which suggests that Ruthling's claim that he made an earlier request in his declaration is unfounded.

Moreover, both Ruthling's declaration and testimony are utterly lacking in corroboration.

Ruthling did not include his counsel on this call, nor did he make any effort to put the request (or the supposed denial thereof) in writing.  In fact, he did not submit a single exhibit at the hearing. Instead, he simply asks this Court to take his word for it.  But here, as the trial judge in the *Tesla Wall Systems, LLC v. Budd* matter has previously noted, Ruthling was "not an ideal witness in terms of being forthcoming and candid.  He's rather guarded and defensive and he plays word games."  Ex. 26, at 393:16-18.  Thus, without any evidence to bolster his narrative, Ruthling's contradictory and non-credible statements on this and other topics render him not credible.

## II.   CHINESE LAW DOES NOT PROHIBIT RUTHLING FROM PRODUCING DOCUMENTS.

During the hearing, Ruthling asserted that Chinese "privacy" laws justified Guangzhou Guxia's supposed refusal to produce documents.  Ex. 1, at 40.  He did not identify any specific law that would bar disclosure, and having failed to raise this issue in his responses and objections to Related's requests for production, any claim that Chinese law permits Ruthling to avoid his discovery obligations has been waived.   *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992) (concluding that a party arguing that Chinese law interfered with its ability to comply with discovery requests waived any such objection where it failed to object within time required by Fed. R. Civ. P. 33 and 34); Ex. 31.

More importantly, Ruthling's own conduct, and the conduct of Carrie and Mr. Feng, demonstrate that Ruthling  does not truly believe that Chinese law forbids disclosure of employee emails. He has, of course, routinely produced the emails of Chinese employees received or sent by him throughout the course of this litigation without ever hinting that doing so would violate Chinese law.  In addition, Ruthling has admittedly had Guangzhou Guxia provide him with purported documentary support/invoices for Skye Holdings transactions and provide documents and other information to the Ruthling Defendant's expert, Tim Cummins. Further,,

although he claims that Guangzhou Guxia did not provide him with employee emails, but presumably only other types of materials—allegedly on some privacy grounds--that statement, too, is false.  On February 8, 2017, Carrie forwarded Ruthling a group of documents for use in litigation, which included a December 2011 email from a Related Supply employee.  *See* Ex. 24, at 23.

Moreover, Ruthling's vague citation of Chinese "privacy" law fails to satisfy his burden of demonstrating that it forbids disclosure of employee emails. *See United States v. Vetco*, 691 F.2d 1281, 1288 (9th Cir. 1989) ("The party relying on foreign law has the burden of showing such law bars production [of documents].").  A similar argument was raised – albeit more vigorously – in *Munoz v. China Expert Tech., Inc.*, No. 07-cv-10531, 2011 WL 5346323 (S.D.N.Y. Nov. 7, 2011).  There, a Chinese computer company sought to avoid document discovery based on Chinese law relating to "national security and other potentially sensitive interests."  *Id.* at *1.  The court explained that such laws "are viewed with some skepticism in U.S. courts" because they "have broad sweep and can preclude disclosure of a host of nebulously defined categories of information."  *Id.*  For that reason, the Supreme Court has stated that such statutes "do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute."  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987). After applying a balancing test to the Chinese privacy and state secret laws invoked by the defendant, the court rejected the defendant's argument that discovery should be limited based on Chinese law.[5]  *Munoz*, 2011 WL 5346323 at *2; *see also Masimo Corp. v. Mindray DS*

---

[5] The five factors considered in this analysis are:  (1) the importance to the litigation of the requested information, (2) the specificity of the request, (3) the origin and location of the information, (4) the availability of alternative means to secure the information, and (5) the extent

*USA, Inc.*, No. 12-cv-02206, 2014 WL 12589321, at *3 (C.D. Cal. May 28, 2014) (ordering the production of the defendant's source code over the objection that disclosure of the code would violate Chinese secrecy laws).

