UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
RELATED COMPANIES, L.P. and MBM          :        17-cv-4175
SUPPLY COMPANY LLC,                      :
                                         :        OPINION AND ORDER
            Plaintiffs,                  :
                                         :
      -v-                                :
                                         :
CARLETON RUTHLING, TESLA WALLS LLC,      :
HUDSON WALLS LLC, RELATED SUPPLY         :
LTD., JEANEAH PAIK, CHRISTOPHER DU,      :
SKYE HOLDINGS LTD., and SKYE SUPPLY      :
LLC,                                     :
                                         :
            Defendants.                  :
-----------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __/__/__

JED S. RAKOFF, U.S.D.J.

      The Related Companies, L.P. ("Related") and MBM Supply

Company LLC ("MBM") (collectively, "plaintiffs") assert five

causes of action against defendants Carleton Ruthling, Tesla Walls

LLC ("Tesla II"), Skye Holdings, Ltd. ("Skye Holdings"), and Hudson

Walls LLC ("Hudson") (collectively, "defendants"): common law

fraud (Count I), racketeering (Count IV), racketeering conspiracy

(Count V), breach of fiduciary duty (Count VI), and unjust

enrichment (Count VII).[1] See Am. Compl., Dkt. 57. All five causes

---

[1] Plaintiffs also assert causes of action against Jeaneah Paik
(Counts IV, V, and VII), Related Supply Ltd. ("Supply")(Counts I,
IV, V), Christopher Du(Counts I, II, III, IV, V, and VII), and
Skye Supply LLC ("Skye Supply")(Counts I, IV, V, and VII). The
Court dismissed plaintiffs' claims against Skye Supply in August
pursuant to Fed. R. Civ. P. 12(b)(2). See Dkts. 81, 126. Plaintiffs
settled with Du. See Dkt. 151. Paik defaulted. See Dkt. 129. Supply
has not appeared and is purportedly defunct.

1

of action relate to two defunct business ventures run by Ruthling and funded by Related: Tesla Wall Systems LLC ("Tesla") and Related Supply Ltd. ("Supply"). Id. ¶¶ 1-2. Familiarity with the prior proceedings in this case is here presumed.

Plaintiffs now move for summary judgment on Count VI, see Dkt. 146, seeking $2,237,451 in damages, pre- and post-judgment interest, costs, reasonable attorneys' fees, an order enjoining defendants from further disposing of Tesla's assets, and an order appointing a receiver for the same. See Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pl. Mem.") at 19-20, Dkt. 147. Defendants oppose. See Defendants Carleton Ruthling, Tesla Walls LLC, Hudson Walls LLC, and Skye Holdings Ltd.'s Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Def. Opp."), Dkt. 152.

Also before the Court is the motion of defendants for summary judgment on Counts IV and V, see Dkt. 142, and defendants' request that the Court decline to exercise supplemental jurisdiction over plaintiffs' remaining state law claims (Counts I, VI, and VII), see Defendants Carleton Ruthling, Tesla Walls LLC, Hudson Walls LLC, and Skye Holdings Ltd.'s Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem.") at 1, Dkt. 144. In the alternative, defendants move for summary judgment on Count I. Id. Plaintiffs oppose. See Memorandum of Law in Opposition to Defendants Carleton Ruthling, Tesla Walls LLC, Hudson Walls LLC,

and Skye Holdings Ltd.'s Motion for Summary Judgment ("Pl. Opp."),
Dkt. 155.

Separately, defendants renew their motion to dismiss Counts
IV and V, arguing that plaintiffs no longer have standing to sue
under the Racketeering Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. § 1961, et seq., because, on March 27, 2018,
the First Department of New York's Appellate Division vacated
plaintiffs' state court judgment against Tesla. See Letter dated
April 3, 2018 ("Def. Ltr."), Dkt. 168. Plaintiffs oppose. See
Letter dated April 6, 2018, Dkt. 170.

For the reasons set forth below, the Court denies defendants'
motions in full and grants plaintiffs' motion in part and denies
it in part, awarding plaintiffs damages and equitable relief as
set forth in Part IV, infra.

The pertinent facts, either undisputed, or, where disputed,
taken in the light most favorable to the non-moving party, are as
follows:

Plaintiff Related is a privately-owned real estate company
that manages the development, acquisition, financing, marketing,
and sales of mixed-use, residential, retail, and office
properties. See The Related Companies, L.P., New Hudson Facades
LLC, and MBM Supply LLC's Local Rule 56.1 Statement of Undisputed
Facts in Support of Their Motions for Summary Judgment ("Pl. 56.1
St.") ¶ 6, Dkt. 148; Carleton Ruthling, Tesla Walls LLC, Hudson

3

Walls LLC, Skye Holdings Ltd. and Tesla Wall Systems LLC's Response to Plaintiffs' Rule 56.1 Statements of Undisputed Facts ("Def. Reply 56.1 St.") ¶ 6, Dkt. 154. Carleton Ruthling is an engineer. Def. Reply 56.1 St. ¶ 7. Skye Holdings is a Hong Kong limited liability company owned in part by Ruthling. Id. ¶ 17.

In 2007, Ruthling formed Supply, a Samoan company owned 30% by Related and 70% by Skye Holdings. Id. ¶ 30. Until late 2011, Supply obtained materials from China (including sinks, shower pans, and stone) for Related's building projects. Id. ¶ 31. In addition to buying Supply's merchandise, Related funded Supply's operations, id. ¶ 34, loaning the company approximately $5.2 million between 2007 and 2011, id. ¶ 36. Ruthling was Supply's sole Director and manager. Id. ¶ 32.

In 2010, Ruthling proposed a new venture, Tesla, which would obtain a type of glass façade called curtain wall, ship it to the United States, and install it on Related's buildings. See id. ¶ 37-38. Ruthling formed Tesla in Delaware on September 6, 2011, id. ¶ 12, listing himself as the sole and managing member of the LLC, id. ¶ 48. Like Supply, Ruthling ran Tesla, id. ¶ 46, and Related funded it, id. ¶ 52. On February 2, 2012, Related extended its first loan to Tesla in the amount of $2.9 million. Id. ¶ 101.

By the fall of 2012, Related and Ruthling had still not executed an operating agreement for Tesla. Id. ¶¶ 50, 63. Tesla had already begun its first job, a $13.5 million subcontract to

import and install curtain wall for a 47-floor high-rise building called 500 North Lake Shore Drive ("NLSD") - one of Related's development projects in Chicago. Id. ¶ 47. Tesla's second job - importing and installing curtain wall for The Village at Santa Monica ("TVSM"), a 324 unit residential and retail development in California owned by Related - had also started. Id. ¶¶ 27, 53. And Tesla's third job - importing and installing curtain wall for 111 West Wacker Drive ("WWD"), id. ¶ 61, a 65-story glass building being developed by Related in Chicago, id. ¶ 28 - was agreed to in the summer of 2012, although the parties did not execute a written contract until 2013, id. ¶ 62.[2]

Nonetheless, Related was concerned about risks related to the growing but somewhat informal relations with Tesla. Id. ¶ 65 (quoting a Related executive stating that "with Santa Monica moving, 111 starting, there is too much risk on both sides not to get it done"). One of the snags in the LLC negotiations was the status of the $5 million Related had loaned Supply and the $2.9 million Related had wired Tesla in February. See Email from Brenner to Ross dated October 1, 2012, Ex. 58, Dkt. 149-4 (explaining that Ruthling "believes that Related has already been compensated through lower prices" and that the "$5 million + loan should not

---

[2] On January 17, 2012, Ruthling created Hudson listing himself as the sole and managing member. Pl. 56.1 St. ¶ 52. Hudson handled the installation of Tesla's curtain wall on various buildings. Id. ¶ 18.

5

be repaid"); id. (stating further that he told Ruthling that Related loaned him the $2.9 million and advanced the company $4 million in funds all of which Related expects to be repaid); Email from Brenner to Ruthling dated August 28, 2012, Ex. 20, Dkt. 143 (noting the "key areas of disagreement" and listing, first, "[a]dvances to date which need to be repaid . . . over $7 million").

Although Related and Ruthling never were able to execute a full-scale joint venture agreement, see Pl. 56.1 St. ¶ 46, on November 28, 2012, Related and Skye Holdings signed a two-page Term Sheet, id. 67, which the parties agree governs the business, see Transcript dated April 19, 2018, Dkt. 175. The Term Sheet has ten provisions (hereinafter "sections"). See Tesla Wall Systems LLC Tentative Term Sheet dated November 28, 2012 ("Term Sheet"), Ex. 69, Dkt. 149-4.

Section 1 provides that Skye Holdings owns 75% of Tesla and Related owns 25%. Id. § 1. Section 2 provides that Tesla will distribute "Available Cash" in a "Waterfall" as follows: (1) in payment of taxes; (2) in repayment of project cash advances from Related with accrued interest; (3) 40% to Skye Holdings and 60% to Related until existing loans from Related are repaid with accrued interest; and thereafter (4) 75% to Skye Holdings and 25% to Related. Id. § 2.[3]

---

[3] The Term Sheet does not define "Available Cash." However, the parties' correspondence suggests that they understood it to mean

6

Section 6, governing "accounting," provides that Tesla will report to Related any payments it makes to third parties other than Skye Holdings and that the company will follow "customary LLC budgeting, tax and accounting provisions." Id. § 6. Section 7 provides that "[a]ll overhead and other costs [of the company], whether China-based or US-based, are costs of each project." Id. § 7. Section 8 provides that no additional capital contributions will be required and that Related will "make all operation advances as loans @ 9% interest." Id. § 8. Section 10 adopts "Additional Customary LLC Provisions." Id. § 10.