## III.   SANCTIONS ARE WARRANTED BECAUSE RUTHLING FAILED TO PRESERVE DOCUMENTS WHEN HE ANTICIPATED LITIGATION.

The parties here agree that a duty to preserve documents arises "when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).  Thus, the only relevant questions here are when Ruthling began contemplating litigation, and when he removed documents from his custody or control. Despite Ruthling's self-serving testimony, the documents clearly show that Ruthling was contemplating litigation by April 2014, and that he transferred relevant documents to others after that date.

At the hearing, Ruthling testified that he was definitely not contemplating litigation against anyone until at least August 2014.  Ex. 1, at 16.  But the documents reveal a different story. As early as January 6, 2014, Ruthling consulted an attorney, Fraser Mendel, about issues pertaining to Budd's employment.  Ex. 34.  On February 17, 2014. Ruthling again discussed with his counsel "corporate governance requirements in dealing with M. Budd."   Ex. 32.  On March 6, 2014, two days before Budd resigned, Ruthling and his lawyer discussed Budd's "possible violations of his fiduciary duties to Company."  *Id.*

---

to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the foreign state where the information is located.  *See Richmark*, 959 F.2d at 1475 (citing Restatement (Third) of Foreign Relations Law § 442(1)(c)).  Because Ruthling does not explain what particular provision of Chinese law should apply, or why the Chinese government would have a compelling interest here, he has failed to show that these factors could weigh in his favor.

The frequency of these communications escalated following Budd's resignation on March 8, 2014.  Meanwhile, immediately after Budd resigned, Ruthling contacted his counsel at Mossack Fonseca to discuss closing certain companies.  *Id.*

By April 16, 2014, it seems clear that Ruthling was contemplating litigation against Budd and Related.  That day, Ruthling wrote to Related:

> Budd was consulting for RLP, it is entirely inappropriate ethically and contractually… It represents interference in Tesla business by RLP and Mike Budd.  It has caused and is causing harm to Tesla....He accepted the role of President of Tesla, and he has a duty of loyalty to Tesla, and obligations under his agreement with Tesla.  His present actions are inconsistent with those duties…. It appears that RLP has decided that using an asset of Tesla in a consulting basis is cheaper and better than to continue to support Tesla, or to use Tesla in any capacity.  This is harmful to Tesla and we believe not appropriate.

Ex. 4.  The same day, Ruthling wrote an email to his attorney Roland Nikles with the subject line "possible damages" and another with the subject "Budd inappropriate actions."  Ex. 32 at 40. Ruthling sent a follow-up email to Related the following week, stating, among other things, that "Related has taken the services of Michael Budd, [and] greatly decreased the ability of Tesla 2 to survive as a company."  Ex. 6.

Knowing that litigation was imminent, Ruthling took affirmative steps to conceal documents.  On April 16, 2014 – the same day he wrote his attorney about "possible damages" – Feng, at Ruthling's request, emailed Ruthling liquidation documents for Guangzhou ASIS (which at the time owned the @relatedsupply.net domain).  Ex. 5 at 5.  Ruthling signed these documents two days later, thereby making himself the sole member of the Guangzhou ASIS liquidation committee and giving him complete control over the emails at this domain address. *Id.*  Once Ruthling controlled the liquidation process of Guangzhou ASIS, he no longer needed his ownership interest in ASIS QC Manufacture Ltd., so, Ruthling transferred his interest in that company to Carlos (Charles) Saliba for no consideration on May 27, 2014.  Exs. 2 and 27 at

141:14-18.  It is worth noting that Saliba is also an owner of Santa Fe Holdings Ltd., which is the

parent company of Skye Holdings Ltd.   Ex. 27 at 8:24-9:7.

  Sometime after January 2015 – three months after he filed his first lawsuit against

Michael Budd – Ruthling began coordinating the transfer of former Related Supply documents

and the relatedsupply.net emails to Guangzhou Guxia, a new company that he had formed.[6]  Ex.