Ruthling repeatedly sought cash infusions from Related pursuant to § 8 of the Term Sheet. See, e.g., Def. Reply 56.1 St. ¶ 94 (requesting $1.1 million in February 2013); id. ¶ 97 (requesting $900,000 in May 2013); id. ¶ 98 (requesting a cash advance citing negative cash flow of $1.3 million in June 2013). Indeed, between October 2012 and July 31, 2014, plaintiffs made at least sixty wire transfers to Tesla. See id. ¶ 84. Ruthling typically provided minimal information for the funding requests, id. ¶ 94 (contesting only the adequacy of Ruthling's accounting reports), and many requests were made at the last minute, with

---

after-tax profits. See Email from Ruthling to Wong, Loughran, and Brenner dated November 27, 2012, Ex. 68, Dkt. 149-4 (informing Related that it was "acceptable to Skye Holdings" for Tesla to pay back the outstanding balance of Supply's cash advances from Tesla's "profits" at a rate of 40% to Related and 60% to Skye).

Ruthling and/or Du citing dire consequences for the business if the money was not sent immediately, id. ¶ 95 (same). For example in June of 2013, Ruthling stated that Tesla "is sound and operating well except for the lack of cash. However, I don't see the business going past 24 hours from now." Id. ¶ 99.

In response to Tesla's repeated request for cash, Related's executives frequently asked Ruthling for more information about Tesla's expenditures. See id. ¶ 102 (collecting emails); id. 94 (quoting Brenner explaining that it "is impossible to evaluate this [request] without an analysis of the cash inflows and outflows for Tesla" and requesting "an analysis by job of costs incurred, amounts paid to subs, and amounts received from the jobs"). Frequently, Related was not satisfied with Ruthling's answers. See id. ¶ 115 (quoting an executive telling Ruthling that "[y]our accounting function is not working. This is unacceptable and Related cannot be expected to advance cash because your team has not submitted information for the requisition."). By March 2013, Related sought to limit its lending to Tesla. Id. ¶ 96 (quoting Loughran stating that "until we come to grips with accounting issues we" will not "deal with further loans and funding"). On more than one occasion, email evidence suggests that Ruthling intentionally withheld information from Related. See, e.g., id. ¶ 104 (quoting Ruthling instructing Du not "to provide a response to" Ferraro's requests in a timely fashion); id. (quoting Du

stating that generally Tesla would "not volunteer information" to Related); id. ¶ 106.[4]

In an effort to induce Related to make cash advances to Tesla, Ruthling made various representations to Related about Tesla's business. Among these (and of particular relevance to the claims here), Ruthling represented that Paik, Ruthling's wife, who drew a sizable monthly salary from Tesla, was a "foreign employee" who worked for "RS/Tesla" managing "websense," making "travel arrangements," and doing "research on varied topics." See Email from Du to Brenner dated February 29, 2012, Ex. 29, Dkt. 143.

By the second quarter of 2013, it became clear that Tesla was losing money on its subcontracts, see Def. Reply 56.1 St. ¶ 198-99, and, at a meeting on August 1, 2013, Related informed Ruthling that it was likely to withdraw its support for the venture, id. ¶ 224 (noting that Ruthling understands that Related wants to "wind down the business at the conclusion of 111 and TVSM"). Thereafter, Ruthling apologized for "not sharing the detailed numbers" with Related and Related told him that "the only way you regain lost confidence is to perform in an entirely different manner." Id. ¶ 225.

---

[4] While Ruthling maintains that ample accounting reports were provided to Related, see, e.g., Def. Reply 56.1 St. ¶ 212, the email record shows, even in the light most favorable to Ruthling, that Related repeatedly requested additional accounting information and was dissatisfied with what Ruthling provided.

9

In September, Ruthling and Du discussed sharing the general ledger of Skye Holdings with Related in order to allay Related's concerns about financial transparency and convince Related to continue funding Tesla. Id. ¶ 203. On September 12, 2013, Du emailed Ruthling asking "Do you still want to [go] down this path with them [Related]???? More info means more questions." Id. ¶ 203. On September 17, Ruthling instructed Tesla to tell Related: "apologies for the confusion the general ledger of skye holdings will not be provided." Id. ¶ 204.

On or about September 20, 2013, Ruthling and Du shared the "general ledger" with Related. See id. ¶ 154 (citing Exhibit 40). The ledger includes a panoply of arguably personal expenses represented as business expenses, including dozens of Chinese lessons for Ruthling's wife billed to "HR & Recruiting" and something called "Hudson School deposit" also billed to "HR & Recruiting." See Skye Holdings General Ledger at 22, Ex. 45, Dkt. 160-5 (listing numerous Chinese lessons in July 2012). The ledger also includes as business expenses rent payments for Ruthling's residence in Hong Kong, a "domestic helper," cellphone bills, and living expenses including food, electricity, tax preparation, and internet. See Def. Reply 56.1 St. ¶ 140 (stating only that these expenses "appear on the General Ledger"). While Ruthling's position is that these expenses were properly charged to the company, see id. ¶ 144 (quoting Ruthling testifying that Tesla

10

paid "for a good number" of his living expenses including "rent, food, electricity, internet"); id. ¶ 141 (quoting Ruthling testifying that Related "should have been" charged for his "domestic helper"), plaintiffs maintain that Related never approved them and that they were a misuse of funds.

Shortly after receiving the general ledger, Related stopped the business. Id. ¶ 233 (noting, in October, that Related "stopped the business"); id. ¶¶ 234, 256. Tesla, however, had not yet finished TVSM and 111 WWD, and Related could not timely complete these buildings if Tesla were defunct. See, e.g., id. ¶ 210. As one Related executive put it, "We do have a completion guarantee on these jobs, so we have to be certain that they get done. One way or another we are going to pay – and it will be even more costly to complete these jobs if Tesla goes under." Id. Ruthling and Du recognized this. See id. ¶ 235 (quoting Du writing Ruthling that Related "needs the two projects to complete smoothly so they can earn their margin and decrease loans from 8.467 million to 4.732 million"). Accordingly, Related sought to execute a wind-down agreement with Ruthling that would incentivize Ruthling to finish these jobs. See id. ¶¶ 246-247; id. ¶ 246 (quoting Ruthling as telling Du "our rough position is . . . they cover all costs for the projects, pay all the vendors including [Skye Holdings and] cover [operational expenses] till May [and] then we are done").

11

Related and Ruthling reached an oral agreement that Tesla and Skye would no longer pre-pay expenses. See Deposition of Carleton Ruthling dated November 16, 2017 ("Ruthling Dep.") at 21, Ex. 9, Dkt. 160-1. And, among other things, Related began to pay certain of Tesla's vendors directly. See Def. Reply 56.1 St. ¶ 212. After a few months, Ruthling became concerned that Related was not holding up its end of the deal. Specifically, Skye Holdings was laying out cash so that Tesla could continue operating, and Related was not advancing new cash as agreed. See Ruthling Dep. Nov. 16 at 192. In an effort to force Related to send more money, Ruthling and Gramling threatened to withhold supplies for Related's building projects. For example, Ruthling instructed AIT, a third-party shipping vendor, to hold containers that were supposed to be delivered to the TVSM job site. See, e.g., Email from Screnci to Tesla Wall Systems dated February , 2014, Ex. 219, Dkt. 149-12 (stating that "I've been asked to let you know that AIT will not be delivering any further shipments to the Santa Monica site until the account is paid down to zero" and that "TWS [Tesla Wall Systems] is going to have to pre-pay future shipments"). To resolve the delay, Related tried to pay AIT's bills directly, but Ruthling still directed AIT to withhold the shipments. See Pl. 56.1 St. ¶ 296. It even appears that Ruthling began buying the containers from AIT himself so that he could hold them until Related acceded to his demands. See id. ¶ 297.

In plaintiffs' view this was extortion; in Ruthling's view, Tesla simply "made the commercially reasonable and legitimate decision to withhold the shipment of goods that plaintiffs refused to pay for." Hudson Walls LLC, Carleton Ruthling, Skye Holdings Ltd., and Tesla Walls LLC's Counter Statement of Undisputed Material Facts in Opposition to Motions for Summary Judgment ("Def. Ct. 56.1 St.") ¶ 25, Dkt. 153. As Ruthling put it, "Related knew that I was holding containers in certain instances, Related also knew they were in breach of their agreement to Tesla to pay for all costs, so Skye would not have to fund the operations closing out $1 billion worth of [plaintiffs'] buildings." Id.

Thereafter, in April, Ruthling told Related that Related was in breach of its oral agreement to pre-pay the costs of completing TVSM and 111 WWD. See Email from Ruthling to Brenner dated April 22, 2014, Ex. 58, Dkt. 160-7 (explaining that the balance owed to Skye has increased from a zero balance" on January 8, 2014 to "$757k on March 31," and listing various expenses that need to be paid "in the next few days" moving the "amount owed to Skye to over $1 million ($1082k)"). According to Ruthling, the "promised payments of the NLSD close out were not sent nor other OpEx or product cost payments," and until the balance "come[s] down to half [of] where it is now (i.e. no more than $500k)" "I am putting a temporary hold on delivery of materials and engineering." Id.