20.  Although Ruthling installed two employees as the shareholders of Guangzhou Guxia,

Ruthling's approval was required before an office could be leased for Guangzhou Guxia.  NAG

Decl. Ex. 19.  Indeed, Carrie – one of the "owners" of the company – expressed serious concern

about being the legal representative of Ruthling's new company, and Ruthling assured her that

he would not give her such a role.  NAG Decl. Ex. 11.  In another communication, at Ruthling's

direction, Feng emails Carrie stating, "According to discussion with you and Mr. Ruthling, I

revised the application documents for registering new company in Panyu."  NAG Decl. Ex. 14.

Carrie then provides the signed documents.  NAG Decl. Ex. 15.  Ruthling also continues to

approve company expenses on a regular basis.  NAG Decl. Ex. 17, 20.  Even more egregiously,

Ruthling has funneled tax rebates and other income that should have gone to Tesla I into

Guangzhou Guxia.  *See* NAG Decl. Ex. 35 (Feng tells Ruthling that he planned "to ratify part of

loan from Related (RMB199019) as business receiving [sic] of GuXia Company to match with

its expenses, so we can have a little profit in 2015"); NAG Decl. Ex. 27 at 266:12-267:11

(identifying Guangzhou Guxia as a company that received a $600,000 value-added tax for a

---

[6] Ruthling was also aware of other potential Tesla-related litigation at the time he directed the transfer of documents from to Guangzhou Guxia.  On July 25, 2014, Ruthling states that Tesla I and Hudson Walls "need to stay open in case there will be litigation." Ex. 33.  He testified at his Feb. 24, 2016 deposition that this email was concerned with the litigation stemming from the TVSM project. NAG Decl. Ex. 30, 19:23-24:25.  Since that was a Tesla I and Related project, he had an additional obligation, to retain any relevant documents about Tesla I's work, much of which was performed by the employees of Guangzhou ASIS using @relatedsupply.net email domains.

product shipped for Tesla I).

The sole purpose of the creation of Guangzhou Guxia appears to be to give Ruthling plausible deniability about his control of the entity, as the functions of the companies are identical, with Ruthling stating that the "new company will be the same as the previous one." NAG Decl. Ex. 10 and 13.  Ruthling's conduct in attempting to conceal relevant documents in a company which he clearly controls, after the start of litigation, is sufficiently egregious to warrant sanctions.  *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 201 (S.D.N.Y. 2007) ("a monetary award may be appropriate to punish the offending party for its actions or to deter the litigant's conduct, sending the message that egregious conduct will not be tolerated").

Given the unnecessary and unreasonable expense that Ruthling's conduct has caused Related to incur to litigate its right to clearly relevant documents that should have already been produced in this action, Related asks that this Court to issue "an award of the costs, including attorneys' fees, that they incurred in connection with this motion."  *Id.*  Moreover, to the extent that the Ruthling Parties fail to produce documents and emails in the possession of Guangzhou Guxia, Related asks that they be precluded from using any documents from that source in connection with this litigation.  For the avoidance of doubt, such a ruling should extend to any part of the Ruthling Parties' expert reports that are based on documents provided to them by employees of Guangzhou Guxia.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Compel should be granted and the Ruthling Parties should be required to produce documents from Related Supply, including all relevant email correspondence made to and from email accounts at the domain "@relatedsupply.net," and attorneys' fees and costs incurred in bringing this motion should be

18

awarded to Related without regard to whether and when such documents are produced.  To the extent that such documents are not produced, Plaintiffs ask that this Court preclude the Ruthling Parties from using any documents they obtained from Guangzhou Guxia and/or its employees.

Dated:  January 19, 2018                          Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

*/s/Nicholas A. Gravante, Jr.*
Nicholas A. Gravante, Jr.
Karen A. Chesley
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

Karen C. Dyer
121 South Orange Avenue
Orlando, Florida 32801
(407) 425-7118

*Attorneys for Plaintiffs The Related Companies, L.P. and MBM Supply Company LLC*