13

In response Related told Ruthling that it was looking into the situation; Related did not dispute that it had agreed to pay these costs. See Email from Brenner to Ruthling dated April 22, 2014, Ex. 58, Dkt. 160-7 ("[w]e are looking into this"); id. ("[i]f we can finalize the Close-Out Agreement we can finalize all of this"); id. (asking Ruthling to "[k]indly let" him "know what product deliveries" he is "holding"). Both sides continued to discuss these expenses and tried to roll the issue into a larger negotiation over a final wind-down agreement. See Email from Ferraro to Ruthling dated April 23, 2014, Ex. 58, Dkt. 160-7 (stating that "[i]t looks like the $757k is all product cost with the exception of the $165k estimate for March Opex [operational expenses]," stating that Related would "fund the payroll and Opexbut first would like a list of the employees whose severance is being paid" and stating that Related would "tie out the $757k but large amounts are" for the TVSM project and "we need to understand if change orders for added material are being billed to the project"); Email from Ruthling to Ferraro dated April 23, 2014, Ex. 58, Dkt. 160-7 (responding to Ferraro explaining various expenses that have been shouldered by Skye Holdings in order to prevent delays and help Related avoid violating a "completion guarantee" on the TVSM project); id. (attaching a list of Tesla's employees); id. (outlining "the financial reasons why Tesla has temporarily suspended services and deliveries until accounts are

14

brought current" and stating that "Skye has gone from a state" on January 8 "where accounts were current to the current state where +$1 million is owed to Skye"); id. (stating that "Skye was not supposed to fund the business and go deeper into debt to close out and finish RLP's buildings").[5]

Around this time, beginning in or around March 2014, and without informing Ruthling, Related sought to start a new company to manufacture curtain wall domestically. See Def. Reply 56.1 St. ¶¶ 318, 323-24. Related hired Tesla's number two, Michael Budd, to help run this new company. Budd started with Related as a Senior Vice President on or around May 8, 2014. Id. ¶ 336. Budd's move further strained Ruthling's relationship with Related. Ruthling viewed Budd's move as a breach of his contractual obligations and fiduciary duties to Tesla. See id. ¶ 265; id. ¶ 264 (quoting an email from Ruthling to Related stating that Budd had "clearly interfered with Tesla's primary business interest and this was done with the knowledge of/supported by Related").

Ruthling and Related continued to fight over cash advances and the wind down agreement until August. See id. ¶ 268. Related sought a release from Tesla for any claims it might have against

---

[5] As late as May, Related conceded that it owed some substantial amount of money to Tesla to offset advances made by Skye Holdings to complete the relevant jobs. See Email from Brenner to Ferraro dated April 28, 2014, Ex. 60, Dkt 160-7 (forwarding Ruthling's email dated April 23 detailing various debts incurred by Skye Holdings and asking if "Skye is owed $1 million ++ or $757,000?").

15

Related or its affiliates in connection with Budd's work for Related. See Closeout Agreement dated July 31, 2014 ¶ 12, Ex. 297, Dkt. 149-19. Ruthling sought, among other things, to retain VAT refunds due to Tesla. For example, in April of 2014, Ruthling threatened to withhold shipments to TVSM until he received assurances that he could keep the VAT funds. See Def. Reply 56.1 St. ¶ 161 (contesting only Related's awareness that "Skye kept the VAT"). No agreement was ever reached. Id. ¶ 271. Tesla ceased operations on July 31, 2014. Id. ¶ 165.

Thereafter, Ruthling diverted Tesla's remaining assets to his benefit. For example, he sold equipment that had been purchased for between $50,000 and $100,000 to an associate at a bargain price and kept the proceeds. See id. ¶¶ 165-175. He also kept the company's cash, see id. ¶¶ 272-73, insurance payouts, and VAT refunds, see id. ¶¶ 274-75 (noting that Ruthling retained a check for $25,000 in October and deposited a check for $17,667 on December 8, 2014). The VAT refunds amounted to approximately $1 million. Id. ¶ 164.[6]

---

[6] Ruthling directed some of these proceeds, around $600,000, directly to a new company called Guangzhou Guxia ("GG"), even though he did not formally own or control GG. See id. ¶ 161 (quoting Ruthling explaining that these VAT refunds were related to products shipped for Tesla) (not contested). GG was the subject of a discovery dispute earlier in this litigation. See Order dated December 22, 2017, Dkt. 130; Memorandum Order dated January 29, 2018, Dkt 140. Plaintiffs' motion for sanctions in connection with this dispute remains sub judice. See Dkt. 165.

16

On October 27, 2014, Ruthling caused Tesla to sue Budd for breach of contract and breach of fiduciary duty. Tesla Wall Systems v. Budd, No. 14 Civ. 8564 (S.D.N.Y. 2014). Two years later, on November 29, 2016, a jury found Budd liable and awarded Tesla $14.5 million. See Dkt. 87, No. 14 Civ. 8564. Subsequently, Judge Stanton of this Court vacated the award and ordered a retrial on damages. See Opinion and Order dated April 26, 2017, Dkt. 130, No. 14 Civ. 8564. Earlier this year, the case settled. See Notice of Settlement, Dkt. 172, No. 14 Civ. 8564.

Separately, in 2015, Related brought suit in state court against Tesla to recover the money Related had lent Tesla, Related Cos., L.P. v. Tesla Wall Systems, LLC, No. 650778/2015 (N.Y. Sup. Ct. 2015). In 2016, Related won a $15.4 million judgment. Tesla, which lacked the funds to satisfy the judgment, appealed.[7] On February 17, 2017, Related filed the instant action in Delaware state court and on April 3, 2017, defendants removed the case to federal court. See Dkt. 1., On June 2, 2017, the case was transferred, on consent, to this District. See Dkts. 42, 44.

Thereafter, defendants moved to dismiss and, by bottom line order dated August 4, the Court denied defendants' motion. See Dkt. 81. Now, as mentioned, defendants move for summary judgment

---

[7] In April 2018, New York's Appellate Division vacated the judgment and remanded the case for further proceedings. See Notice of Decision, Dkt. 167.

on Counts I, IV, and V and plaintiffs move for summary judgment on Count VI.

## DISCUSSION

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual issue is "genuine" if it "may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In moving for summary judgment or opposing summary judgment, a party "must offer some hard evidence showing that its version of events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

Although the party requesting summary judgment bears the initial burden of showing the Court, by reference to the record, the absence of genuine issues of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), the moving party need not show "that his opponent's case is wholly frivolous." DeStefano v. MVN Assocs., Inc., No. 10 Civ. 5441, 2013 WL 395440, at *1 (S.D.N.Y. Feb. 1, 2013). Where the non-movant has the burden of proof at

18

trial, the movant can prevail on summary judgment by either: (1) showing the nonmoving party has no evidence to support an essential element of its claim; or (2) presenting affirmative evidence to negate an essential element of the nonmoving party's claim. Fakhoury Enters., Inc. v. J.T. Distribs., No. 94 Civ. 2729, 1997 WL 291961, at *2 (S.D.N.Y. Jun. 2, 1997). If the Court determines the movant has carried its initial burden, the non-movant must then "go beyond the pleadings" and demonstrate that there is indeed a genuine issue of material fact for trial. Celotex, 477 U.S. at 324.

## I. Counts IV and V: Civil RICO and RICO Conspiracy

Defendants move for judgment as a matter of law on plaintiffs' RICO claims (Counts IV and V). Defendants argue that plaintiffs have failed to establish three elements of their RICO claim: a predicate act of mail or wire fraud, a pattern of racketeering activity, and causation. See Def. Mem. at 9-16. Defendants also argue that plaintiffs' RICO conspiracy claim fails, id. at 16, and that both counts IV and V are time barred by a four year statute of limitations, which, they argue, expired a year before plaintiffs commenced this suit, id. at 17-18. Additionally, in light of the First Department's April 27, 2018 Decision and Order vacating Related's prior judgment against Tesla, defendants renew their argument that plaintiffs lack standing to bring RICO claims at this time. See Letter dated April 3, 2018, Dkt. 168.

19

The Court considers each of these issues in turn:

## A. Predicate Acts of Fraud

In defendants' view, plaintiffs cannot identify evidence sufficient to establish even a single predicate act of mail or wire fraud. See Def. Mem. at 10.[8] According to defendants, this case is nothing more than a garden variety business dispute: Tesla was a start-up business and Related provided funds to cover Tesla's operating expenses. Although the contract governing Tesla's obligations to Related, the Term Sheet, established that Tesla would pay back Related's advances out of its future profits, id. at 5, the Term Sheet sets no restrictions on Tesla's spending or operations and Tesla was never profitable.

According to plaintiffs, defendants operated a scheme designed "to obtain advances from Related on the false pretext that such advances were needed to supply materials to Related's projects, and then to misappropriate those funds." Pl. Opp. at 12. Among the numerous false or inflated charges that plaintiffs cite are a series of salary payments to Ruthling's wife, Paik, totaling $4,600 per month. See Skye Holdings General Ledger dated June 30,

---

[8] Specifically, plaintiffs have failed to provide "factual evidence of the content, time, place and speaker of each alleged mailing or [wiring], and demonstrate the manner in which each alleged mailing or [wiring] furthered the purported scheme to defraud" as required by law. Def. Mem. at 10 (quoting Crown Heights Jewish Cmty. Council, Inc. v. Fischer, 63 F. Supp. 2d 231, 253 (E.D.N.Y. 1999).

2013, Ex. 140, Dkt. 149-10 (showing salary from two sources totaling $4,587); Dep. of Skye Holdings by Carleton Ruthling dated November 14, 2017 ("Skye Holdings Dep.") at 56:13-57:21, Ex. 368, Dkt. 149-25. Among the fraudulent misrepresentations plaintiffs cite are a series of statements by Tesla, Ruthling, and Du that Paik worked for Tesla as one of its employees. For example, in early 2012, Du represented to Related that Paik, who drew a sizable monthly salary from Tesla, was a "foreign employee" who worked for "RS/Tesla" managing "websense," making "travel arrangements," and doing "research on varied topics." See Email from Du to Brenner dated February 29, 2012, Ex. 29, Dkt. 143. In 2012 and 2013, Paik's salary was listed in various financial statements provided to Related, see Def. Reply 56.1 St. ¶ 138, and when Tesla was winding down Ruthling sought and secured from Related substantial severance pay for Paik, see Email from Ruthling to Brenner dated March 4, 2014, Ex. 45, Dkt. 159-2.

Although defendants now point to Ruthling's deposition testimony that, in exchange for her salary, Paik performed "project management services, administrative assistant services or executive admin assistant services, and IT . . . for both the local Chinese entities as well as for . . . Skye Holdings," Skye Holdings Dep. at 56:18-57:18, defendants have marshalled next to no evidence

21

that Paik did any of these things.[9] In fact, at one point defendants were so sure that Paik did not do work for Tesla and was not properly a party to this lawsuit, that they represented this view repeatedly to plaintiffs and to the Court. For example, in early 2017 defendants stated that "[a]lthough named as a Defendant in the present suit, Ms. Paik [] did not play a role in the events giving rise to the parties' dispute." See Defendants Tesla Wall Systems LLC, Tesla Walls LLC, and Hudson Walls LLC's Memorandum in Support of Their Motion to Sever and Transfer or, Alternatively, to Dismiss ("Del. Mem. 1") at 4 n.4, Dkt. 13. Defendants also stated: "Ms. Paik did not play a role in Tesla's operations and, upon information and belief, is only a party to this suit because Related knew that naming her as a defendant would hurt Dr. Ruthling." Memorandum of Law in Support of Dr. Carleton Ruthling and Skye Holdings Ltd.'s Motion to Dismiss or, Alternatively, to Join Motion to Transfer ("Del. Mem. 2") at 4, Dkt. 29.

During discovery, defendants went yet further and, in response to plaintiffs' document demands, asserted that "Ms. Paik has never been employed by any Ruthling Defendant," defined as Carleton Ruthling, Tesla, Hudson, and Skye Holdings. Letter from Lawrence Dany to Karen Dyer dated October 25, 2017 ("Dany Ltr.")

---

[9] The record includes just two email chains including Paik from early 2012. In one Paik forwarded an email and in another Paik responded to a potential job applicant in Dubai. See Exs. 31-32, Dkt. 160-4.

22

at 2, Dkt. 171-2. Counsel even told plaintiffs that, from January 2014 to the present, Paik "was not employed by any Ruthling defendant or by any entity owned or controlled (directly or indirectly) by the Ruthling Defendants." Id.

Plaintiffs now seek to equitably estop defendants from contradicting these statements. See Memorandum of Law in Support of Related's Request to Estop the Ruthling Parties From Asserting Positions Contradictory to Prior Statements and Admissions ("Estoppel Mem."), Dkt. 171. Defendants oppose. See Memorandum Opposing Related's Request Regarding Equitable Estoppel ("Estoppel Opp."), Dkt. 172. Defendants' position is roughly that "they never employed Ms. Paik but that she received compensation for various services she provided to Skye Holdings and [Tesla's] Chinese-based affiliates." Id. at 1. As regards defendants' earlier statement that Paik never played a role in "Tesla's operations," defendants argue that Tesla operates only in the United States and that, in reading this sentence, plaintiffs and the Court must distinguish between Tesla "which operated exclusively in the United States, and the company's Chinese-based affiliates." Id. at 7.

But much of Tesla's work was performed in China and Ruthling himself was based in China – and no one contests that Ruthling played a role in Tesla's operations. Moreover, defendants themselves do not make this doubtful distinction in their numerous statements to each other, Related, and the Court. See, e.g., Ex.

23

43, Dkt. 159-2 (Ruthling providing Related with "a current list of Tesla China staff responsibilities"); Def. Opp. at 11-12 (defendants describing Gramling's role as receiving filings "from Tesla I's Chinese offices"); Email from Ruthling to Brenner and Ferraro dated February 21, 2014, Ex. 229, Dkt. 149-13 (Ruthling stating that "[m]ost tesla china staff are between 18-30 months in tenure"); Transcript dated January 16, 2018 at 8:11-17, Dkt. 138 (Ruthling) (testifying that a Chinese employee "conduct[ed] business on behalf of" Tesla). As the above-mentioned representations were reasonably relied on by plaintiffs and the prejudice is clear, the Ruthling Defendants cannot now argue that Paik was an employee of Skye Holdings or Tesla, that she was entitled to a salary on that basis, that she was entitled to severance from Tesla upon termination of her "employment," or that she played a role in Tesla's "operations" in either the United States or in China.[10]

Within those constraints defendants may still argue at trial that Paik performed services that entitled her to collect a monthly $4,600 check at the company's expense. It is not clear, however, how far such an argument can get defendants as, putting their

---

[10] Equitable estoppel "is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001). See also Veltri v. Bldg. Serv. 32B-J Pension Fund, 393 F.3d 318, 326 (2d Cir. 2004).

24

representations to one side, competent evidence exists that Paik was not entitled to monthly salary. For example, Paik was excluded from a list of Tesla's employees in February 2014, a list that included mostly (if not exclusively) employees working in China. See Email from Ruthling to Brenner dated February 18, 2014, Ex. 43, Dkt. 159-2. And, for a period of potentially six months, Paik herself was not paid her salary at all, even though seemingly Skye Holdings continued to bill Tesla for it each month. See Email from Paik to Ruthling dated February 25, 2014, Ex. 231, Dkt. 149-13 (stating that various amounts are "due" including "6 months of salary"); Skye Holdings Dep. at 57:21 (Ruthling testifying that Paik's salary was charged to Tesla).

Moreover, Paik's own statements suggest, at least on one reading, that she did not believe she was a salaried employee at all, see Email from Paik to Ruthling dated February 25, 2014, Ex. 231, Dkt. 149-13 (suggesting that if Ruthling was going to skip her monthly payments they should stop calling it her "salary" and instead "call it for what ever it is"), as did a statement of Tesla's own accountant, Du, see Email from Du to Ruthling dated July 9, 2012, Ex. 40, Dkt. 149-4 ("There's a payment to jeaneah for $47,550 from the HSBC account. Is this really payable to you for past management fees? Please let me know ASAP."). Perhaps most importantly, defendants themselves only point to two emails Paik ever sent in connection with Tesla's work, both of which were sent

in early 2012. See Def. Reply 56.1 St. ¶ 138 (stating only that plaintiffs were aware Paik was "receiving a salary"); Def. Ct. 56.1 St. ¶ 20 (citing as evidence that Paik performed "tasks in exchange for her salary" only two emails Paik sent in early 2012).

Accordingly, even were defendants not estopped from arguing that Paik was an employee of Tesla or Skye Holdings, there is a genuine dispute of fact as to whether defendants fraudulently misrepresented to plaintiffs that Paik was an employee of Tesla in order to induce plaintiffs to advance funds used to pay her salary and a substantial severance.

Furthermore, the multiple acts of wire fraud regarding Paik are not the only such predicate acts that plaintiffs rely on and that remain in genuine dispute. As predicate acts of mail and wire fraud, plaintiffs also point to dozens of false bills sent by Skye Supply to Tesla for "container fees," which Ruthling described as "extra costs we can bill to the knuckleheads." Pl. 56.1 St. ¶ 143; see also id. ¶ 193 (noting that in total Skye Supply charged Tesla approximately $400,000 for logistics services, a significant portion of which was not justified); id. ¶ 148 (noting money advanced by Related and used by Ruthling to fund the formation of a Hong Kong shell company); Pl. Opp. at 16 (noting money used by Ruthling to improperly pay Skye Holdings $564,000 for research and development costs).

26

**B. Continuity/Pattern of Racketeering**

To prevail on a RICO claim, plaintiffs must also establish a pattern of racketeering. See Moss v. Morgan Stanley Inc., 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(a)-(c)). A pattern of racketeering exists, inter alia, where two or more predicate acts occurred over a period of at least two years ("closed-end continuity"). See DeFalco v. Bernas, 244 F.3d 286, 321 (2d Cir. 2001) (noting that the Second Circuit has never found continuity where the pattern extended less than two years). Although two years is not "a bright-line requirement," it is "rare that conduct persisting for a shorter period of time establishes closed-end continuity, particularly where [] 'the activities alleged involved only a handful of participants' and do not involve a 'complex, multi-faceted conspiracy.'" Spool v. World Child Intern. Adoption Agency, 520 F.3d 178, 184 (2d Cir. 2008) (quoting GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 468 (2d Cir. 1995)).

Plaintiffs here allege acts of fraud beginning in 2010 and extending to as late as 2015. While the Court is skeptical that plaintiffs muster sufficient evidentiary support for some of their allegations, the Court need not reach these issues at this juncture as it is undisputed that Paik was paid a salary every month beginning in January 2012, that Du and Ruthling made representations about her work in March 2012 and February 2014,

and that Related continued to pay her salary through July 31, 2014, at which point Related paid her a substantial severance.[11]

Similarly, the allegedly false billings continued for over three years. There is also sufficient evidence to go to a jury on the question of whether Ruthling fraudulently concealed, diverted, and retained VAT refunds, insurance refunds, and other cash remaining at Tesla and its affiliate, Hudson, after it ceased operations in July 2014. These activities stretched through the fall and into 2015, see Deposition of Tesla Wall Systems, LLC by Carleton Ruthling dated November 15, 2017 ("Tesla Wall Sys. Dep.") at 267, Ex. 369, Dkt. 149-25., meaning that plaintiffs may be able to prove at trial predicate RICO acts dating as early as January 2012 and as late as April 2015, a period exceeding three years. Accordingly, the Court finds that there is a genuine dispute of material fact regarding whether defendants engaged in a pattern of racketeering activity.

## C. Causation/Reliance

Defendants also argue that the record is "void of any evidence suggesting" that defendants' "purported[ly] fraudulent conduct caused injury" to plaintiffs. Def. Mem. at 16. This is because, according to defendants, plaintiffs were aware of each of the

---

[11] Defendants also used Tesla's funds to pay for Paik's Mandarin lessons and cell phone and represented that these expenses were incurred for business purposes.

28

disputed expenses they now claim were fraudulent and nevertheless continued to advance money to Tesla.

But defendants miss the point. Even where plaintiffs were aware of the charges, as in the case of Paik's salary, plaintiffs were not aware that defendants' representations about the charges - in the case of Paik that she worked for the company - were false. Moreover, as Tesla and Ruthling owed plaintiffs a fiduciary duty, it was presumptively reasonable for plaintiffs to rely on their representations. See Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C., No. 11 Civ. 4416, 2013 WL 628533, at *13 (S.D.N.Y. Feb. 15, 2013) (reliance on a fiduciary's representations is reasonable under New York law).

As there is, at the very least, a genuine dispute of material fact regarding whether plaintiffs relied on these representations and omissions, the Court finds that plaintiffs have adduced enough evidence of reliance to go to trial on Count IV.

## D. Statute of Limitations

Defendants assert a statute of limitations defense to Counts IV and V, contending plaintiffs' RICO claims are time barred as a matter of law. See Def. Mem. at 17-18. As a general matter, the statute of limitations begins to run on a claim when a plaintiff "discovers — or should have reasonably discovered — the alleged injury." World Wresting Entm't, Inc. v. Jakks Pac., Inc., 328 F. App'x 695, 697 (2d Cir. 2009). On a RICO claim, the limitations

29

ℑ `

period begins to run "even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." Id. (quoting Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 427 (2d Cir. 2008)).

Plaintiffs commenced this action in February 2017. Accordingly, plaintiffs' claims are time barred if defendants had sufficient "storm warnings" of defendants' fraudulent scheme prior to February 2013. See Koch v. Christie's Int'l PLC, 699 F.3d 141, 148 (2d Cir. 2012) ("RICO claims are subject to a four-year statute of limitations."). Defendants argue that Ruthling, Related, and Du exchanged numerous emails prior to February 2013 regarding defendants' "failure to provide accounting transparency." Def. Mem. at 18. In fact, defendants claim, plaintiffs were aware of many of the allegedly fraudulent charges as early as March 2012. See Defendants' Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgement ("Def. 56.1 St.") ¶ 48, Dkt. 150.

But none of the emails defendants cite indicates that Ruthling was conspiring with Gramling, Du, and others to disguise expenses and overcharge Related. While plaintiffs were on notice that Tesla was paying Paik a salary, for example, defendants never told plaintiffs that Paik was not performing any work for the company. Indeed, plaintiffs maintained up through 2014 that Paik was an

30

employee of Tesla and should be paid a severance. Thus, at the very least there is a genuine dispute of fact regarding whether and when plaintiffs should have known that defendants were defrauding them by disguising various improper expenses. Accordingly, defendants are not entitled to summary judgment on the basis of this affirmative defense.

## E. Standing

In a civil cause of action arising under 18 U.S.C. § 1962, plaintiffs must establish "standing" to seek relief in Court by adequately alleging an injury proximately caused by the RICO violation. Defendants renew their argument, advanced previously at the motion to dismiss phase, that plaintiffs have failed to establish RICO standing as plaintiffs' alleged damages are not "clear and definite" as required by Motorola Credit Corp. v. Uzan, 322 F.3d 130, 135 (2d Cir. 2003) (holding "a cause of action does not accrue under RICO until the amount of damages becomes clear and definite" (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir. 1994))).

According to defendants, this Court, in denying their motion to dismiss, previously distinguished Uzan on the grounds that the plaintiff in that action "had not yet obtained a final judgment in arbitrations relating to the underlying transactions" whereas, in this matter, the related state court action was subject to a final judgment. Def. Ltr. at 1. Now that that judgment has been vacated,

defendants contend, plaintiffs' state court action seeking contractual damages is once again pending, so plaintiffs have no longer exhausted their bargained-for remedies. See id.

But, as the Court held in its prior Opinion, "[t]he fact that plaintiffs might be able to recover from Tesla I if Tesla I is able to recover assets in other lawsuits is not a bar to plaintiffs pursuing the instant action. Courts routinely take into account recoveries from other sources when a plaintiff has claims against multiple parties." Dkt. 126, at 42-43. Unlike in Uzan, where the plaintiff was a secured creditor, here, plaintiffs are "not secured," so "there is 'no collateral on which to foreclose, or any other contractual remedy.'" Id. at 44 (quoting Uzan, 322 F.3d at 136). Whereas in Uzan the parties' contract set forth remedies for default — arbitration and foreclosure - here, the parties agreed to no "bargained-for" remedies. As a result, there are no contractual rights for plaintiffs to exhaust. Tesla has no assets and no potential sources of income. If, somehow, against all odds, plaintiffs are able to recover from Tesla, the Court could take that recovery into account in determining appropriate damages here.

In these circumstances, vacatur of the state court judgment does not affect plaintiffs' standing. Plaintiffs' claims are not against Tesla, they are against Tesla's owners and employees who, plaintiffs allege, looted the company for their own benefit in

financially ascertainable ways. See GICC Capital Corp., 30 F.3d at 293 ("When a corporation fraudulently is caused to issue debt and stripped of its assets in a manner that obviously will leave the creditors unpaid, those creditors have standing. Their injury is 'reasonably foreseeable or anticipated as a natural consequence.'" (quoting Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 24 (2d Cir. 1990))). Therefore, the Court finds that plaintiffs have standing to pursue their RICO claims and denies defendants' motion to vacate the Court's prior order denying defendants' motion to dismiss Counts IV and V.

## F. Conspiracy

Defendants also argue that they are entitled to summary judgment on plaintiffs' RICO conspiracy claim (Count V) because (1) plaintiffs' RICO claim is not viable and (2) plaintiffs have failed to establish "an agreement" by defendants "to engage in conduct of the type that would be sufficient to constitute a pattern of racketeering activity." Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 489 (2d Cir. 2014).

As plaintiffs have adduced enough evidence to go to trial on Count IV, Count V does not fail on that basis. As regards defendants' argument that plaintiffs' have failed to adduce evidence of an agreement, plaintiffs need only show that defendants agreed to commit a RICO violation that was "manifested by 'words or actions.'" Palatkevich v. Choupak, No. 12 Civ. 1681, 2014 WL

33

1509236, at *21 (S.D.N.Y. Jan. 24, 2014) (quoting Maersk, Inc. v. Neewra, Inc., 554 F. Supp. 2d 424, 462 (S.D.N.Y. 2008)). Here there is substantial evidence of Ruthling's knowledge of and responsibility for defendants' allegedly unlawful scheme, the interests of the other co-defendants and co-conspirators in the scheme, and Ruthling's control over these persons in support of the scheme. See Pl. Opp. at 20. Furthermore, Ruthling's knowledge can be imputed to each of the other entity defendants. Serin v. N. Leasing Sys., Inc., No. 06 Civ. 1625, 2009 WL 7823216, at *14 (S.D.N.Y. Dec. 18, 2009) ("[K]nowledge [] can be imputed to the corporate entity they allegedly controlled and utilized to further the conspiracy."). Accordingly, defendants' motion for summary judgment as to Count V is denied.

## II. Count I: Common Law Fraud

Defendants argue that plaintiffs' fraud claim fails because plaintiffs have not adduced evidence sufficient to establish that defendants made a misrepresentation or omission of material fact or that plaintiffs reasonably relied on any such purported misrepresentation and omission. See Def. Mem. at 19-20.

"Under New York law, a plaintiff alleging fraud must show five elements by clear and convincing evidence: '(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of plaintiff; and (5) resulting damage to the

34

plaintiff.'" Herzfeld v. JPMorgan Chase Bank, N.A., 354 F. App'x 488, 489 (2d Cir. 2009) (quoting Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006)).

Here, for example, as discussed in the context of Count IV, Ruthling's representation to Related that Paik was an employee of Tesla, when in fact she was not, was arguably made by Ruthling and Du with an intent to defraud Related by inducing them to advance money to pay her monthly salary and, later, her severance. Plaintiffs reasonably relied on these representations because Paik had performed work for Supply, and defendants had no way of knowing what Paik was or was not doing in Asia.

Similarly, plaintiffs have adduced sufficient evidence that Ruthling's representation to Related that various employees of Tesla were working on completing Related's projects in 2014 and not on other unrelated projects was a material misrepresentation of fact, as Ruthling apparently knew many of them were working on other projects that Related had explicitly refused to pay for. See Def. Reply 56.1 St. ¶¶ 187-88 (not contesting that Ruthling disguised legal expenses for Tesla II and charged Related for the expenses); Email from Ruthling to Budd dated November 20, 2013, Ex. 197, Dkt. 149-12 (reminding Budd "not [to] discuss [non-Related] matters with RLP even though it is obviously in their best interests" because they "are questioning work done on potential future jobs"). Moreover, Ruthling purportedly made these

35

representations in order to induce Related to advance additional cash, which cash was advanced. Accordingly, defendants' motion for summary judgment on Count I is denied.

## III. Count VI: Breach of Fiduciary Duty

Turning to plaintiffs' motion for partial summary judgment on Count VI, plaintiffs argue that Ruthling and Skye Holdings breached their fiduciary duties to Tesla as a matter of law.

With respect to common law breach of fiduciary duty claims, New York courts apply the law of the state of incorporation. See Marino v. Grupo Mundial Tenedora, S.A., 810 F. Supp. 2d 601, 607 (S.D.N.Y. 2011). Tesla (or the "company") is incorporated in Delaware. See Def. Reply 56.1 St. ¶ 12. Under Delaware law, the elements of a claim for breach of fiduciary duty include (1) the existence of a fiduciary duty and (2) a breach of that duty. See Marino, 810 F. Supp. 2d at 607.

Ruthling and Skye Holdings here concede for purposes of this motion that they owed Related fiduciary duties. See Defendants Carleton Ruthling, Tesla Walls LLC, Hudson Walls LLC, and Skye Holdings Ltd.'s Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Def. Opp. Mem.") at 7, Dkt. 152 ("[S]olely for the purposes of the instant motion, Defendants assume Dr. Ruthling and Skye Holdings owed Plaintiffs a fiduciary duty."). Unless an LLC agreement alters a fiduciary's duties, a manger and controlling member's duties include "the traditional

36

fiduciary duties of loyalty and care to its members." Glick v. KF Pecksland LLC, No. 12624, 2017 WL 5514360, at *19 (Del. Ch. Nov. 17, 2017); see also William Penn P'ship v. Saliba, 13 A.3d 749, 756 (Del. 2011) (same). Controlling members likewise owe a duty of care and loyalty to a minority member. Kelly v. Blum, No. Civ. A. 4516, 2010 WL 629850, at *12 (Del. Ch. Feb. 24, 2010).

Plaintiffs argue that defendants breached these duties to Tesla in three ways: (1) by engaging in self-interested transactions, (2) by leveraging control of shipments to extort money from plaintiffs during the parties' wind-down negotiations, and (3) by diverting the company's cash and other assets during the "wind-down" period. See Memorandum Of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pl. Mem.") at 1-2, Dkt. 147. The Court considers each argument in turn:

## A. Self-Interested Transactions

Plaintiffs argue that Ruthling engaged in the following series of self-interested transactions in breach of his fiduciary duties: (1) paying Paik, his wife, a salary amounting to $4,600 per month; (2) paying Skye Supply, a company he co-owned with his friend Steve Gramling, $55,000 for unjustified logistics services; (3) paying $180,000 to capitalize a Hong Kong company and bank account; (4) charging various personal expenses to the company including rent, moving expenses, food, electricity, internet, cell

phone bills, a housekeeper, and his wife's Chinese lessons; and (5) paying Skye Holdings $564,000 for intellectual property.

As an initial matter, defendants dispute that these transactions were "self-interested," as, defendants argue, the payments were not made directly to Ruthling himself. But because Ruthling had a financial interest on the other side of each of these transactions,[12] the Court finds that an "entire fairness" standard is nonetheless appropriate. Kahn v. Lynch Commc'n Sys. Inc., 638 A.2d 1110, 1117 (Del. 1994) (explaining that, when reviewing the conduct of a fiduciary, Delaware courts apply an "entire fairness" standard where a fiduciary "stands on both sides" of a transaction).

An entire fairness inquiry has two prongs: fair dealing and fair price. See William Penn P'ship, 13 A.3d at 756-57. The concept

---

[12] According to defendants, all that plaintiffs have shown here with respect to these transactions is that they "occurred between Dr. Ruthling and parties with which he had ongoing relationships." See Def. Opp. Mem. at 8. But it is undisputed that the transactions involve Ruthling's wife, see Def. Reply 56.1 St. ¶ 9, and various companies Ruthling owns and controls, see id. ¶ 180 (Ruthling owned 49% of Skye Supply beginning in 2007); id. ¶ 13 (Ruthling owns Tesla II); id. ¶ 148 (Ruthling owns the Hong Kong entity). Accordingly, Ruthling stood to benefit personally as a result of the transactions. See Carlson v. Hallinan, 925 A.2d 506, 529-30 (Del. Ch. 2006) (applying the entire fairness standard where fiduciary caused the company to pay another company he owned); Valeant Pharm. Int'l v. Jerney, 921 A.2d 732, 745 (Del. Ch. 2007) (finding that "self-interested compensation decisions made without independent protections are subject to the same entire fairness review as any other interested transaction").

38

of fair dealing incorporates "how the transaction was structured, the timing, disclosures, and approvals," while the concept of "fair price relates to the economic and financial considerations of the transaction." Id. Because Ruthling stood on both sides of the above-mentioned transactions, he bears the burden of showing that each involved fair process and fair price. See Kahn, 638 at 1117 ("The initial burden of establishing entire fairness rests upon the party who stands on both sides of the transaction."). Accordingly, to defeat plaintiffs' motion, Ruthling must "go beyond the pleadings" and demonstrate that there is indeed a genuine issue of material fact for trial. Celotex, 477 U.S. at 324.

## (1) Paik's Salary

As discussed in Part I, supra, Ruthling caused Skye Holdings to charge Tesla a monthly salary for Paik. See Def. Reply 56.1 St. ¶ 138 (contesting only plaintiffs' contention that Paik's salary was not properly disclosed). Defendants argue that plaintiffs were aware that Paik was receiving a salary, see Email from Du to Brenner and Ferraro dated July 12, 2012, Ex. 30, Dkt. 160-3 (attaching the company's cash flow statement for June 2012 listing a $1,935.48 payment to "Jeaneah Paik" under "salaries"), and that Paik performed "reasonable, business-related tasks in exchange for her salary," Def. Ct. 56.1 St. ¶ 20.. Specifically, defendants contend, Paik managed "websense," made travel arrangements, and

did "research on varied topics." See Def. Opp. Mem. at 10 (quoting Def. Ct. 56.1 St.).

But the only evidence that defendants point to that Paik did these things is two email chains from the first half of 2012. One is with a job applicant in Dubai, see Email from Paik to Paik dated March 14, 2012, Ex. 31, Dkt. 160-4, and the other regards renewing a service called Websense, see Email from Paik to Camp dated May 2, 2012, Ex. 32, Dkt. 160-4. Defendants do not explain how either of these emails benefited Tesla. Defendants do not point to any evidence that Paik made travel arrangements or did research (as they claim). In fact, defendants marshal no evidence showing Paik did any work at all after May 2012. Nor do defendants attempt to argue that sending a handful of emails over a three month period is sufficient to justify a salary of $4,600 per month. As no reasonable juror could conclude on the evidence presented that $165,000 was a fair price for Paik's work, the Court finds, as a matter of law, that defendants breached their fiduciary duties to Tesla by paying Paik these monies.[13]

**(2) Skye Supply's Container Fees**

Plaintiffs argue that a series of payments, referred to as "container fees," totaling $55,000 made by Tesla to Skye Supply

---

[13] The Court notes that, in reaching this conclusion, it has not relied on its ruling in Part I, supra, equitably estopping defendants from arguing that Paik was employed by Tesla.

were duplicative of payments made by Tesla to AIT Worldwide Logistics ("AIT"), a third party vendor. See Pl. Mem. at 8; Def. Reply 56.1 St. ¶¶ 190-193 (contesting only that these expenses were not disclosed). According to plaintiffs, defendants have failed to show that these transactions were entirely fair because defendants did not disclose that Ruthling owned 49% of Skye Supply until June 2013 and because defendants do not show identify evidence tending to show that Gramling's fee, which defendants contend was "equivalent to that of a customs broker," was fair given the actual services Gramling provided. See Reply Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pl. Reply") at 5, Dkt. 164.[14]

But defendants point to competent evidence that Tesla hired Skye Supply to facilitate shipping from China to the U.S. and to serve as an intermediary between Tesla's China-based vendors and AIT. Deposition testimony indicates that Gramling forwarded Importer Security Filings for shipping containers from Tesla's Chinese offices to AIT, performed quality control on shipments,

---

[14] Among other things, plaintiffs point to evidence suggesting that Ruthling encouraged Gramling to overbill Tesla for his services. See Email from Ruthling to Gramling dated October 6, 2013, Ex. 176, Dkt. 149-11 ("[W]hat I need is the charges Tesla is responsible for [] and the extra costs we can bill to the knuckleheads [Related]."); Email from Ruthling to Gramling dated March 13, 2014, Ex. 247, Dkt. 149-15 ("[S]end a bill to Chris for container services [] don't be shy on billing rlp will pay, make sure it is justified and will not be challenged.").

coordinated logistics between AIT and job-site contacts, and
handled problems that emerged during the shipping process. See
Deposition of Steve Gramling at 88:20-98:3, 93:4-5, 95-97, Ex. 47,
Dkt. 160-6 (describing work with customs, AIT, local job sites).
Further, defendants contend that Gramling was paid a below-market
rate of $120 per container. See Def. Opp. Mem. at 11; Email from
Ruthling to Brenner dated June 3, 2013, Ex. 33, Dkt. 160-4 (stating
that a customs broker usually charges $200/container and performs
less work than Gramling performed for Tesla).

Accordingly, it is clear that there is genuine dispute of
material fact regarding whether these container fees were fairly
priced. Defendants point to evidence that they were (Gramling's
testimony, Ruthling's emails, Ruthling's testimony), plaintiffs
point to evidence that they were not (emails between Ruthling and
Gramling, Tesla's payments to AIT for similar services). It is
also clear that there is a genuine dispute of material fact
regarding whether the process was fair. While plaintiffs may not
have been aware of the relationship between Ruthling and Skye
Supply initially, Ruthling disclosed the relationship fully when
asked. See id. (Ruthling informing Brenner that he owns a financial
interest in Skye Supply and Brenner asking how Ruthling establishes
that the charges, which he said "look reasonable," were "market").
Thereafter, Related continued to pay the fees. While fair dealing
requires that a person not "deliberately withhold material

42

information," see In re Dole Food Co., Inc. Stockholder Litig., No. 8703, 2015 WL 5052214, at *30 (Del. Ch. Aug. 27, 2015), plaintiffs do not point to uncontroverted evidence that Ruthling withheld his stake in Skye Supply. Accordingly, plaintiffs' motion for summary judgment as to these container fee payments is denied.

### (3) Hong Kong Bank Account

Plaintiffs argue that Ruthling misappropriated $180,000 in order to show "financial viability" for a corporate entity in Hong Kong. See Pl. Mem. at 9; Def. Reply 56.1 St. ¶ 148. According to plaintiffs, Ruthling promised that the money would be returned within three months, but it never was. See Def. Reply 56.1 St. ¶ 150 (only contesting that the money was not disclosed); Email from Ruthling to Brenner dated January 30, 2013, Ex. 81, Dkt. 149-5 (stating that the "HK company[] is a dummy company for the sole purpose" of him moving to Hong Kong and that he needs "to be paid a nominal salary in Hong Kong or Hong Kong will not allow" him to stay and that $130,000 "is needed in my personal bank account for a period of 3 months to show I am a person of means where it will then be returned").

But there is evidence both that plaintiffs were informed of this transaction at the time it occurred, see Def. Ct. 56.1 St. ¶ 22; Email from Ruthling to Brenner dated January 30, 2013, Ex. 81, Dkt. 149-5, and that the money did not come from Tesla or Related but instead from Skye Holdings, see Def. Opp. Mem. at 13; Email

43

from Ruthling to Brenner dated November 28, 2013, Ex. 42, Dkt. 160-5 (stating that "RLP never provided" the $150,000 spent to setup a new company in Hong Kong, that "Skye provided those funds," that they were "released back to Skye" after four months, and that "Chris verified over the phone this was not charged to RLP and he can verify via email"); Ruthling Dep. at 142:13-143:12 (stating that "the money that was deposited was actually Skye Holdings' money).

As there is a dispute regarding whether these payments came at the expense of Tesla or instead came out of funds belonging to Skye Holdings, there is a genuine dispute of material fact regarding whether the $180,000 transaction was entirely fair to Tesla. Accordingly, plaintiffs' motion for summary judgment as to this transaction is denied.

**(4) Personal Expenses**

Plaintiffs argue that, despite receiving large "management fees" from the company, Ruthling spent $243,284 of the company's money on a host of personal expenses including an apartment in Hong Kong, moving expenses, utilities, domestic services, and his wife's Mandarin lessons. See Pl. Mem. at 10; Pl. 56.1 St. ¶¶ 151-60. Defendants do not contest that these payments were made. See Def. Opp. Mem. at 14; Def. Reply 56.1 St. ¶¶ 151-60 (contesting only that these payments were not disclosed). Instead, defendants argue that "well before" the wind-down of Tesla, plaintiffs were

44

aware of the expenses and plaintiffs continued to advance money to the company. See Def. Opp. Mem. at 14. Specifically, defendants point to the disclosure of the General Ledger made sometime shortly after August 31, 2013. Id.; Skye Holdings General Ledger, Ex. 45, Dkt. 160-5. But there is little evidence that these payments were disclosed prior to August 2013.

As regards fair price, defendants make no attempt at all to justify these expenditures. Instead, defendants argue that they were "approved" by plaintiffs. See Def. Ct. 56.1 St. ¶ 23. But none of the evidence cited by defendants regarding "approval" shows approval. For example, defendants cite an email exchange between Ruthling and Brenner from November 2013. While Ruthling mentions one of the rent transactions, see Email from Ruthling to Brenner dated November 7, 2013, Ex. 17, Dkt. 160-2 (discussing "a transfer from the company USD account to the company HKD account, and then a second transaction from HKD account to pay the vendor i.e. the rent for one month"), Related's executive, Brenner, responds by stating only that "this is too hard to follow. We need a straight forward schedule that enables me to see where the $3 million you received in October was spent. Payments to 3rd parties not within the myriad of companies you have set up," Email from Brenner to Ruthling dated November 7, 2013, Ex. 17, Dkt.160-2.

The other emails cited by defendants are similarly bereft of approval. See, e.g., Email from Ruthling to Brenner dated November

45

27, 2013, Ex. 43, Dkt. 160-5 (stating that Skye pays for "two
categories" of expenses: "Product Costs and "OpEx Costs," defining
the latter was "technical designers, QC, Manufacturing, Shipping,
Accounting/Purchasing/ Billing" and noting that "Skye also bills
a management fee which is part of opex which is approximately
$203,000 usd/year and Carleton Receives a local china rmb salary
of 40,000 rmb/mo which is approx. $79,000 at current exchange
rates"); id. (stating that "[t]he above items are the only items
and categories that are billed from Skye to Tesla. Skye does not
have any other fees that Skye is charging to the business."); Email
from Ferraro to Loughran dated January 30, 2013, Ex. 44, Dkt. 160-
5 (chain in which Ruthling and Related executives discuss the
Company's expenses, including, the HK entity but not any personal
expenses); Email from Du to Ruthling dated September 20, 2013, Ex.
45, Dkt. 160-5 (attaching excerpts of the general ledger); Email
from Du to Brenner and Ferraro dated January 21, 2014,  Ex. 46,
Dkt. 160-5 (attaching excerpts of the general ledger); Deposition
of Jennifer Ferraro dated November 1, 2017 at 165, Ex. 19, Dkt.
160-2 (testifying that Related continued to make advances to Tesla
after Related discovered that some "of the advances were being
used to pay for the Hong Kong apartment" and that Related did not
"take any credit or backcharge against Tesla" for those expenses
saying that Related "had no choice"). Moreover, Related sought to

46

end the venture around the time that defendants' disclosed the general ledger.

As defendants point to no evidence in the record tending to show that these payments were fairly priced or otherwise approved by plaintiffs, the Court finds that defendants breached their fiduciary duties. by charging the company for these expenses.

**(5) Intellectual Property**

Plaintiffs also argue that defendants concealed as an operating expense a payment of $564,000 to Skye Holdings for the development of "intellectual property." See Pl. Mem. at 10; Pl. 56.1 St. ¶¶ 88, 176.

Although defendants argue that plaintiffs expressly approved this payment, see Def. Opp. Mem. at 14-15 (citing Def. Ct. 56.1 St. ¶ 24), defendants point only to (1) an email chain from March 2012 between Ruthling and Du that makes no specific mention of the charge, see Email from Ruthling to Du dated March 18, 2012, Ex. 49, Dkt. 160-6; (2) an email from Du to Ferraro and Brenner that attaches various financial statements but makes no specific mention of the charge, see Email from Du to Ferraro dated March 22, 2012, Ex. 50, Dkt. 160-6 (attaching various financial statements for Tesla); (3) an email from Ruthling to Ferraro providing information regarding product development costs, see Email from Ruthling to Ferraro dated June 22, 2012, Ex. 51, Dkt. 160-7 (attaching bills from various sub-contractors); (4) an email

47

from Ferraro to Du and Ruthling stating that Related will not fund the curtain wall development costs "until our Joint Venture agreement is finalized," see Email from Ferraro to Du dated September 21, 2012, Ex. 52, Dkt. 160-7; (5) an email from Du regarding Tesla's low cash balance, see Email from Du to Brenner and Ferraro dated September 20, 2013, Ex. 53, Dkt. 160-7 (attaching various financial statements including one with an entry on January 31, 2013 for $563,829.93 which may be the relevant charge); and (6) an email from Du to Brenner, Ferraro, and Ruthling regarding various financials, see Email from Du to Brenner and Ferraro dated October 24, 2013, Ex. 54, Dkt. 160-7 (attaching various financial statements).

None of these emails relates to whether $564,000 was a fair price (and plaintiffs contend that the amount double counts for labor costs and other expenses). None of these emails shows that the charge was approved. None of these emails shows that the charge was fully disclosed. While an email from September 2013 may have included a line item reflecting the charge, the line item is buried among hundreds of charges for similar amounts and is not easily identified (defendants do not even identify it in their brief). Moreover, Related clearly informed Ruthling that "Related would not pay the $564,000 until the parties executed a joint venture

agreement," Pl. 56.1 St. ¶¶ 86-87, which was never executed.[15] Accordingly, the Court finds that defendants breached their fiduciary duty as a matter of law by charging Tesla $564,000 without fully disclosing the payment.

## B. Improper Exercise of Control

Plaintiffs argue that defendants improperly leveraged their control over Tesla's supply chain to delay plaintiffs' projects and extract concessions. Specifically, plaintiffs argue that Ruthling instructed Gramling to instruct AIT to block Tesla shipments from being delivered to Related's buildings. See Pl. Mem. at 11. As a result of Ruthling's improper "hardball" tactics, plaintiffs argue that they were forced to agree to various conditions in the wind-down negotiations.

But the wind-down agreement was never signed or executed. Accordingly, plaintiffs never paid any monies in connection with the agreement. See Pl. Mem. at 14.[16] As a remedy for Ruthling's purported breach, plaintiffs seek merely VAT refunds, which

---

[15] And none of these emails shows that such an agreement was ever executed, nor do defendants contend that such an agreement was ever executed.

[16] The Court is also unable to identify any evidence in the record that plaintiffs ever sent the money that Ruthling demanded. All plaintiffs cite for the proposition that Ruthling's gambit "worked" is an email that Ruthling sent to AIT instructing them to release the materials. See Email from Ruthling to Erica and Eric dated April 28, 2014, Ex. 276, Dkt. 149-16. There is no indication in the email or elsewhere that Related actually paid any money to Tesla (or that the holds were removed from the materials).

49

plaintiffs argue were "received and withheld as a result of conduct that constitutes a clear abuse of Ruthling's status as a fiduciary." Id. But this connection it not clear at all. Although Ruthling may have not been entitled to retain these refunds, his decision to divert them is at best a separate breach, not a consequence of his decision to withhold various shipments.

Moreover, defendants point to evidence that Ruthling's efforts to halt these shipments was a proper business decision taken in response to Related's failure to perform its obligations to fund Tesla's remaining work. See Email from Brenner to Ferraro dated April 28, 2014, Ex. 60, Dkt. 160-7 (forwarding Ruthling's email dated April 23 detailing various debts incurred by Skye Holdings and asking if "Skye is owed $1 million ++ or $757,000?"). As plaintiffs have failed to establish that Ruthling's purportedly improper delays caused them harm (or even that they caused delay), and there is a genuine dispute of material fact regarding the propriety of the conduct itself, plaintiffs' motion for summary judgment as to these actions is denied.

## C. Diversion of Funds

The manager of an LLC owes certain fiduciary duties even when a company is in the process of shutting down. See Comerica Bank v. Glob. Payments Direct, Inc., No. Civ. A. 9707, 2014 WL 3779025, at *14 (Del. Ch. Aug. 1, 2011). "Although the contours of those duties may be different after dissolution of an LLC during the wind up

period, they continue to encompass . . . an obligation to distribute the assets of the company promptly consistent with maximizing their value." Id. Where a fiduciary fails to wind up an LLC's "affairs promptly to serve the best interests of all its members," it has breached its fiduciary duty. Id.[17]

Plaintiffs argue that defendants breached their duties to Tesla during its wind-down period by: (1) transferring Tesla's intellectual property to Tesla II for no consideration, see Pl. Mem. at 16-17; (2) transferring Tesla's tools valued at $40,000 from the 111 Wacker Street project to a business associate, see id. at 17-18; and (3) transferring Tesla's cash, totaling approximately $70,000, to Skye Holdings; retaining a $25,000 refund check received in October 2014 without notifying Related; and retaining a $16,667 insurance refund check received on December 8, 2014 without notifying Related, see id. at 19. The Court reviews each issue in turn:

## (1) Intellectual Property

Plaintiffs argue that Ruthling transferred Tesla's intellectual property to Tesla II for no consideration. In connection with this transfer, plaintiffs seek $564,000, the amount, as discussed, that Skye Holdings improperly charged Tesla for intellectual property in 2013. But plaintiffs cannot recover

[17] Ruthling contests that he owed a duty to plaintiffs during the wind-down period, ETC. See Def. Opp. Mem. at 17.

51

the same $564,000 twice, and in so far as plaintiffs seek the
return of actual intellectual property currently possessed by
Tesla II, there is a genuine issue of material fact regarding any
information currently used by Tesla II belongs to Tesla, whether
it was what plaintiffs had paid $564,000 for, or whether plaintiffs
were entitled to the exclusive use of that information in
connection with the amounts they paid. Accordingly, plaintiffs'
motion as regards the theft of intellectual property during the
wind down period is denied.

**(2) Equipment**

Plaintiffs argue that defendants improperly seized expensive
tools and, despite valuing them at $40,000, transferred them to a
third-party business associate for $10,000 and retained the
proceeds. Defendants do not contest that they took the tools,
transferred them to their business associate, and kept the
proceeds. Rather, defendants argue that they had the authority to
do so. See Def. Opp. at 19.

But defendants point to no legal basis for acquisition and
sale of these tools. When Tesla ceased active operations it was
millions of dollars in debt to plaintiffs and plaintiffs also owned
an equity stake in the business. Ruthling and Skye Holdings had no
right to strip away Tesla's assets for themselves. Ruthling
provided no value to Tesla in exchange for these tools.
Accordingly, the Court finds that defendants are liable as a matter

of law for misappropriating the tools and awards damages in the
amount of $40,000.[18]

### (3) Cash Transfers and VAT Refunds

Plaintiffs argue that Ruthling improperly transferred
approximately $70,000 from Tesla's banks accounts in October 2014
and retained refunds totaling $42,667 paid out thereafter. See Pl.
Mem. at 19. Defendants argue that these transfers were proper and
that, at the very least, there is a question of fact whether Tesla
owed Related any of these monies because Related owed Skye Holdings
approximately $900,000 as of the wind-down. See Def. Opp. at 19-
20; Ruthling Dep. Nov. 16 at 263:22-264:5.

But once Tesla was defunct, any remaining cash and assets
were not needed to operate the business. Accordingly, Tesla was
contractually obligated to pay that cash according to Section 2 of
the Term Sheet: first in payment of taxes and then in repayment of
plaintiffs' advances. If Skye Holdings has a claim against Related
for $900,000 or even if Tesla has a claim against Related for
$900,000, that does not defeat Tesla's obligation to pay Related
its available cash. Moreover, defendants point to no provision in
the Term Sheet permitting them to pay the cash to themselves and

---

[18] Defendants argue that summary judgment as to this issue should
be denied because this allegation does not appear in the complaint.
But this issue is plainly covered by plaintiffs' allegations in
the complaint that Ruthling looted the company. See Am. Comp. ¶¶
9-10.

53

plainly the payments did not advance any business purpose of Tesla. Accordingly, the Court finds defendants liable as matter of law for diverting and retaining Tesla's cash including form its bank accounts, insurance refunds, and VAT refunds.

## IV. Remedies

Plaintiffs seek monetary damages in connection with the various above-mentioned breaches, as well as pre- and postjudgment interest, an award of costs and attorneys' fees, an injunction preventing defendants from further disposing of Tesla's assets, and an accounting of the company's remaining assets as of its closing on July 31, 2014 including any money that has passed through the company since then.[19]

Defendants do not address these requests in their answering papers. Accordingly, defendants waive any challenge to plaintiffs' calculation of damages and plaintiffs' request for equitable relief. See NML Capital, Ltd. v. Republic of Argentina, No. 05 Civ. 2434, 2009 WL 1528535, at *1 (S.D.N.Y. May 29, 2009) (argument regarding calculation of damages that defendant "chose not to address" in its opposition to summary judgment was waived).

---

[19] Plaintiffs withdraw their initial request for the appointment of a receiver to oversee Tesla's assets. See Letter dated May 25, 2018 at 1 n.1, Dkt. 177.

54

As regards monetary damages, the Court hereby awards damages in connection with the above-mentioned breaches in the amount of $2,057,451 plus pre- and postjudgment interest.

As regards injunctive relief, the Court grants plaintiffs' motion and accordingly hereby enjoins defendants from further disposing of Tesla's assets without prior permission of the Court.

As regards plaintiffs request for reasonable attorneys' fees and costs, under applicable Delaware law the Court has the discretion to shift fees if it finds that a party acted in bad faith. See Auriga Capital Corp. v. Gatz Props. LLC, 40 A.3d 839, 880-81 (Del. Ch.) ("[W]hether a party's conduct warrants fee shifting under the bad faith exception is a fact-intensive inquiry."), judgment entered sub nom. Auriga Capital Corp. v. Gatz Properties, LLC (Del. Ch. Feb. 23, 2012), aff'd, 59 A.3d 1206 (Del. 2012). A finding of bad faith requires "clear evidence" that the other side "acted in subjective bad faith" in their conduct of the litigation. Id. "The bad faith exception is not 'lightly' invoked." Id. (quoting Nagy v. Bistricer, 770 A.2d 43, 64 (Del. Ch. 2000)). In Auriga Capital this conduct included pushing "legally and factually implausible assertions," failing to collect "responsive documents," and generally raising the costs of litigation in order to induce a settlement. Id. Noting this standard, the Court defers any consideration of this question until the conclusion of the case.

As regards plaintiffs' request for an accounting, defendants argue by letter brief that plaintiffs are not entitled to an accounting of Tesla's assets because (1) Tesla is not a party to this lawsuit and (2) plaintiffs have an adequate remedy at law. See Letter dated June 1, 2018 at 2-3, Dkt. 179. But Ruthling and Skye Holdings are a party to this lawsuit and when "a fiduciary breaches its duties to a member of a limited liability company, that member may in appropriate circumstances obtain an order requiring the fiduciary to account for its actions." Gallagher v. Long, No. Civ. A. 8181, 2013 WL 718773, at *4 (Del. Ch. Feb. 28, 2013), aff'd, 65 A.3d 616 (Del. 2013). In order to learn the scope of defendants' misappropriations, Related is entitled to an accounting of how Ruthling and Skye Holdings disposed of Tesla's assets after it ceased operations on July 31, 2014. See also Technicorp Int'l II, Inc. v. Johnston, No. Civ. A. 15084, 2000 WL 713750, at *2 (Del. Ch. May 31, 2000) (where "corporate fiduciaries cause the corporation to pay moneys to themselves or to third parties, and the fiduciaries cannot document any legitimate business purpose for the expenditures," the Court is not "required to accept the fiduciaries' uncorroborated and self serving testimony of business purpose").[20]

---

[20] Related does not have an adequate remedy at law because defendants have sought to hide and divert Tesla's assets, for example, its VAT refunds. See Tesla Wall Sys. Dep. at 266-268.

Accordingly, Ruthling and Skye Holdings are hereby ordered to fund an accounting of how they disposed of Tesla's assets after July 31, 2014, to be conducted by an independent accounting firm to be selected by the parties and approved by the Court. See Carlson v. Hallinan, No. Civ. A. 19466, 2006 WL 1510759, at *2 (Del. Ch. May 22, 2006) (requiring a party to "bear the expense of the entire accounting" where that party failed to show that they dealt properly with the corporate funds entrusted to their case).

## V. Conclusion

For the reasons set forth above, the Court denies in full defendants' motion for summary judgment and grants in part and denies in part plaintiffs' motion for summary judgment as to Count VI. In connection with Count VI, the Court awards plaintiffs damages in the amount of $2,057,451, plus pre- and postjudgment interest in amounts to be determined at the end of the case. The Court also enjoins Carleton Ruthling and Skye Holdings from further disposing of the assets of Tesla Wall Systems LLC and orders that Ruthling and Skye Holdings select jointly with plaintiffs an independent accounting firm jointly with plaintiffs that Ruthling and Skye Holdings will fund to complete an accounting of their distribution of the company's assets beginning in or about July 31, 2014, including any actions they took to divert to other recipients any amounts due to the company after that date. The parties shall inform the Court of the selected accountant by no

later than July 11, 2018 and complete the accounting by no later than August 31, 2018.

The parties are reminded that the trial of all remaining claims and matters will commence on October 1, 2018.

The Clerk is instructed to close docket entry numbers 142 and 146. The Clerk is further instructed to close docket entry number 133, which was resolved by Memorandum Order dated January 29, 2018. See Dkt. 140.

SO ORDERED.

Dated: New York, NY
~~June~~ 2018

JED S. RAKOFF, U.S.D.J.